# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PILKINGTON NORTH AMERICA, INC. | Docket No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA and AON RISK SERVICES CENTRAL, INC. | **JURY DEMAND** |
| Defendants. | |

Plaintiff, Pilkington North America, Inc. ("Pilkington"), by and through its attorneys of record, as and for its Complaint against Defendants, Mitsui Sumitomo Insurance Company of America ("MSI") and Aon Risk Services Central, Inc. ("Aon"), alleges as follows:

## INTRODUCTION

1.      In this civil action, Plaintiff Pilkington seeks recompense concerning the substantial property damage and business interruption caused by a tornado that damaged or destroyed a factory owned and operated by Pilkington in Ottawa, Illinois on or around February 28, 2017.  Pilkington estimates that the tornado caused $60 million to $100 million of property damage and business interruption loss.

2.      Although Pilkington was insured at the time of the tornado under a commercial property and business interruption insurance policy issued by Defendant MSI, MSI has failed to fully indemnify Pilkington for Pilkington's loss.  Instead, as described more fully below, MSI has invoked a policy sublimit that was revised in 2016 at MSI's behest, without adequate notice of the revisions to Pilkington, to cap Pilkington's recovery at $15 million.

3.      Defendant Aon similarly has refused to accept responsibility for the faulty advice and other services that it gave to Pilkington (or the advice and services it failed to give) with respect to the policy revisions proposed by MSI, which, if permitted to stand, reduce Pilkington's available coverage for damage caused by the tornado by approximately $298 million.

4.      Pilkington therefore brings this action for relief, seeking reformation of the insurance contract, declaratory relief, monetary damages, attorneys' fees and costs, prejudgment interest, and such other and further relief as the Court may deem just and proper.

## PARTIES

5.      Plaintiff Pilkington is a Delaware corporation with its principal place of business at 811 Madison Avenue, Toledo, Ohio 43697.  Pilkington manufactures and markets glass and glazing products, primarily for the architectural and automotive markets, throughout the United States and North America.

6.      Defendant MSI is a property and casualty insurance company organized under the laws of the State of New York with its principal place of business at 560 Lexington Avenue, 20th Floor, New York, New York 10022.  MSI is licensed by the New York State Department of Financial Services to transact business in the State of New York and is engaged in the business of selling insurance policies.

7.      Defendant Aon is an Illinois corporation having a principal place of business at 200 East Randolph Street, Chicago, Illinois 60601.  Aon is licensed by the New York State Department of Financial Services to transact business in the State of New York and is engaged in the business of brokering insurance.  Upon information and belief, with respect to the events alleged herein, Aon has done business and/or operated both in its own name and as Aon Risk Services, Inc. of MI.

2

## JURISDICTION AND VENUE

8.      Federal subject matter jurisdiction exists under 28 U.S.C. § 1332, as Pilkington, MSI, and Aon are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9.      Certain claims herein arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  This Court may declare the rights and other legal relations of the parties under 28 U.S.C. §§ 2201 and 2202 because this is a case of actual controversy within the Court's jurisdiction.

10.     This Court has personal jurisdiction over MSI and Aon because MSI and Aon are qualified to do business in the State of New York, have transacted business in the State of New York with respect to the transactions alleged in this Complaint, and have consented to personal jurisdiction in the State of New York by virtue of the "Suit and Choice of Law" provision of the insurance policy herein at issue.  Additionally, MSI is incorporated under the laws of the State of New York and maintains its principal place of business in the State of New York.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because MSI is headquartered in this District, MSI and Aon are subject to the Court's personal jurisdiction, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTS

12.     Pilkington manufactures and markets glass and glazing products for the architectural and automotive markets.  Pilkington owns, operates, and/or manages several factories and other locations in North America dedicated to that purpose.

A.      **The Insurance Policy**

13.     From at least policy periods 2010–2011 through 2016–2017, Pilkington, as a fully owned subsidiary of NSG Holding USA II, Inc. ("NSG"), was insured under commercial

property and business interruption insurance policy number PKG3125760, issued by MSI to NSG (the "Policy").  NSG was a holding company that did not have any operations or active business.  Pilkington negotiated and procured the Policy on NSG's behalf to insure Pilkington's property and operations.

14.    MSI issued the Policy to NSG, covering Pilkington as NSG's subsidiary, for successive, annual policy periods.  Each policy period ran from April 1 to April 1 of the following year.  For example, the Policy as issued for the 2016–2017 policy period was in effect from April 1, 2016, to April 1, 2017.

15.    The Policy provides insurance for "direct physical loss of, or direct physical damage to, first-party property and directly resulting effect on income and expense as more specifically provided for in the" remainder of the Policy.

16.    At all times relevant to this action, Pilkington has promptly paid the annual premium required to keep the Policy in effect.

17.    Certain of Pilkington's properties that are insured under the Policy are located in the State of New York.

18.    Upon information and belief, the Policy was underwritten and issued by MSI in the State of New York.  The Policy identifies MSI's New York office as its "Home Office."

**B.    Aon's Relationship with Pilkington and to the Policy**

19.    Since at least 2010, Aon has brokered the Policy.

20.    As part of its brokering of the Policy, Aon has, among other things, prepared and submitted to MSI Pilkington's property submission relating to renewal of the Policy, presented the terms of renewal to Pilkington as part of Pilkington's annual insurance policy program proposal, advised Pilkington on the scope and terms of coverage, accepted premium payments from Pilkington and forwarded premium payments to MSI on Pilkington's behalf, provided

4

notice of various claims under the Policy to MSI on behalf of Pilkington, served as an intermediary between MSI and Pilkington, and administered the renewed Policy throughout the policy period.

21.   Upon information and belief, Aon has directly transacted business with MSI in the State of New York in connection with many of these activities.  Upon information and belief, Aon also has routinely included MSI personnel located in the State of New York on communications with other MSI personnel pertaining to the Policy.

22.   Throughout their business relationship, Pilkington has relied on Aon to advise and guide Pilkington on the scope and terms of the Policy.

23.   Aon understood that the Pilkington employees with whom the Aon brokers interacted did not have insurance expertise, and that Pilkington relied on Aon for guidance with respect to policy changes and renewals.

24.   It was standard practice between Aon and Pilkington for Aon to handle direct communications with Pilkington's insurers, and for Pilkington not to speak directly with or receive direct communications from its insurers. Instead, Aon would exercise its judgment about what information to relay to Pilkington, and Pilkington relied on Aon to inform it of what it needed to know with respect to its insurance program.

25.   As part of the policy renewal proposals that Aon presented to Pilkington in 2015 and 2016, Aon included its ARS US Business Terms, Edition Date June 20, 2014 (the "Contract").  A true and correct copy of the Contract is provided as **Exhibit 1**.

26.   Pilkington accepted the Contract when instructing Aon to bind the 2015–2016 and 2016–2017 insurance policy programs presented by Aon, on April 1, 2015; May 12, 2015; and April 4, 2016.  True and correct copies of the "instructions to bind" conveying Pilkington's

5

acceptance of the Contract for the relevant time periods are provided as **Exhibits 2**, **3**, and **4**, respectively.

27.     The Contract was in effect during the entirety of the 2015–2016 and 2016–2017 policy periods and governed the relationship of Pilkington and Aon with respect to the Policy.

28.     The Contract provides that, among other things, Aon would deliver the following services to Pilkington:

> In preparation for placing or renewing your insurance coverage, we will consult with you regarding insurance market conditions, the insurers we suggest be approached, our recommended program options to pursue, and out marketing strategy on your behalf.  By the conclusion of the marketing process, we will provide you with written information regarding the coverage details, policy terms and conditions provided by the markets. . . .

> We will obtain your instructions to us to bind specific programs based on the program proposal we provide. . . .

> ARS will administer your relationship with insurance companies including, where applicable, issues such as billings in connection with selected programs, data reporting, and compliance with negotiated requirements.

29.     The Contract also specifies that "[t]he role of the insurance producer such as ARS in any particular transaction involves review with insurance purchasers about the benefits and terms and conditions of insurance contracts and selling insurance."

30.     Aon's services were to be provided "unless and until either of us notifies the other that ARS is no longer acting as your broker of record."  Neither Pilkington nor Aon at any time prior to the Tornado advised the other that Aon was no longer acting as Pilkington's broker of record.

C.      **Pilkington's Property Damage Claim**

31.     On or around February 28, 2017, a factory owned and operated by Pilkington that is located at 300 20th Avenue, Ottawa, Illinois 61350 (the "Ottawa Factory") was devastated by a tornado (the "Tornado").

32.     Pilkington estimates that it has suffered property damage and business interruption loss of $60 million to $100 million as a result of the destruction caused by the Tornado.

33.     At the time the Tornado struck the Ottawa Factory, Pilkington was insured under the Policy.  The Policy limit was €300,000,000, or $319,382,700, per Occurrence excess of deductible.  The Policy insured the Ottawa Factory.

34.     Pilkington timely submitted its claim for property damage and business interruption loss resulting from the Tornado to MSI for indemnification under the Policy (the "Claim"), and all pertinent conditions of coverage have been satisfied.

35.     The Claim is covered under the Policy as issued for the 2016–2017 policy period.

36.     None of the Policy's various coverage conditions and/or exclusions preclude coverage for Pilkington's loss.

37.     MSI indemnified Pilkington for $15 million of the Claim but denied coverage for the remainder on the ground that a Policy sublimit applicable to losses resulting from windstorms (the "Windstorm Sublimit") capped coverage for the Tornado at $15 million.

38.     The Windstorm Sublimit that appears in the 2016–2017 Policy differs from the sublimit that appeared in the 2015–2016 Policy, as originally issued, due to revisions made to the sublimit in 2016 at MSI's request.

**D.    The Original Windstorm Sublimit**

39.    As issued for policy periods 2010–2011 through 2015–2016, the Policy contained a Windstorm Sublimit that applied to "**Windstorm caused by Named Storm** combined per occurrence and in the annual aggregate" (the "Original Windstorm Sublimit").  A true and correct copy of the Policy as originally issued for the 2015-2016 policy period is provided as **Exhibit 5**.

40.    The Policy defines "Windstorm" as "[t]he direct action of wind, or the direct action of hail (regardless of whether hail is accompanied by wind)," with certain exceptions.

41.    The Policy defines "Named Storm" as:

> [A] weather or atmospheric condition that has been declared as a hurricane, typhoon, tropical storm or cyclone by the U.S. National Weather service, World Meteorological Organization, Australia Bureau of Meteorology, Philippine Atmospheric, Geophysical & Astronomical Services Administration, the Seychelles Meteorological Service or a similar weather organization.

42.    The Tornado that destroyed the Ottawa Factory was not caused by "a weather or atmospheric condition that ha[d] been declared as a hurricane, typhoon, tropical storm or cyclone by" any of the weather organizations named in the Policy's definition of "Named Storm" or any similar weather organizations.

43.    The Tornado that destroyed the Ottawa Factory therefore was not a "Windstorm caused by Named Storm" within the meaning of the Policy.

**E.    The Revised Windstorm Sublimit**

44.    Although the wording of the Windstorm Sublimit in the Policy as issued for the 2010–2011 through 2015–2016 policy periods does not describe the Tornado and therefore would not have applied to limit coverage for Pilkington's Claim had it remained in effect, the Windstorm Sublimit was revised by means of an endorsement proposed by MSI to Aon during

8

the 2015–2016 policy period (the "Endorsement").  A true and correct copy of the Policy

Declarations as revised by the Endorsement is provided as **Exhibit 6**.

45.     The Windstorm Sublimit, as revised by the Endorsement, applies to "**U.S.**

**Windstorm** combined per occurrence and in the annual aggregate" (the "Revised Windstorm

Sublimit").

46.     The Policy does not define "U.S. Windstorm."

47.     Aon transmitted Pilkington's consent to the Endorsement, including the Revised

Windstorm Sublimit, to MSI in New York on January 19, 2016.

48.     Aon shortly thereafter incorporated the Revised Windstorm Sublimit into the

property submission that it proposed for Pilkington and submitted to MSI for the 2016–2017

policy period.

49.     Aon's incorporation of the Revised Windstorm Sublimit into the 2016–2017

property submission caused MSI to issue the 2016–2017 Policy with the Revised Windstorm

Sublimit, rather than the Original Windstorm Sublimit.  A true and correct copy of the Policy as

issued for the 2016–2017 policy period is provided as **Exhibit 7**.

50.     Upon information and belief, Aon conducted at least a portion of the negotiations

for renewal of the Policy for the 2016–2017 period with MSI in New York.

51.     MSI has refused to fully indemnify Pilkington for the Claim as a result of the

Revised Windstorm Sublimit in the 2016–2017 Policy.

**F.     MSI's Failure to Provide Adequate Notice of the Revision to the Windstorm
         Sublimit**

52.     Upon information and belief, MSI first proposed a revision to the Windstorm

Sublimit by e-mail to Aon on June 2, 2015, as one of several changes to the policy limit and

various sublimits in the Policy.

53.     MSI's e-mail disclosed only that MSI proposed to increase the value of some of the Policy's limit/sublimits and decrease others—revisions that MSI's representative said were needed to address "figures [that] were incorrect" due to "redundancy" and "the exchange rate." MSI's e-mail said nothing about changing the scope or wording of any sublimits.  In the same e-mail, MSI's representative assured Aon that the proposed changes "will have mixed impact on the coverage, but overall, I believe those changes will not affect too much on client [i.e., Pilkington], except the overall limit has increased by $62.2 million."

54.     MSI's e-mail included an attached Excel file that listed all of the sublimits in the Policy and showed changes to certain of those sublimits.  Although MSI's e-mail did not disclose any proposed changes to the wording of any of the sublimits, in the Excel file, the Windstorm Sublimit is annotated "Partially Delete" and is modified with a strikethrough as follows: "Windstorm ~~caused by Named Storm combined per occurrence and in the annual aggregate~~."

55.     MSI did not copy Pilkington on, and Pilkington did not otherwise receive, MSI's June 2, 2015, e-mail to Aon or its attachment.

56.     Upon information and belief, MSI did not contact Aon again regarding the proposed revisions until approximately five months later, in November 2015.

57.     On November 24, 2015, MSI e-mailed Aon proposed revised Policy Declarations to effect changes to the limit and sublimits of the Policy.  MSI's e-mail did not refer to its earlier e-mail of June 2, 2015, or the Excel file attached to its June 2 e-mail.

58.     The proposed revised Policy Declarations attached to MSI's November 24, 2015, e-mail reflected a new, proposed Windstorm Sublimit wording:  "U.S. Windstorm combined per occurrence and in the annual aggregate."  However, the wording of the sublimit was not marked in any way to indicate that it had been revised.

10

59.     As an attachment to its November 24, 2015, e-mail, MSI also sent Aon an Excel file that the e-mail described as "the comparison of major items."  Upon information and belief, the Excel file did not indicate that any change was proposed with respect to the Windstorm Sublimit.

60.     MSI's e-mail asked Aon to "start negotiating with client at the earliest," referring to Pilkington.

61.     MSI did not copy Pilkington on MSI's November 24, 2015, e-mail to Aon.

62.     On December 14, 2015, MSI e-mailed Aon the proposed revised version of the Policy Declarations that would be incorporated into the Policy through the Endorsement, which included the Revised Windstorm Sublimit wording.

63.     Pilkington was copied on MSI's December 14, 2015, e-mail.  However, the text of MSI's e-mail did not address any of the revisions that were proposed, and the attachment did not flag in any way the proposed changes to the wording of the Windstorm Sublimit.

64.     On January 19, 2016, Aon transmitted to MSI in New York Pilkington's authorization to execute the Endorsement, and the Endorsement became part of Pilkington's Policy.  The Policy premium was not reduced as a result of the Endorsement.

65.     In its transmission, Aon expressly notified MSI that Pilkington's consent was "based on the property limit presentation provided by [MSI] (attached) and the assurance no other terms and conditions other than valuation were included in the endorsement . . . ."  Upon information and belief, the "property limit presentation" referenced in Aon's January 19, 2016, e-mail was the same document as the "comparison of major items" provided by MSI as an attachment to its November 24, 2015, e-mail.

**G.      Aon's Failure to Ascertain or Define the Scope of the Revised Windstorm Sublimit**

66.     Aon received MSI's June 2, 2015, e-mail that attached the Excel file in which the Windstorm Sublimit is annotated "Partially Delete" and is modified with a strikethrough. However, Aon did not provide MSI's June 2, 2015, e-mail or its attachment to Pilkington or otherwise notify Pilkington of the e-mail or its attachment.

67.     Aon similarly received MSI's November 24, 2015, e-mail and its attachments but did not provide them to Pilkington.

68.     Upon information and belief, on or around January 17 or 18, 2016, Aon conferred with MSI over the telephone about MSI's proposed Endorsement.

69.     Upon information and belief, sometime prior to that phone call, despite the fact that the Policy does not define "U.S. Windstorm," Aon independently formed the understanding that the Policy defined U.S. Windstorm by reference to High Hazard Wind Zones and Moderate Hazard Wind Zones (as defined in the Policy), and that the Revised Windstorm Sublimit would apply only to windstorms in occurring within those Zones.

70.     Upon information and belief, during its January 2016 call with MSI, Aon conveyed its mistaken understanding that the Policy defined "U.S. Windstorm" and that the sublimit for U.S. Windstorm would apply only to High Hazard Wind Zones and Moderate Hazard Wind Zones.  MSI did not contradict Aon's statement, and Aon did not ask any questions about or further discuss the proposed revisions to the Windstorm Sublimit.

71.     The Ottawa Factory is not located within High Hazard Wind Zones or Moderate Hazard Wind Zones, as those terms are defined in the Policy.  If the Revised Windstorm Sublimit applied only to High Hazard Wind Zones or Moderate Hazard Wind Zones, the loss resulting from the Tornado would not be subject to the Windstorm Sublimit, and would be fully covered up to the Policy limit.

12

72.     However, as described above, the Policy does not define "U.S. Windstorm" at all and does not define "Windstorm" by reference to High Hazard Wind Zones or Moderate Hazard Wind Zones, nor does the Policy provide that the Revised Windstorm Sublimit will apply only with respect to windstorms in those Zones.

73.     Though recognizing that the proposed Endorsement revised the language of the Windstorm Sublimit, Aon failed to take any action that would have led it to learn that the Policy does not define U.S. Windstorm or otherwise limit the scope of U.S. Windstorm or of the Revised Windstorm Sublimit to High Hazard Wind Zones and Moderate Hazard Wind Zones.

74.     Aon further failed to take any action to ensure that the Endorsement specified that the Revised Windstorm Sublimit would apply only to High Hazard Wind Zones and Moderate Hazard Wind Zones.  That is, Aon failed to take any action to ensure that the language of the Policy reflected and effected Aon's understanding of how the revised sublimit would apply.

**H.      Aon's Failure to Advise Pilkington of MSI's Proposed Changes to the Windstorm Sublimit**

75.     Upon information and belief, following its telephone call with MSI on or around January 17 or 18, 2016, Aon called Pilkington to advise Pilkington concerning the effects of the changes to the Policy that would be made by MSI's proposed Endorsement.

76.     Aon knew that Pilkington lacked insurance expertise and was relying on Aon's advice and guidance to decide whether to accept or reject the proposed Endorsement.

77.     Aon incorrectly advised Pilkington that the proposed Endorsement would change only the values of the Policy limit and sublimits to correct currency valuations.

78.     Aon further advised Pilkington that the changes made by the proposed Endorsement were acceptable and recommended that Pilkington accept them.

79.     Aon failed to notify Pilkington that the proposed Endorsement revised the wording of the Windstorm Sublimit and failed to advise Pilkington that the Endorsement would reduce Pilkington's available coverage for loss caused by certain Windstorms by approximately $298 million.

80.     Aon further failed to recommend that Pilkington reject the proposed Endorsement due to its reduction of coverage for U.S. Windstorms other than those caused by Named Storms, or to advise Pilkington to take any other action to protect itself from the proposed reduction in coverage.

81.     Relying on Aon's advice and guidance, Pilkington consented to the Endorsement under the mistaken belief that the endorsement made changes to the values of the Policy limit and sublimits only, and that it did not change the wording of any sublimits, including the Windstorm Sublimit.

82.     Shortly after transmitting Pilkington's "consent" to the Endorsement to MSI in January 2016, in or around the period March 26 to 28, 2016, Aon prepared Pilkington's property proposal in connection with the renewal of the Policy for policy period 2016–2017.

83.     Without conferring with Pilkington on the matter, Aon incorporated the Revised Windstorm Sublimit into Pilkington's property proposal for the 2016–2017 policy period.

84.     In doing so, Aon failed to properly consider or advise Pilkington on the potential detrimental effect that incorporating the Revised Windstorm Sublimit into the 2016–2017 Policy would have on Pilkington's insurance coverage.  Aon also failed to explain to Pilkington at any time prior to the Tornado how the 2016–2017 Policy would differ from the 2015–2016 Policy, as issued, with respect to coverage for loss due to windstorms.

85.     On March 28, 2016, Aon sent MSI the 2016–2017 property proposal that Aon had prepared.

86.     On information and belief, at least some portion of the negotiations between Aon and MSI with respect to the 2016–2017 Policy took place in New York, including emails sent to and/or from New York.

87.     Due to Aon's incorporation of the Revised Windstorm Sublimit into Pilkington's 2016–2017 property proposal, the Policy as issued for policy period 2016–2017 contained the Revised Windstorm Sublimit.

88.     On information and belief, Aon's incorporation of the Revised Windstorm Sublimit into Pilkington's 2016–2017 property proposal was a direct result of Pilkington having unknowingly "consented" to the Endorsement during the 2015–2016 policy period.  As described above, Aon's e-mail transmitting Pilkington's "consent" to the Endorsement expressly based that "consent" on MSI's "property limit presentation"—i.e., MSI's "comparison of major items"—and MSI's "assurance [that] no other terms and conditions other than valuation were included in the endorsement."

I.      **Impact of the Revised Windstorm Sublimit on Pilkington's Coverage**

89.     As Pilkington's insurer and broker, respectively, MSI and Aon knew that the limit of the 2015–2016 Policy, as originally issued, was $313 million, and that the limit of the 2015–2016 Policy, as revised, and of the 2016–2017 Policy, as issued, was €300 million.  Furthermore, both MSI and Aon knew that coverage for loss falling under the Windstorm Sublimit was limited to only $15 million.

90.     Yet, MSI failed to adequately communicate to Aon or Pilkington the Policy revisions that MSI proposed with respect to the scope of the Windstorm Sublimit, which expanded the range of losses that would be included within the sublimit.

15

91.     Specifically, MSI failed to describe or otherwise flag the proposed revisions to the Windstorm Sublimit in the body of its June 2, 2015, November 24, 2015, or December 14, 2015 e-mails; misleadingly described the proposed revisions as pertaining to valuation only; failed to refer back to the attachment to its June 2, 2015 e-mail in later communications; failed to flag the proposed revisions to the Windstorm Sublimit language in the attachments to the November 24, 2015 e-mail; failed to flag the proposed revisions to the Windstorm Sublimit language in the proposed endorsement attached to the December 14, 2015 e-mail; failed to correct Aon's mistaken understanding of the scope of the proposed revisions; and failed to respond to Aon's statement that it was accepting the revisions that MSI had requested to the 2015–2016 Policy in reliance on MSI's "assurance no other terms and conditions other than valuation were included in the endorsement."

92.     Due to MSI's failure to provide adequate notice of its proposed revisions to the Windstorm Sublimit, Pilkington did not know that the Endorsement would affect the scope of the Windstorm Sublimit when it agreed to the Endorsement.  Pilkington did not intend to consent to such a change to the Policy.

93.     As a direct and proximate result of MSI's conduct, Pilkington's available coverage for the Claim was reduced by approximately $298 million.

**J.    Aon's Awareness of the Significance of the Windstorm Sublimit to Pilkington's Coverage**

94.     Despite MSI's failure to provide adequate notice, Aon recognized that the Endorsement revised the language of the Windstorm Sublimit.

95.     Further, as an experienced insurance broker, Aon understood that the wording of a policy sublimit—like the wording of any limitation on coverage, such as an exclusion—could have profound consequences for the coverage available for a given loss under an insurance

policy. Likewise, Aon knew that the total policy limits for Pilkington's property policy were in excess of $300 million, and that the Windstorm Sublimit drastically reduced coverage for certain losses to $15 million—a reduction of over 95%.

96.     Yet, despite Aon's acknowledged awareness that the wording of the Windstorm Sublimit was changing, and its knowledge that the wording would have significant consequences for Pilkington's available coverage for certain losses—in short, despite the obvious risk of serious harm to Pilkington from an unfavorably worded sublimit—Aon failed to take any action to protect Pilkington's interests with respect to the Windstorm Sublimit.

97.     Specifically, among other things, despite its knowledge that the Revised Windstorm Sublimit would materially and detrimentally alter the insurance that Pilkington had enjoyed, Aon failed to take any action to circumscribe the effects of the revision to the Windstorm Sublimit in the proposed Endorsement, to ensure that the Policy reflected Aon's understanding of the effect of the Revised Windstorm Sublimit, to notify Pilkington of the proposed change to the Windstorm Sublimit wording, to advise Pilkington that the proposed change would reduce coverage for loss caused by U.S. Windstorms other than those caused by Named Storms, to recommend that Pilkington reject the change or protect itself from the effects of the revision by other means, or to properly consider, or advise Pilkington concerning, the potential detrimental effect of incorporating the Revised Windstorm Sublimit into the 2016–2017 Policy.

98.     Aon's failures, individually and collectively, constitute wanton, willful, and/or grossly negligent misconduct.

99.     As a direct and proximate result of Aon's faulty advice, Aon's failures to warn Pilkington of the effects of the revision to the Windstorm Sublimit, and Aon's breaches of its

professional obligations to Pilkington, Pilkington's available coverage for the Claim was reduced by approximately $298 million.

## FIRST CLAIM FOR RELIEF

### (For Reformation of Contract Against MSI)

100.    Pilkington repeats and incorporates by reference the allegations in paragraphs 1 through 99 above as if set forth in full herein.

101.    The Original Windstorm Sublimit appeared in the Policy as originally issued for the 2015–2016 policy period.  In January 2016, Pilkington agreed to an Endorsement proposed by MSI that effected several changes to the Policy.  Among other things, the Endorsement changed the value of several of the Policy's limit/sublimits.  The Endorsement also revised the language of the Windstorm Sublimit, replacing the Original Windstorm Sublimit with the Revised Windstorm Sublimit.

102.    When proposing the Endorsement, however, MSI represented to Aon that the Endorsement merely increased the value of some of the Policy's limit/sublimits and decreased others.  MSI did not disclose that the Endorsement would effect any change to the scope of the Windstorm Sublimit.  Furthermore, the "comparison of major items" provided by MSI to flag the changes that would be made to the Policy by the Endorsement did not indicate that any change was proposed with respect to the Windstorm Sublimit.

103.    When transmitting Pilkington's assent to the Endorsement to MSI, Aon specifically notified MSI that Pilkington's assent was premised on the "property limit presentation"—i.e., the "comparison of major items"—provided by MSI and on MSI's assurance that no terms and conditions other than valuation were included in the endorsement.

104.    The revisions to the Windstorm Sublimit effected by the Endorsement were the product of fraud or mutual mistake and fail to express the actual and real agreement of MSI and Pilkington.

105.    Pilkington is entitled to reformation of the Policy for the 2015–2016 and 2016–2017 policy periods to reflect the agreement between MSI and Pilkington that the Endorsement was to effect changes only to Policy valuations, and not to the language of the Windstorm Sublimit.  In other words, Pilkington is entitled to reformation of the Policy to restore the Original Windstorm Sublimit to the Policy Declarations in place of the Revised Windstorm Sublimit.

106.    Pilkington is entitled to enforce the Policy, as reformed, and is entitled to the benefits of the Policy, as reformed.

## SECOND CLAIM FOR RELIEF

### (For Breach of Contract Against MSI)

107.    Pilkington repeats and incorporates by reference the allegations in paragraphs 1 through 99 above as if set forth in full herein.

108.    At all times hereinafter mentioned, NSG and Pilkington had an insurable interest in the Ottawa Factory, which was insured by the Policy.

109.    At all times relevant hereto, Pilkington has paid, and MSI has received, all premiums due under the Policy, and Pilkington has complied with all other terms, provisions, and conditions of the Policy.

110.    While the Policy was in full force and effect, Pilkington suffered damage to the Ottawa Factory as a result of the Tornado.

111.    Due to the aforesaid damage, Pilkington suffered a property damage and business interruption loss in an amount estimated to exceed $60 million, which is covered by the Policy.

112.    Notwithstanding the fact that Pilkington timely submitted the Claim to MSI under the Policy, MSI failed to fully indemnify Pilkington for its loss, up to the Policy limit.

113.    By failing to fully indemnify Pilkington up to the Policy limit, MSI has breached its insurance contract with Pilkington.

114.    As a direct and proximate result of MSI's breach of contract, Pilkington has been deprived of the benefits of insurance coverage for which substantial premiums were paid, and has sustained actual damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (For Declaratory Relief Against MSI)

115.    Pilkington repeats and incorporates by reference the allegations in paragraphs 1 through 99 above as if set forth in full herein.

116.    MSI has disputed its obligation to indemnify the amounts incurred by Pilkington as property damage and business interruption loss arising from the Tornado.

117.    Actual and justiciable controversies currently exist between Pilkington and MSI with respect to MSI's obligation to pay Pilkington's loss arising from the Tornado, including, but not limited to, whether the Revised Windstorm Sublimit was in effect at the time of the loss and, if so, whether it will be enforced as written despite the circumstances by which it came to be in the Policy.

118.    Pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Pilkington requests a declaration that Pilkington's loss is covered under the Policy and that MSI

is obligated to provide coverage for the full amount of Pilkington's loss up to the Policy limit of €300,000,000 per Occurrence excess of deductible.

## FOURTH CLAIM FOR RELIEF

### (For Breach of the Implied Duty of Good Faith and Fair Dealing Against MSI)

119.  Pilkington repeats and incorporates by reference the allegations in paragraphs 1 through 99 above as if set forth in full herein.

120.  An implied covenant of good faith and fair dealing exists in every contract, including the Policy.  The covenant requires each party to the contract to refrain from doing anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

121.  MSI breached the Policy's implied covenant of good faith and fair dealing by misrepresenting to Aon and Pilkington that MSI's proposed Endorsement changed only the valuations in the Policy.  By employing this false premise to induce Pilkington to assent to the Endorsement, MSI wrongfully deprived Pilkington of the full benefit of Pilkington's contractual insurance coverage for loss caused by Windstorms other than Named Storms.

122.  Specifically, among other acts as discovery may reveal, MSI has breached the Policy's implied covenant of good faith and fair dealing by:

(a)     failing to describe or otherwise flag the proposed revisions to the Windstorm Sublimit in the bodies of its June 2, 2015, November 24, 2015, and/or December 14, 2015, e-mails;

(b)     misrepresenting that the proposed revisions pertained to valuations only;

(c)     failing to refer to or re-attach the attachment to its June 2, 2015, e-mail in its November 24, 2015, and/or December 14, 2015, e-mails;

(d)      failing to flag the proposed revisions to the Windstorm Sublimit language in the attachments to the November 24, 2015 e-mail, including in the "comparison of major items";

(e)      failing to flag the proposed revisions to the Windstorm Sublimit language in the proposed endorsement attached to the December 14, 2015, e-mail;

(f)      failing to correct Aon's mistaken understanding that the proposed Revised Windstorm Sublimit would apply to High Hazard Wind Zones and Moderate Hazard Wind Zones only; and

(g)      failing to clarify that the Endorsement altered the language of the Windstorm Sublimit when Aon expressly stated that Pilkington's consent to the Endorsement was premised on MSI's representations that the Endorsement effected only the changes set forth in the "comparison of major items" and only affected Policy currency valuations.

123.      As a direct and proximate result of MSI's breach of the implied covenant of good faith and fair dealing, Pilkington has been deprived of the benefits of insurance coverage for which substantial premiums were paid, and has sustained actual damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### (For Breach of Contract Against Aon)

124.      Pilkington repeats and incorporates by reference the allegations in paragraphs 1 through 99 above as if set forth in full herein.

125.      In the Contract, Aon undertook, among other things, an ongoing duty to administer Pilkington's relationship with insurance companies, to advise Pilkington on the benefits and terms and conditions of its insurance contracts, and to recommend insurance program renewal options.

126.    Among other acts as discovery may reveal, Aon has breached its contractual obligations to Pilkington by failing to:

(a)    take any action to circumscribe the effects of the revision to the Windstorm Sublimit in MSI's proposed Endorsement;

(b)    ensure that the Policy reflected Aon's understanding of the effect of the Revised Windstorm Sublimit, i.e., that the sublimit for U.S. Windstorm would not apply to any Windstorm occurring outside of High Hazard Wind Zones or Moderate Hazard Wind Zones;

(c)    notify Pilkington that the proposed Endorsement changed the Windstorm Sublimit wording;

(d)    advise Pilkington that the change to the Windstorm Sublimit proposed in the Endorsement would reduce coverage for loss caused by U.S. Windstorms other than Named Storms;

(e)    recommend that Pilkington reject the proposed Endorsement or protect itself from the effects of the revision to the Windstorm Sublimit by other means;

(f)    properly consider or confer with Pilkington concerning the potential detrimental effect of incorporating the Revised Windstorm Sublimit into the 2016–2017 Policy;

(g)    notify Pilkington that the 2016–2017 Policy as proposed contained the Revised Windstorm Sublimit; or

(h)    recommend that Pilkington refuse to bind the 2016–2017 Policy with the Revised Windstorm Sublimit.

127.    As a direct result of Aon's breach of its obligations under the Contract, MSI has refused to indemnify Pilkington for the Claim in excess of $15 million, and Pilkington has been deprived of the full benefit of the insurance coverage for property damage and business

interruption loss caused by Windstorms that Pilkington historically had procured and did not intend to relinquish.

128.    As a direct result of Aon's breach of its obligations under the Contract, Pilkington has been forced to incur and will continue to incur consequential damages, including, without limitation, attorneys' fees and other expenses in bringing this action.

129.    As a direct and proximate result of the aforesaid actions and omissions by Aon, Pilkington has sustained actual damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### (For Intentional Misrepresentation Against Aon)

130.    Pilkington repeats and incorporates by reference the allegations in paragraphs 1 through 99 above as if set forth in full herein.

131.    In its capacity as an insurance broker, Aon had an obligation and a duty to accurately convey to Pilkington all material information that Pilkington needed to determine whether to accept or reject MSI's proposed changes to the 2015–2016 Policy and whether to bind the 2016–2017 Policy containing the changes.

132.    Aon knew that MSI's proposed Endorsement revised the language of the Windstorm Sublimit in such a way as to materially and detrimentally alter the insurance coverage that Pilkington had enjoyed.

133.    Among other acts as discovery may reveal, Aon breached its duty to Pilkington by:

(a)    failing to provide to Pilkington copies of material communications from MSI relating to the Endorsement;

(b)     falsely stating to Pilkington that the Endorsement changed only the currency valuations of the limit and certain sublimits, even though the Endorsement actually proposed a revision to the wording of the Windstorm Sublimit and Aon was aware that the wording had changed;

(c)     falsely stating to Pilkington that the Endorsement was acceptable and did not effect any material changes to Pilkington's coverage;

(d)     advising Pilkington to accept the Endorsement;

(e)     concealing from Pilkington Aon's actual understanding of the changes, including, but not limited to, Aon's understanding that the Endorsement did change the Windstorm Sublimit wording, that the Policy defined Windstorm by reference to High Hazard Wind Zones and Moderate Hazard Wind Zones, and that the Revised Windstorm Sublimit would not apply to any Windstorm occurring outside of High Hazard Wind Zones or Moderate Hazard Wind Zones;

(f)     failing to advise Pilkington that the proposal for the 2016–2017 policy incorporated the Revised Windstorm Sublimit;

(i)     falsely implying to Pilkington by failing to advise Pilkington otherwise that the 2016–2017 Policy proposal requested coverage materially identical to that requested in the 2015–2016 Policy proposal and provided by the 2015–2016 Policy as originally issued;

(k)     falsely implying to Pilkington by failing to advise Pilkington otherwise that, by binding the 2016–2017 policy, Pilkington would receive coverage materially identical to that provided by the 2015–2016 Policy as originally issued.

134.    Aon made these misrepresentations knowing that Pilkington lacked insurance expertise and would rely on Aon's representations when deciding whether to accept or reject the Endorsement and whether to bind the 2016–2017 Policy, as proposed.

135.    Likewise, when Aon misrepresented to Pilkington that the Endorsement did not change any terms other than the currency valuations of the limit and certain sublimits, Aon was aware that its statements were false, that Pilkington had not received any explanation of the Endorsement directly from MSI, and that Pilkington was relying on Aon's summary of the Endorsement and on Aon's advice to proceed with the Endorsement in making its decision whether to approve the Endorsement.

136.    Pilkington relied on Aon's faulty advice and misrepresentations when accepting MSI's proposed Endorsement and when instructing that the 2016–2017 Policy be bound in accordance with Aon's policy proposal.

137.    As a direct and proximate result of the aforesaid actions and omissions by Aon, Pilkington has sustained actual damages in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### (For Negligence Against Aon)

138.    Pilkington repeats and incorporates by reference the allegations in paragraphs 1 through 99 above as if set forth in full herein.

139.    In its capacity as an insurance broker, Aon had an obligation and a duty to advise Pilkington with respect to MSI's proposed changes to the 2015–2016 Policy and to broker a renewal Policy for policy period 2016–2017.  Aon was obligated to exercise reasonable care in completing these undertakings.

140.    Aon failed to exercise reasonable care in analyzing the changes that would be made to the Policy by the Endorsement, in advising Pilkington regarding the changes that would be made to the Policy by the Endorsement, and in brokering Pilkington's renewal Policy for policy period 2016–2017.

141.    Among other acts as discovery may reveal, Aon breached its duty to exercise reasonable care by:

(a)    failing to provide copies to Pilkington of material communications from MSI relating to the Endorsement;

(b)    inaccurately advising Pilkington that the Endorsement did not change any terms other than the currency valuations of the limit and certain sublimits;

(c)    failing to inform Pilkington that the Endorsement proposed a revision to the language of the Windstorm Sublimit;

(d)    failing to analyze the Policy to determine whether the Policy defined Windstorm by reference to High Hazard Wind Zones and Moderate Hazard Wind Zones;

(e)    failing to propose revisions to the proposed Endorsement that would have expressed in clear language the understanding that Aon believed applied to the Revised Windstorm Sublimit—i.e., that the sublimit for U.S. Windstorm would not apply to any Windstorm occurring outside of High Hazard Wind Zones or Moderate Hazard Wind Zones;

(f)    failing to propose language for the 2016–2017 Policy that either mirrored the Original Windstorm Sublimit or expressed in clear language the understanding that Aon believed applied to the Revised Windstorm Sublimit—i.e., that the sublimit for U.S. Windstorm would not apply to any Windstorm occurring outside of High Hazard Wind Zones or Moderate Hazard Wind Zones;

(g)    failing to advise Pilkington to reject the Endorsement or otherwise protect itself from the change to the Windstorm Sublimit in the Endorsement;

(h)    failing to confer with Pilkington before incorporating the Revised Windstorm Sublimit into Pilkington's proposal for the 2016–2017 Policy;

(i)    failing to ensure that the 2016–2017 Policy proposal did not differ materially from the 2015–2016 Policy proposal;

(j)    failing to inform Pilkington that the 2016–2017 Policy, as proposed, contained the Revised Windstorm Sublimit; and

(k)    failing to advise Pilkington not to bind the 2016–2017 Policy containing the Revised Windstorm Sublimit.

142.    When Aon advised Pilkington that the Endorsement did not change any terms other than the currency valuations of the limit and certain sublimits, Aon was aware that its statements were false and that Pilkington had not received any explanation of the Endorsement from MSI, and that Pilkington was relying upon Aon's summary of the Endorsement and upon Aon's advice to proceed with the Endorsement in making its decision whether to approve the Endorsement.

143.    Further, Pilkington made the decision to approve the Endorsement in reliance upon the description of the Endorsement provided by Aon.

144.    When Aon submitted the 2016–2017 policy proposal on Pilkington's behalf, Aon knew that Pilkington expected the Windstorm Sublimit in the 2016–2017 renewal policy to mirror the Original Windstorm Sublimit set forth in the 2015–2016 policy as originally issued, and that it was relying upon Aon to procure a renewal policy that did not materially change this coverage.

145.    As a direct and proximate result of the aforesaid actions and omissions by Aon, Pilkington has sustained actual damages in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### (For Negligent Misrepresentation Against Aon)

146.    Pilkington repeats and incorporates by reference the allegations in paragraphs 1 through 99 above as if set forth in full herein.

147.    In its capacity as an insurance broker, Aon had an obligation and a duty to convey information pertaining to Pilkington's policies to Pilkington with reasonable care.

148.    Aon failed to exercise reasonable care both in analyzing the changes that would be made to the Policy by the Endorsement and in conveying information to Pilkington regarding the changes that would be made to the Policy by the Endorsement.

149.    Among other acts as discovery may reveal, Aon breached its duty to exercise reasonable care by:

(a)    failing to provide copies to Pilkington of material communications from MSI relating to the Endorsement;

(b)    falsely stating to Pilkington that the Endorsement did not change any terms other than the currency valuations of the limit and certain sublimits;

(c)    failing to inform Pilkington that the Endorsement proposed a revision to the language of the Windstorm Sublimit;

(d)    failing to analyze the Policy to determine whether the Policy defined Windstorm by reference to High Hazard Wind Zones and Moderate Hazard Wind Zones;

(e)    failing to propose revisions to the proposed Endorsement that would have expressed in clear language the understanding that Aon believed applied to the Revised Windstorm Sublimit—i.e., that the sublimit for U.S. Windstorm would not apply to any Windstorm occurring outside of High Hazard Wind Zones or Moderate Hazard Wind Zones;

(f)     failing to propose language for the 2016–2017 Policy that either mirrored the Original Windstorm Sublimit or expressed in clear language the understanding that Aon believed applied to the Revised Windstorm Sublimit—i.e., that the sublimit for U.S. Windstorm would not apply to any Windstorm occurring outside of High Hazard Wind Zones or Moderate Hazard Wind Zones;

(g)     failing to advise Pilkington to reject the Endorsement or otherwise protect itself from the change to the Windstorm Sublimit in the Endorsement;

(h)     failing to confer with Pilkington before incorporating the Revised Windstorm Sublimit into Pilkington's proposal for the 2016–2017 Policy;

(i)     failing to ensure that the 2016–2017 Policy proposal did not differ materially from the 2015-2016 Policy proposal;

(j)     failing to inform Pilkington that the 2016–2017 Policy, as proposed, contained the Revised Windstorm Sublimit; and

(k)     failing to advise Pilkington not to bind the 2016–2017 Policy containing the Revised Windstorm Sublimit.

150.    When Aon advised Pilkington that the Endorsement did not change any terms other than the currency valuations of the limit and certain sublimits, Aon was or should have been aware that its statements were false, that Pilkington had not received any explanation of the Endorsement directly from MSI, and that Pilkington was relying on Aon's summary of the Endorsement and on Aon's advice in making its decision whether to approve the Endorsement.

151.    Further, Pilkington made the decision to approve the Endorsement in reliance on the description of the Endorsement provided by Aon.

152.    As a direct and proximate result of the aforesaid actions and omissions by Aon, Pilkington has sustained actual damages in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF

### (For Breach of Fiduciary Duty Against Aon)

153.    Pilkington repeats and incorporates by reference the allegations in paragraphs 1 through 99 above as if set forth in full herein.

154.    Through its dealings and interactions with Aon, Pilkington developed a special relationship of trust and confidence with Aon.

155.    Pilkington trusted Aon and relied upon Aon to provide sound advice pertaining to Pilkington's risk, property damage and business interruption insurance program, policy provisions affecting coverage, and policy revisions proposed by insurers.

156.    Aon understood that Pilkington trusted and relied upon Aon to provide sound advice.

157.    Aon owed fiduciary duties to Pilkington, including the duty to exercise good faith and reasonable diligence and duties of loyalty and faithfulness, when brokering Pilkington's property damage and business interruption insurance.

158.    Among other acts as discovery may reveal, Aon breached the fiduciary duties owed to Pilkington by:

(a)    failing to provide copies to Pilkington of material communications from MSI relating to the Endorsement;

(b)    misrepresenting to Pilkington that the Endorsement did not change any terms other than the currency valuations of the limit and certain sublimits;

(c)      failing to inform Pilkington that the Endorsement proposed a revision to the language of the Windstorm Sublimit;

(d)      failing to analyze the Policy to determine whether the Policy defined Windstorm by reference to High Hazard Wind Zones and Moderate Hazard Wind Zones;

(e)      failing to propose revisions to the proposed Endorsement that would have expressed in clear language the understanding that Aon believed applied to the Revised Windstorm Sublimit—i.e., that the sublimit for U.S. Windstorm would not apply to any Windstorm occurring outside of High Hazard Wind Zones or Moderate Hazard Wind Zones;

(f)      failing to propose language for the 2016–2017 Policy that either mirrored the Original Windstorm Sublimit or expressed in clear language the understanding that Aon believed applied to the Revised Windstorm Sublimit—i.e., that the sublimit for U.S. Windstorm would not apply to any Windstorm occurring outside of High Hazard Wind Zones or Moderate Hazard Wind Zones;

(g)      failing to advise Pilkington to reject the Endorsement or otherwise protect itself from the change to the Windstorm Sublimit in the Endorsement;

(h)      failing to confer with Pilkington before incorporating the Revised Windstorm Sublimit into Pilkington's proposal for the 2016–2017 Policy; and

(i)      failing to ensure that the 2016–2017 Policy proposal did not differ materially from the 2015-2016 Policy proposal;

(j)      failing to inform Pilkington that the 2016–2017 Policy, as proposed, contained the Revised Windstorm Sublimit; and

(k)      failing to advise Pilkington not to bind the 2016–2017 Policy containing the Revised Windstorm Sublimit.

159.     As a direct and proximate result of the aforesaid actions and omissions by Aon, Pilkington has sustained actual damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Pilkington North America, Inc., prays for relief as follows:

(1)     On the First Claim for Relief, Pilkington respectfully requests a judgment reforming the terms of the Policy to restore the Original Windstorm Sublimit to the Policy Declarations in place of the Revised Windstorm Sublimit.

(2)     On the Second Claim for Relief, Pilkington respectfully requests a money judgment against MSI in an amount exceeding $75,000.00, the amount to be determined at trial.

(3)     On the Third Claim for Relief, Pilkington respectfully requests a judgment declaring that, under the terms of the Policy, MSI is obligated to indemnify Pilkington in full for all property damage and business interruption loss that Pilkington incurs as a result of the Tornado, subject only to the €300,000,000 per Occurrence excess of deductible Policy limit.

(4)     On the Fourth Claim for Relief, Pilkington respectfully requests a money judgment against MSI in an amount exceeding $75,000.00, the amount to be determined at trial.

(5)     On the Fifth Claim for Relief, Pilkington respectfully requests a money judgment against Aon in an amount exceeding $75,000.00, the amount to be determined at trial.

(6)     On the Sixth Claim for Relief, Pilkington respectfully requests a money judgment against Aon in an amount exceeding $75,000.00, the amount to be determined at trial.

(7)     On the Seventh Claim for Relief, Pilkington respectfully requests a money judgment against Aon in an amount exceeding $75,000.00, the amount to be determined at trial.

(8)     On the Eighth Claim for Relief, Pilkington respectfully requests a money judgment against Aon in an amount exceeding $75,000.00, the amount to be determined at trial.

(9)    On the Ninth Claim for Relief, Pilkington respectfully requests a money judgment

against Aon in an amount exceeding $75,000.00, the amount to be determined at trial.

(10)   For attorney fees and costs of suit.

(11)   For pre- and post-judgment interest.

(12)   For such other and further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Pilkington demands trial by jury as to all issues so triable.


Dated: September 6, 2018                              Respectfully submitted,

                                                     COVINGTON & BURLING LLP

                                                     By:  _s/ P. Benjamin Duke_____
                                                     P. Benjamin Duke
                                                     Covington & Burling LLP
                                                     The New York Times Building
                                                     620 Eighth Avenue
                                                     New York, New York 10018
                                                     Telephone:  (212) 841-1072
                                                     Facsimile:  (646) 441-9072
                                                     Email:  pbduke@cov.com

                                                     *Attorneys for Plaintiff*