UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------- X

PILKINGTON NORTH AMERICA, INC., :
                                :
            Plaintiff,          :
                                :
    -against-                   :
                                :           No. 18 Civ. 8152 (JFK)
MITSUI SUMITOMO INSURANCE CO.   :           **OPINION & ORDER**
OF AMERICA and AON RISK         :
SERVICES CENTRAL, INC.,         :
                                :
            Defendants.         :

------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/30/2019

APPEARANCES

FOR PLAINTIFF PILKINGTON NORTH AMERICA, INC.
      Peter Benjamin DeWitt Duke
      Rachel Garland Snidow
      Bethany Theriot
      Seth Adam Tucker
      COVINGTON & BURLING LLP

FOR DEFENDANT MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA
      Brian E. O'Donnell
      Brooks Howard Leonard
      RIKER DANZIG SCHERER HYLAND & PERRETTI LLP

FOR DEFENDANT AON RISK SERVICES CENTRAL, INC.
      Robert B. Ellis
      Michael S. Biehl
      Lauren Oland Casazza
      KIRKLAND & ELLIS LLP

**JOHN F. KEENAN, United States District Judge:**

    Pilkington North America, Inc. ("Pilkington"), a Delaware

manufacturer, brings suit against Aon Risk Services Central,

Inc. ("Aon" or "ARS"), an Illinois insurance broker, and Mitsui

Sumitomo Insurance Company of America ("MSI"), a New York

insurance company, for breach of contract, negligence,

intentional and negligent misrepresentation, and breaches of

1

certain fiduciary duties and the implied covenant of good faith
and fair dealing.  Jurisdiction is based on diversity of
citizenship pursuant to 28 U.S.C. § 1332(a).  Before the Court
are Aon's and MSI's motions to dismiss the Complaint pursuant to
Federal Rule of Civil Procedure 12(b)(6).  For the reasons set
forth below, Aon's motion is GRANTED in part and DENIED in part.
MSI's motion is GRANTED in part and DENIED in part.

## I.  Background

The Court takes the following facts and allegations from
the Complaint and, for the purposes of these motions, deems them
to be true.

Pilkington is a Delaware corporation with its principal
place of business at 811 Madison Avenue, Toledo, Ohio 43697.
(Compl. ¶ 5.)  Pilkington manufactures and markets glass and
glazing products, primarily for the architectural and automotive
markets.  (Id.)  Pilkington owns a factory in Ottawa, Illinois
that incurred approximately $60 to $100 million of property
damage and business interruption loss due to a tornado on or
around February 28, 2017 ("the Tornado").  (Id. ¶¶ 31-32.)

MSI is a property and casualty insurance company organized
under the laws of the State of New York with its principal place
of business at 560 Lexington Avenue, 20th Floor, New York, New
York 10022.  (Id. ¶ 6.)  At the time the Tornado struck,
Pilkington, as a fully owned subsidiary of NSG Holding USA II,

2

Inc. ("NSG"), was insured under a commercial property and business interruption insurance policy issued to NSG by MSI ("the Policy"). (Id. ¶¶ 2, 13.) The Policy was brokered by Aon, an Illinois corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois 60601. (Id. ¶¶ 7, 19.) Aon is licensed by the New York State Department of Financial Services to transact business in the State of New York. (Id. ¶ 7.)

Since at least 2010, Aon performed a variety of services for Pilkington related to its active and future insurance coverage needs. (Id. ¶¶ 19-20.) Pilkington relied on Aon to advise and guide it regarding the scope and terms of the Policy, and Aon understood that Pilkington relied on it for guidance with respect to policy changes and renewals. (Id. ¶¶ 22-23.)

In 2015 and 2016, Aon included its ARS US Business Terms, Edition Date June 20, 2014 ("the Contract") with the policy renewal proposals that it presented to Pilkington. (Id. ¶ 25.) Pilkington accepted the Contract, which was in effect during the entirety of the 2015-2016 and 2016-2017 policy periods. (Id. ¶¶ 26-27.) The Contract provided Aon would deliver certain services to Pilkington and specified that Aon would review with Pilkington the benefits, terms, and conditions of its insurance contracts. (Id. ¶¶ 28-29.) The standard practice between Aon and Pilkington was for Aon to handle direct communications with

Pilkington's insurers, and for Pilkington not to receive direct communications from them.  (Id. ¶ 24.)

When the Tornado struck, the Policy had an indemnification limit of approximately $320 million per occurrence excess of deductible.  (Id. ¶ 33.)  Pilkington timely submitted a claim to MSI for the property damage and business interruption loss it incurred.  (Id. ¶ 34.)  MSI, however, invoked a policy sublimit applicable to certain types of windstorms, which capped coverage at $15 million ("the Windstorm Sublimit").  (Id. ¶¶ 37, 51.) The Windstorm Sublimit MSI invoked under the 2016-2017 Policy differed from the sublimit in the 2015-2016 Policy, as originally issued, due to a revision that was requested by MSI, proposed to Aon, and endorsed by Pilkington during the 2015-2016 policy period ("the Endorsement").  (Id. ¶¶ 35, 38, 44, 47.)

The Windstorm Sublimit in the 2015-2016 Policy, as originally issued ("the Original Windstorm Sublimit"), would not have triggered the $15 million limitation.  (Id. ¶ 44.)  The Windstorm Sublimit in the Endorsement and the 2016-2017 Policy (the "Revised Windstorm Sublimit"), however, broadened the definition of the types of windstorms subject to the cap.  As a result, when the Tornado struck, Pilkington's coverage for the loss was limited to $15 million.  (Id. ¶¶ 39-43, 45, 51.)

### A.  MSI's proposed changes to the Policy

MSI first proposed revising the Windstorm Sublimit in an

email to Aon on June 2, 2015. (Id. ¶ 52.) The revision was one of several proposed changes to the Policy. (Id.) The body of MSI's email disclosed only that it proposed changing the values of the Policy's limit and sublimits because some of the figures were incorrect due to "redundancy" and "the exchange rate." (Id. ¶ 53.) MSI's representative assured Aon that the proposed changes "will not affect too much on" Pilkington. (Id.) Although the body of MSI's email did not disclose any changes to the wording of any sublimits, the email attached an Excel file that listed all of the sublimits in the Policy and showed proposed changes to certain of them. (Id. ¶¶ 53-54.) In the Excel file, the Windstorm Sublimit was annotated "Partially Delete" with the relevant text marked with a strikethrough. (Id. ¶ 54.) MSI did not copy Pilkington on, and Pilkington did not otherwise receive, MSI's email or the Excel file attachment. (Id. ¶ 55.)

On November 24, 2015, MSI again emailed proposed changes to the Policy to Aon. (Id. ¶ 57.) MSI's November email did not refer to its June email or the Excel file attachment. (Id.) The proposed revised policy declarations in the November email included the new, Revised Windstorm Sublimit, however the wording of the sublimit was not marked to indicate that it had been revised. (Id. ¶¶ 45, 58.) Pilkington was not copied on this email either. (Id. ¶ 61.)

On December 14, 2015, MSI emailed Aon a second proposed revised version of the policy declarations that it requested to be incorporated into the Policy through the Endorsement. (Id. ¶ 62.) The proposal again included the Revised Windstorm Sublimit wording. (Id.) Pilkington was copied on MSI's December email, but Pilkington did not realize the Revised Windstorm Sublimit changed the terms of the Original Windstorm Sublimit because the body of MSI's email did not address any of the revisions that were proposed, and the attachment did not flag the proposed changes to the Windstorm Sublimit. (Id. ¶¶ 63, 92.)

In mid-January 2016, Aon and MSI discussed the proposed Endorsement during a telephone call. (Id. ¶ 68) Sometime prior to the call, Aon independently formed the understanding that the Policy defined the types of windstorms subject to the Revised Windstorm Sublimit by reference to certain wind zones that were defined elsewhere in the Policy. (Id. ¶ 69.) Aon believed the Revised Windstorm Sublimit would only apply to windstorms occurring within the defined zones. (Id.) Aon conveyed its mistaken understanding to MSI during the January 2016 call, but MSI did not contradict Aon's statement, and Aon did not ask any questions about, or further discuss, MSI's proposed revisions to the Windstorm Sublimit. (Id. ¶ 70.) Although Aon recognized that the Endorsement revised the language of the Windstorm Sublimit, Aon failed to confirm its understanding regarding the

types of windstorms subject to the Revised Windstorm Sublimit or to ensure that the new terms were consistent with its understanding. (Id. ¶¶ 73-74.) If the Revised Windstorm Sublimit applied as Aon understood it, the loss resulting from the Tornado would have been fully covered up to the $320 million policy limit. (Id. ¶ 71.)

## B. Aon's advice regarding the Endorsement

After the call with MSI, Aon conferred with Pilkington and incorrectly advised Pilkington that the Endorsement would only change the values of the Policy limit and sublimits to correct currency valuations. (Id. ¶¶ 75, 77.) Aon advised Pilkington that the Endorsement's proposed changes were acceptable and recommended Pilkington agree to it. (Id. ¶ 78.) Aon, however, failed to notify Pilkington that the Endorsement revised the wording of the Windstorm Sublimit and failed to advise Pilkington that the Endorsement would reduce coverage for certain types of windstorms. (Id. ¶ 79.)

Relying on Aon's advice and guidance, Pilkington consented to the Endorsement, and on January 19, 2016, Aon transmitted Pilkington's authorization to MSI. (Id. ¶¶ 64, 75, 81.) The Endorsement became part of the 2015-2016 Policy. (Id. ¶ 64.) In its transmission, Aon notified MSI that Pilkington's consent was based on "the property limit presentation" MSI provided "and the assurance no other terms and conditions other than valuation

7

were included in the [E]ndorsement." (Id. ¶ 65.) Pilkington believes that the "property limit presentation" Aon referenced is the same document as the "comparison of major items" attachment MSI provided in its November 2015 email, which did not indicate that any change was proposed with respect to the Windstorm Sublimit. (Id. ¶¶ 59, 65.) The Policy premium was not reduced as a result of the Endorsement. (Id. ¶ 64.)

In late-March 2016, Aon prepared Pilkington's property proposal for the 2016-2017 Policy renewal. (Id. ¶ 83.) Without conferring with Pilkington on the matter, Aon incorporated the Revised Windstorm Sublimit into the proposal and sent the proposal to MSI. (Id. ¶¶ 83, 85.) Aon failed to advise Pilkington regarding the effect the Revised Windstorm Sublimit would have on its 2016-2017 insurance coverage, or how the 2016-2017 Policy differed from the original 2015-2016 Policy with respect to coverage for loss due to windstorms. (Id. ¶ 84.) Aon's incorporation of the Revised Windstorm Sublimit into the proposal was a direct result of Pilkington having unknowingly consented to the Endorsement, and it caused MSI to issue the 2016-2017 Policy with the Revised Windstorm Sublimit, rather than the Original Windstorm Sublimit. (Id. ¶¶ 49, 87-88.) Pilkington did not know that the Endorsement would affect the scope of its insurance coverage for windstorms when it agreed to the Endorsement, and it did not intend to consent to such a

8

change.  (Id. ¶ 92.)

### C. The Complaint

On September 6, 2018, Pilkington filed the Complaint in this action.  (ECF No. 1.)  The Complaint asserts nine total claims for relief.  Against Aon, Pilkington asserts claims for breach of contract, intentional misrepresentation, negligence, negligent misrepresentation, and breach of fiduciary duty. Against MSI, Pilkington asserts claims for reformation of contract, breach of contract, declaratory relief regarding the enforceability of the 2016-2017 Policy as written, and breach of the implied duty of good faith and fair dealing.

On January 24, 2019, Aon and MSI filed individual motions to dismiss the Complaint for failure to state a claim upon which relief may be granted.  (ECF Nos. 23, 34.)  The Court heard oral argument on October 17, 2019.

## II.  Legal Standard

### A.  Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

On a motion to dismiss, the Court must accept the factual allegations in the Complaint as true and draw all reasonable inferences in the plaintiff's favor. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.'" Halebian v. Berv, 644 F.3d 122, 130 (2d Cir. 2011) (quoting Glob. Network Commc'ns, Inc. v. N.Y.C., 458 F.3d 150, 155 (2d Cir. 2006)). "In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." Subaru Distributors Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005).

## B.  Rule 9(b) Heightened Pleading Standard

In addition to the requirements of Rule 12(b)(6), a complaint alleging fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) by stating the circumstances constituting fraud "with particularity." ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).  To satisfy this

requirement, the Complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 187 (2d Cir. 2004) (internal quotation marks omitted). The adequacy of particularized allegations under Rule 9(b) is "case- and context-specific." Espinoza ex rel. JPMorgan Chase & Co. v. Dimon, 797 F.3d 229, 236 (2d Cir. 2015).

"Rule 9(b)'s heightened particularity requirement does not apply to allegations regarding fraudulent intent, also known as scienter, which may be alleged generally." Minnie Rose LLC v. Yu, 169 F. Supp. 3d 504, 511 (S.D.N.Y. 2016). Plaintiffs, however, "are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." Stephenson v. PricewaterhouseCoopers, LLP, 482 Fed. App'x 618, 622 (2d Cir. 2012) (quoting Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990)). "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Loreley Financing (Jersey) No. 3. Ltd. v. Wells Fargo Securities, LLC, 797 F.3d 160, 176-77 (2d Cir. 2015) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007)).

**III.  Aon's Motion to Dismiss**

Aon moves to dismiss all five of Pilkington's claims against it.  Each is discussed in turn below.

**A.  Conflicts of Law**

As a preliminary matter, Aon agrees with Pilkington "that there are no conflicts of law as to the specific issues raised in [Aon's] motion to dismiss (and that a choice-of-law analysis as to these issues is not necessary at this time)." Aon Reply at 1 n.1 (ECF No. 40).  "If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law." Licci ex rel. Licci v. Leb. Can. Bank, SAL, 672 F.3d 155, 157 (2d Cir. 2012).  Accordingly, the Court applies New York law to Aon's instant motion.

**B.  Breach of Contract**

The Complaint alleges Aon breached the Contract by failing to provide crucial information regarding the Endorsement and by failing to take any action to circumscribe the detrimental effects of the Revised Windstorm Sublimit.  Specifically, Pilkington alleges Aon breached contractual provisions that required Aon to:

- "review with [Pilkington] about the benefits and terms and conditions of insurance contracts" ("Duty #1");

- "administer [Pilkington's] relationship with insurance companies" ("Duty #2");

- "consult with [Pilkington] regarding . . . our recommended

program options to pursue" ("Duty #3"); and

- "provide [Pilkington] with written information regarding the coverage details, policy terms and conditions provided by the markets" ("Duty #4"). (Compl. ¶¶ 28, 29, 125.)

Aon argues that Duty #1 is not an obligation under the Contract because the language only generically describes the role of an insurance broker, and Pilkington does not plausibly allege breaches of Duties #2, #3, or #4 because the Complaint acknowledges that Aon took actions consistent with these provisions.[1]

### 1. Applicable Law

"For a breach of contract claim, Plaintiff must provide specific allegations as to an agreement between the parties, the terms of that agreement, and what provisions of the agreement were breached as a result of the acts at issue." Hekmat v. U.S. Transp. Sec. Admin., 247 F. Supp. 3d 427, 433 (S.D.N.Y. 2017) (internal quotation marks omitted). Breach of contract claims that are unsupported by any contract-based allegations are

---

[1] In a footnote, Aon raises the argument that Pilkington does not have standing to enforce the Contract because the Contract was between Aon and Pilkington's parent entity, NSG. Pilkington responds that Aon has waived this argument by placing it in a footnote, and, regardless, Pilkington may sue to enforce the Contract as an intended third-party beneficiary. Aon did not address Pilkington's counterargument in its Reply. Accordingly, the Court finds that Aon has waived this objection to the Complaint. See, e.g., Scott v. Chipotle Mex. Grill, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) ("Arguments made only in a footnote are generally deemed to be waived."); Weslowski v. Zugibe, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) ("[B]ecause the arguments appear only in footnotes, they are not properly raised, and the Court is under no obligation to consider them.").

deficient.  See, e.g., id.; Valentini v. Citigroup, Inc., 837 F.

Supp. 2d 304, 327 (S.D.N.Y. 2011).  On a motion to dismiss, the

Court "should resolve any contractual ambiguities in favor of

the plaintiff." Subaru, 425 F.3d at 122.

### 2. Analysis

The Complaint contains sufficient factual matter to

plausibly allege that Aon breached the Contract.  First, Aon

failed to notify Pilkington that the proposed Endorsement

changed the Windstorm Sublimit wording.  (Compl. ¶¶ 75, 77, 79.)

This plausibly alleges breach of Duty #4, which obligated Aon to

provide Pilkington with "written information regarding the

coverage details, policy terms and conditions" provided by the

insurance markets.  (Id. ¶ 28.)  Indeed, the Complaint asserts

that Aon did not provide any information—written or otherwise—

regarding MSI's proposed revision to the Windstorm Sublimit,

which was a material change to the coverage details and policy

terms of the 2015-2016 Policy.

Second, Aon failed to notify Pilkington that the 2016-2017

property proposal Aon prepared and submitted to MSI contained

the Revised Windstorm Sublimit.  (Id. ¶¶ 83-85.)  This plausibly

alleges breach of Duty #3, which obligated Aon to "consult" with

Pilkington "regarding . . . our recommended program options to

pursue."  (Id. ¶ 28.)

Finally, although Aon asserts that Duty #1 is not a

14

contractual obligation, the Court holds otherwise because (1) the relevant sentence specifically includes Aon in the description of the role of an insurance broker;[2] and (2) at this procedural stage, any contractual ambiguities will be resolved in Pilkington's favor. Subaru, 425 F.3d at 122.  Accordingly, the Complaint plausibly alleges that Aon breached its obligation to review with Pilkington the benefits, terms, and conditions of insurance contracts by: (1) failing to notify Pilkington that the proposed Endorsement changed the Windstorm Sublimit wording (Compl. ¶¶ 75, 77, 79); (2) failing to advise Pilkington that the proposed change would reduce coverage for loss caused by certain types of windstorms (id. ¶¶ 79-80); (3) failing to properly consider or confer with Pilkington regarding the potential detrimental effect of incorporating the Revised Windstorm Sublimit into the 2016-2017 proposal (id. ¶¶ 83-85); and (4) failing to notify Pilkington that the 2016-2017 Policy contained the Revised Windstorm Sublimit.  (Id. ¶¶ 84, 87.)

## C.  Tort-Based Claims

Aon argues that Pilkington's tort-based claims are foreclosed by the economic loss doctrine because the claims center on the terms of the Contract and the Complaint fails to

---

[2] The full sentence reads:  "The role of the insurance producer such as ARS in any particular transaction involves review with insurance purchasers about the benefits and terms and conditions of insurance contracts and selling insurance." (Compl. ¶ 29.)

establish that Aon owed any extra-contractual duties.

Pilkington argues that (1) the Complaint properly alleges a

"special relationship" which overcomes the economic loss

doctrine entirely; and (2) even if the doctrine applied, (a) the

Complaint alleges a close relationship akin to privity which

permits its negligence and breach of fiduciary duty claims, and

(b) the doctrine does not apply to intentional torts.

### 1. Economic Loss Doctrine

"New York law holds that a negligence action seeking

recovery for economic loss will not lie." Cty. of Suffolk v.

Long Island Lighting Co., 728 F.2d 52, 62 (2d Cir. 1984). "[I]f

the parties have a remedy in contract, they may not also bring

claims sounding in tort that claim only economic damages

independent of physical injury or damage to property." Holborn

Corp. v. Sawgrass Mut. Ins. Co., 304 F. Supp. 3d 392, 397

(S.D.N.Y. 2018). The doctrine "rests on the principle that

economic losses arising from injury to expectancy interests

created by contract ought to be brought as contract claims."

Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n, 328 F. Supp. 3d

141, 159 (S.D.N.Y. 2018). "[A]n exception to the economic loss

doctrine exists where the defendant has a duty independent of

contractual obligations." Holborn, 304 F. Supp. 3d at 397

(internal quotation marks omitted).

Under New York law, insurance brokers "have a common-law

duty to obtain requested coverage for their clients within a
reasonable time or inform the client of the inability to do so;
however, they have no continuing duty to advise, guide or direct
a client to obtain additional coverage." Am. Bldg. Supply Corp.
v. Petrocelli Grp., Inc., 979 N.E.2d 1181, 1184 (N.Y. 2012)
(quoting Murphy v. Kuhn, 682 N.E.2d 972, 974 (N.Y. 1997)).
"Where a special relationship develops between the broker and
client," however, "the broker may be liable, even in the absence
of a specific request, for failing to advise or direct the
client to obtain additional coverage." Voss v. Neth. Ins. Co., 8
N.E.3d 823, 828 (N.Y. 2014).  A special relationship may be
established in one of three ways:

> (1) the agent receives compensation for consultation
> apart from payment of the premiums, (2) there was some
> interaction regarding a question of coverage, with the
> insured relying on the expertise of the agent, or (3)
> there is a course of dealing over an extended period of
> time which would have put objectively reasonable
> insurance agents on notice that their advice was being
> sought and specially relied on.

Murphy, 682 N.E.2d at 975-76 (citations omitted).

If a special relationship exists, the special duties that
attach are "governed by the particular relationship between the
parties and [are] best determined on a case-by-case basis." Id.
at 975.  An insurance broker may be found negligent for failure
to fulfill the duties that attach due to a special relationship.
See Voss, 8 N.E.3d at 828-29.  A special relationship will also

support a claim for breach of fiduciary duty because "[t]he 'duty' element of [negligence and fiduciary duty] causes of action requires the same inquiry." Muller-Paisner v. TIAA, 289 Fed. App'x 461, 465 (2d Cir. 2008). Insureds bear the burden of proving a special relationship. Murphy, 682 N.E.2d at 976.

### a. Arguments

Pilkington argues that a special relationship existed under Murphy's second and third exceptions because (1) Aon explained the effect of the Endorsement to Pilkington, recommended its acceptance, and Pilkington consented to it in reliance on Aon's expertise (Compl. ¶¶ 75-78, 81); and (2) the Complaint alleges a longstanding relationship of trust and reliance between Pilkington and Aon most clearly evidenced by the allegations that Aon did not forward MSI's June and November 2015 communications to Pilkington, but instead orally advised Pilkington on the Endorsement and Aon's recommendation that Pilkington accept it. (Id. ¶¶ 66-70; 75-78.) Aon argues that no special relationship existed because (1) Pilkington did not make a request or ask any questions specifically about the Windstorm Sublimit; and (2) courts have routinely rejected generic course of dealing claims that are premised solely on the existence of a long-standing relationship between a client and its insurance broker.

## b. Analysis

The Complaint plausibly alleges a special relationship under the second exception in Murphy; the Court does not decide whether Murphy's third exception is also met.  To satisfy Murphy's second exception, "courts have generally required that the insured make a specific request about the feature of the proposed insurance at issue in the subsequent suit." Holborn, 304 F. Supp. 3d at 404; see also Spinnato v. Unity of Omaha Life Ins. Co., 322 F. Supp. 3d 377, 393 (E.D.N.Y. 2018).  Here, although the Complaint does not allege that Pilkington and Aon specifically discussed the terms of the Windstorm Sublimit, it does allege that the two discussed the terms of the Endorsement, and it is this conversation which is at the center of Pilkington's tort-based claims.  These circumstances are more in-line with Voss, where the New York Court of Appeals ruled that a special relationship may have existed, 8 N.E.3d at 829, than with Murphy, Holborn, or Spinnato, where the plaintiffs did not even allege that a conversation between the parties occurred regarding the insurance policy at issue. See 682 N.E.2d at 975; 304 F. Supp. 3d at 404; 322 F. Supp. 3d at 393.

In Voss, the plaintiff asked the defendant whether an insurance policy with $75,000 in business interruption coverage would be sufficient. 8 N.E.3d at 825-26.  The defendant "allegedly assured her that it would suffice," and the plaintiff

subsequently accepted the policy. Id. at 826. The Court of
Appeals ruled that a special relationship may have existed, and
thus summary judgment was inappropriate, because the parties
"discussed business interruption insurance from the inception of
their business relationship," the defendant obtained "relevant
data in order to calculate the proper level of coverage," and
the plaintiff questioned the $75,000 amount and the defendant
"assured her that it was adequate based on his review of her
business finances." Id. at 829. Pilkington alleges a similar
discussion with Aon with respect to the Endorsement's proposed
changes to the Policy's limit and sublimits, which includes the
revised terms of the disputed Windstorm Sublimit.

By contrast, in Murphy, the Court of Appeals found no
special relationship where the plaintiff "never asked [the
defendant] to increase the liability limits" on the insurance
policy at issue and, "[i]n fact, there is no indication that
[the plaintiff] ever inquired or discussed with [the defendant]
any issues involving the liability limits" of the policy. 682
N.E.2d at 975. "Such lack of initiative or personal
indifference cannot qualify as legally recognizable or
justifiable reliance." Id. The same was true in Holborn. See
304 F. Supp. 3d at 404-05.

Here, the Complaint alleges a particular conversation
between Pilkington and Aon specifically regarding how the

Endorsement would impact the active Policy; Aon advised Pilkington that the Endorsement would only change certain limit and sublimit values and recommended that Pilkington accept it; and Pilkington consented to the Endorsement in reliance on Aon's expertise and advice. (Compl. ¶¶ 75-78, 81.) This plausibly alleges a specific request about the feature of the proposed insurance at issue in the subsequent suit—namely, the terms of the Endorsement—with the insured relying on the expertise of the agent. Accordingly, Pilkington has met its burden of pleading the special relationship exception to the economic loss doctrine with regards to the Endorsement and the incorporation of the Revised Windstorm Sublimit into the 2016-2017 Policy.

During oral argument, Aon cited an out-of-Circuit case, Chem. Tech., Inc. v. Berkshire Agency, Inc., to argue that, with respect to the special relationship test in circumstances such as this case, Michigan law may conflict with New York law. No. 326394, 2016 WL 4008455 (Mich. Ct. App. July 26, 2016). Notwithstanding Aon's express acknowledgement that a conflict of law does not exist between New York and other relevant jurisdictions with respect to its motion, see supra section III.A, the case Aon cited also does not warrant dismissal of Pilkington's tort-based claims at this time. In Chem. Tech., the Court of Appeals of Michigan ruled in favor of the defendant insurance broker where the plaintiff insured was unable to prove

21

the existence of a special relationship under one of the four exceptions in the "special relationship test." Id. at *5. The court concluded that, on a motion for summary judgment, the insured's argument was meritless because it "ignores the fact that Chemical is charged with having read the insurance policy at issue, and 'insureds' claims that they have reasonably relied on misrepresentations that clearly contradict the terms of the insurance policies must fail.'" Id. (citation omitted).

At the procedural stage of this case, however, drawing all reasonable inferences in Pilkington's favor, Pilkington's reliance was reasonable and the misrepresentations were not clear contradictions to the terms of the Endorsement. Indeed, the Complaint alleges that Aon itself misunderstood the scope of the Revised Windstorm Sublimit, and Aon itself reasonably believed the Endorsement only changed the Policy's limit and sublimit values. Further, applying Michigan's "special relationship test" to the facts of this case, unlike the circumstances in Chem. Tech. which did not even address it, here, the Complaint plausibly alleges a special relationship under the third exception: "an inquiry is made that may require advi[c]e and the agent, though he need not, gives advi[c]e that is inaccurate." Id. at *2 (quoting Harts v. Farmers Ins. Exch., 597 N.W.2d 47, 52 (Mich. 1999)).

Finally, the Complaint is further distinguishable from the

complaints in <u>Murphy</u>, <u>Holborn</u>, and <u>Chem. Tech.</u> which alleged
that the defendant insurance brokers breached extra-contractual
duties by failing to advise the plaintiffs "as to possible
additional insurance coverage needs," <u>Murphy</u>, 682 N.E.2d at 973,
"to recommend a particular type of reinsurance," <u>Holborn</u>, 304 F.
Supp. 3d at 394, or "to advise [the plaintiff] that it was
underinsured [and that] business-interruption and replacement
cost coverage were available." <u>Chem. Tech.</u>, 2016 WL 4008455 at
*5.

Here, the gravamen of the Complaint is not that Aon failed
to recommend a certain insurance product which would have
provided more comprehensive protection; it is that Pilkington
relied on Aon's flawed assessment of the terms of the
Endorsement and Aon's incorporation of those same terms into the
2016-2017 Policy without Pilkington's knowledge.  Drawing all
reasonable inferences in favor of Pilkington, the Complaint is
not about a failure related to "additional coverage."  It is
that Aon did not obtain the coverage that Pilkington had
requested, namely the same coverage Pilkington had under the
original 2015-2016 Policy. <u>Cf.</u> <u>Voss</u>, 8 N.E.3d at 452
("[I]nsurance brokers 'have a common-law duty to <u>obtain</u>
<u>requested coverage</u> for their clients . . . they have no
continuing duty to advise, guide or direct a client to <u>obtain</u>
<u>additional coverage</u>.'") (emphasis added).  The Court notes,

however, "that special relationships in the insurance brokerage context are the exception, not the norm" and "it remains to be determined whether a special relationship existed here." Id. at 455. Nevertheless, at this procedural stage, Pilkington has plausibly alleged such a relationship, and, accordingly, the economic loss doctrine does not bar its tort-based claims at this time.

### 2. Duplicate tort and breach of contract claims

Aon argues the Complaint's tort-based claims fail because they arise from the same conduct that forms the basis of Pilkington's breach of contract claim and seek the same damages. "Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated." Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 58 (2d Cir. 2012). "Such a 'legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract.'" Id. (quoting Clark-Fitzpatrick v. Long Island R.R. Co., 516 N.E.2d 190, 194 (N.Y. 1987)). "Where an independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct." Id.

As discussed above, the Complaint plausibly alleges a

special relationship between Pilkington and Aon with respect to the Endorsement. Accordingly, Aon owed Pilkington a duty to protect against the risk of harm resulting from the Endorsement and Pilkington's tort-based claims are permitted. See Ambac, 328 F. Supp. 3d at 159; see also 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc., 750 N.E.2d 1097, 1101 (N.Y. 2001) ("A duty may arise from a special relationship that requires the defendant to protect against the risk of harm to plaintiff.").

### a. Negligent misrepresentation

"[A] limited exception [to the economic loss doctrine] exists for claims of negligent misrepresentation, as long as there is a showing that there was either actual privity of contract between the parties or a close relationship that approximates privity." Cornelia Fifth Ave., LLC v. Canizales, No. 12-cv-07660 (ALC), 2017 WL 1034644, at *3 (S.D.N.Y. Mar. 16, 2017). Under such circumstances, a defendant may be liable for negligent misrepresentation

> where there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage, provided that such information was expressed directly, with knowledge or notice that it will be acted upon, to one to whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all.

Id. (internal quotation marks omitted).

Here, even if the economic loss doctrine applied, the

Complaint plausibly alleges a claim that fits within Cornelia's limited exception to the doctrine. Pilkington relied on Aon to advise and guide it regarding the scope and terms of the Policy (Compl. ¶ 22); Aon understood that Pilkington did not have insurance expertise and that it relied on Aon's guidance (id. ¶ 23); it was standard practice for Aon to handle all direct communications with Pilkington's insurers, Aon exercised its judgment about what information to relay to Pilkington, and Pilkington relied on Aon to provide it with important information (id. ¶ 24); and Aon knew that Pilkington was relying on Aon's guidance when it decided to accept the Endorsement, and Pilkington did so rely. (Id. ¶¶ 76, 81.) This alleges the "functional equivalent of privity" sufficient to establish a claim for negligent misrepresentation.

### b. Intentional misrepresentation

The economic loss doctrine also does not require dismissal of Pilkington's intentional misrepresentation claim. See In re Gen. Motors Ignition Switch Litig., 257 F. Supp. 3d 372, 432–33 (S.D.N.Y. 2017) ("[M]ost courts in this Circuit have declined to apply the economic loss rule to intentional torts, citing the absence of any New York authority to the contrary. . . . The Court thus adheres to the view that claims for intentional torts are not precluded by New York's economic loss doctrine."), modified on reconsideration, 2017 WL 3443623 (S.D.N.Y. Aug. 9,

2017). Intentional misrepresentation claims may be dismissed
where the claims overlap entirely with a parallel contract
claim. See Aretakis v. Caesars Entm't, No. 16-cv-8751 (KPF),
2018 WL 1069450, at *11 (S.D.N.Y. Feb. 23, 2018)). Here,
however, Pilkington's claim would survive even if the economic
loss doctrine applied because the Complaint alleges the
following actions by Aon that may not constitute a breach of
contract, but, when read together, plausibly allege an
intentional misrepresentation:

- Aon was on notice, or actually knew, that the Endorsement
  changed the terms of the Windstorm Sublimit (Compl. ¶¶ 54,
  68-70);

- Aon provided false statements to Pilkington regarding the
  Endorsement and its impact on Pilkington's insurance
  coverage (id. ¶¶ 75-79; 133);

- Aon concealed from Pilkington its actual understanding of
  the Endorsement's changes (id.); and

- Aon falsely implied to Pilkington that the 2016-2017 policy
  proposal and the Policy as issued by MSI requested and
  included coverage materially identical to the original
  2015-2016 Policy. (Id. ¶ 84; 133)

These allegations, while similar to Pilkington's breach of
contract claim, are sufficiently unique such that Pilkington's
intentional misrepresentation claim is not entirely duplicative
of its contract claim. The intentional misrepresentation claim
hinges on affirmative actions undertaken by Aon, whereas the
contract claim relies on acts that Aon failed to take. Indeed,
Aon does not include the intentional misrepresentation claim in

the side-by-side comparison of Pilkington's contract and tort-based claims that it used to argue that the claims were improperly duplicative.  (See Aon Mem. at 7-8 (ECF No. 35).)

### D.  Fraud-based claims

Aon argues that the Complaint's misrepresentation claims do not satisfy Rule 9(b)'s heightened pleading requirement because Pilkington does not disclose the source of its "upon information and belief" allegations and Pilkington has failed to set forth the who, what, when, where, and why of the misrepresentations.

The Complaint does not specifically allege a "fraud" claim against Aon, but rather a claim of "intentional misrepresentation."  Seeing as this claim alleges that Aon concealed information and made numerous false statements to Pilkington while knowing that the statements were inaccurate, the Court views this claim as one of "fraudulent misrepresentation," which is the term commonly used by courts in this district.  Accord Assoun v. Assoun, No. 14-cv-1368 (PAC), 2015 WL 110106, at *5 (S.D.N.Y. Jan. 7, 2015) ("[Plaintiff] alleges a claim for intentional misrepresentation, which, under New York law, is identical to a claim for fraud.") (collecting cases).

"To state a cause of action for fraudulent misrepresentation under New York law, a plaintiff must allege: '(1) a material misrepresentation or omission of fact (2) made

by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff.'" Riker v. Premier Capital, LLC, No. 15-cv-8293 (ALC), 2016 WL 5334980, at *4 (S.D.N.Y. Sept. 22, 2016) (quoting Woori Bank v. RBS Sec., Inc., 910 F. Supp. 2d 697, 700-01 (S.D.N.Y. 2012)).  To state a cause of action for negligent misrepresentation, "a plaintiff must allege:  '(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'" Id. (quoting Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 490 (2d Cir. 2014)).

### 1.  Whether Rule 9(b) applies to negligent misrepresentation claims

The parties dispute whether negligent misrepresentation claims are subject to the heightened pleading requirement of Rule 9(b), or whether the plain-statement rule of 8(a) applies. In Riker v. Premier Capital, LLC, the court considered this question and concluded that, while the Second Circuit has not provided a clear answer,

> [m]ost of [the courts in the Circuit] have opted to apply Rule 9(b) to the negligent misrepresentation claims in front of them. See Schwartzco Enterprises LLC v. TMH Mgmt., LLC, 60 F. Supp. 3d 331, 349 (E.D.N.Y. 2014) (collecting cases).  Some have determined that Rule 9(b) applies only where the claim resembles a fraud claim.

> See Woori Bank, 910 F. Supp. 2d at 705.  But other courts
> have concluded that it is settled law that Rule 9(b)'s
> heightened standard applies to all claims of negligent
> misrepresentation, relying on Aetna Cas. & Sur. Co. v.
> Aniero Concrete Co., 404 F.3d 566, 583–84 (2d Cir. 2005),
> where the Second Circuit adopted without comment a
> district court's application of Rule 9(b) to a negligent
> misrepresentation claim.

2016 WL 5334980, at *5.  The court applied Rule 9(b) to the

negligent misrepresentation claim before it because "the claim

sounds in fraud." Id.  "Regardless of how [the plaintiff]

'characterize[s] claims by the label used in the pleading[,]

these nominal efforts are unconvincing where the gravamen of the

complaint is plainly fraud and no effort is made to show any

other basis for the claims levied.'" Id. (quoting Matsumura v.

Benihana Nat. Corp., 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008)).

In Silvercreek Mgmt., Inc. v. Citigroup, Inc., the court

also concluded that "the Second Circuit has not spoken clearly

to this question," and it adopted a "case-by-case approach" to

determine whether Rule 9(b) applied. 248 F. Supp. 3d 428, 452–53

(S.D.N.Y. 2017) ("This case-by-case approach, looking at whether

a plaintiff's claim 'rel[ies] on a showing of fraud or mistake,'

has also counseled against the application of Rule 9(b)."). The

court concluded that Rule 9(b) did not apply to the negligent

misrepresentation claim before it because "it is possible that

Defendants could be liable for negligent misrepresentation

independent of their liability for fraud." Id. at 453.  "As

such, given the possibility of a stand-alone claim sounding in negligence, it would be illogical to require a plaintiff to satisfy a heightened pleading requirement merely because she also, separately, alleges claims sounding in fraud that are entirely unrelated." Id.

Pilkington's negligent misrepresentation claim must satisfy the heightened pleading requirements of Rule 9(b). First, the gravamen of the claim very closely sounds in fraud—at the very least it sounds in mistake—because it relies on the same facts and is nearly identical to the Complaint's intentional misrepresentation claim, namely, that Aon made a serious mistake by failing to (1) fully appreciate the significance of MSI's proposed change to the Windstorm Sublimit; (2) highlight to Pilkington that the Endorsement changed the wording of the sublimit; and (3) provide accurate information to Pilkington regarding the Windstorm Sublimit in the 2016-2017 policy proposal. (Compl. ¶¶ 73, 77, 79, 83-84.)

Second, Pilkington's negligent misrepresentation claim is not sufficiently distinct from its intentional misrepresentation claim. In Silvercreek, for example, the court ruled that the negligent misrepresentation claim was not required to satisfy Rule 9(b) where the plaintiff (1) "expressly disclaim[ed] 'any allegation of scienter or recklessness' in its theory of negligent misrepresentation;" and (2) separately alleged claims

sounding in fraud that were "entirely unrelated" to its stand-
alone claim sounding in negligence. 248 F. Supp. 3d at 453.
Pilkington's claim does not rise to this level.  Accordingly, it
must state with particularity the circumstances constituting
Aon's negligent misrepresentation.

### 2. "Upon information and belief"

Aon argues the Complaint's misrepresentation claims must be
dismissed because Pilkington does not disclose the factual basis
for any allegations asserted "upon information and belief."  "If
it were shown that the facts were peculiarly within the
possession and control of the opposing party, then it is true
that [a plaintiff] could plead facts 'upon information and
belief.'  But even then, 'the plaintiff still bears the burden
of alleging facts upon which her or his belief is founded.'"
Riker, 2016 WL 5334980 at *6 (quoting Minnie Rose, 169 F. Supp.
3d at 517).  Here, the Complaint has not set forth a factual
basis for the following allegations:

- MSI first proposed a revision to the Windstorm Sublimit in
  its June 2015 email to Aon.  (Compl. ¶ 52.)

- MSI did not contact Aon again regarding the proposed
  revisions until November 2015.  (Id. ¶ 56.)

- The attachment in MSI's November 2015 email did not
  indicate that a change was proposed with respect to the
  Windstorm Sublimit.  (Id. ¶ 59.)

- The "property limit presentation" referenced in Aon's
  January 2016 email to MSI was the same document as the
  "comparison of major items" that MSI provided to Aon in its

32

November 2015 email.  (Id. ¶ 65.)

- In January 2016, Aon conferred with MSI over the telephone about the Endorsement.  Aon conveyed its mistaken understanding to MSI.  MSI did not contradict Aon's statement.  (Id. ¶¶ 68-70.)

- Aon's January 2016 discussion with Pilkington regarding the Endorsement was after Aon's call with MSI.  (Id. ¶ 75.)

- Aon's incorporation of the Revised Windstorm Sublimit into the 2016-2017 property proposal was a direct result of Pilkington's unknowing consent to the Endorsement.  (Id. ¶ 88.)

These facts, asserted "upon information and belief," are crucial to Pilkington's misrepresentation claims against Aon (and MSI).  The Complaint, however, has not set forth any factual basis for these assertions.  Accordingly, Pilkington has not met its burden under Rule 9(b) and its fraudulent and negligent misrepresentation claims must be dismissed.  See Riker, 2016 WL 5334980 at *6; Minnie Rose, 169 F. Supp. 3d at 517.

### 3.  "With particularity"

Aon argues that Pilkington's misrepresentation claims also lack sufficient detail.  "[T]he point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc., 865 F.3d 71, 87 (2d Cir. 2017) (quoting United States ex rel. Heath v. AT&T, Inc., 791 F.3d 112, 125 (D.C. Cir. 2015)).  To

satisfy Rule 9(b) a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. at 81 (internal quotation marks omitted). Pilkington's misrepresentation claims fail for the additional reason that the Complaint fails to identify the speaker, where the statements were made, and, with respect to intentional misrepresentation, why MSI's statements were fraudulent.

### a. Sufficiently pleaded

**When** and **What**: The following constitute the "when" and "what" allegations of Pilkington's misrepresentation claims:

- Aon was on notice that MSI proposed revising the Windstorm Sublimit at least as early as June 2, 2015. (Compl. ¶ 52.)

- On November 24, and December 14, 2015, Aon received proposed revisions to the Policy from MSI, including changes to the Windstorm Sublimit. (Id. ¶¶ 57-58, 62.)

- On or around January 17 or 18, 2016, Aon called Pilkington to discuss the Endorsement. Aon incorrectly advised Pilkington that the Endorsement only changed the Policy's limit and sublimits to correct currency valuations. (Id. ¶¶ 75, 77.)

- Pilkington consented to the Endorsement soon after the call with Aon. (Id. ¶¶ 64, 75, 81.)

- On January 19, 2016, Aon provided MSI with Pilkington's authorization to execute the Endorsement. Aon notified MSI that Pilkington's consent was based on certain conditions. (Id. ¶¶ 64-65.)

- On or around March 26 to 28, 2016, Aon prepared Pilkington's 2016-2017 property proposal. Aon incorporated

the Revised Windstorm Sublimit into the proposal and sent the proposal to MSI on March 28, 2016. As a result, MSI issued the 2016-2017 Policy with the Revised Windstorm Sublimit. (Id. ¶¶ 82-83, 85, 87.)

These allegations are specific and detailed enough under Rule 9(b) to allege: (1) unknown individuals at Aon were on notice that the Endorsement changed the terms of the Windstorm Sublimit (knowledge of falsity); (2) unknown individuals at Aon failed to tell Pilkington about the change (material omission of fact); (3) Pilkington agreed to the Endorsement based on the omission (reliance); and (4) the 2016-2017 Policy included the Revised Windstorm Sublimit (damage).

### b. **Sufficiently pleaded as to one but not the other**

**Why**: Regarding its negligent misrepresentation claim, Pilkington has met its burden of pleading why Aon's omissions were false because the Complaint plausibly alleges that Aon represented that the Endorsement revised only limit and sublimit valuations, when Aon, a sophisticated insurance broker, was on notice that the Endorsement changed the wording of the Windstorm Sublimit. (Id. ¶ 52.) Pilkington, however, has not met its Rule 9(b) burden with respect to its fraudulent misrepresentation claim because the Complaint's assertions that Aon was anything more than simply on notice that the Windstorm Sublimit had changed—e.g., its allegations that Aon "knew" the Endorsement altered Pilkington's insurance coverage or that Aon

"conceal[ed]" certain information from Pilkington (id. ¶¶ 132,
133(e))—rely on unsupported "upon information and belief"
allegations. (Id. ¶¶ 68-70.)

### c. **Insufficiently pleaded**

The remaining elements that Pilkington must plead are (1)
the misrepresentation was made by the defendant who knew the
information was false, or who had a duty to impart correct
information; and (2) Pilkington's reliance was reasonable.

**Who**: Pilkington argues that Rule 9(b) requires only that
the Complaint identify the particular defendant who made the
statements at issue. Aon argues the Complaint must identify the
specific individual who made the false statement and the
individual to whom it was made.

Here, the Complaint fails to allege sufficient detail
regarding the January 2016 phone call between Pilkington and Aon
that is at the center of Pilkington's claims. Unlike its
allegations relating to written or electronic materials, which
can be readily located, examined, and understood, Pilkington
alleges oral misrepresentations that occurred more than 31
months before the Complaint was filed. Under these
circumstances, Rule 9(b) requires Pilkington to at least
identify who of its own employees were on the call to give Aon
sufficient information to prepare a response. See Chorches, 865
F.3d at 87; see also Riker, 2016 WL 5334980 at *5 (dismissing

misrepresentation claims under Rule 9(b) where the plaintiff's general assertions did not sufficiently identify an individual speaker whose statements exposed the defendant to liability); Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 199 (S.D.N.Y. 2011) (same).

**Where**: Pilkington argues that no legitimate purpose would be served by requiring it to allege where two participants in the phone conversation were located. Courts in this circuit, however, have dismissed claims under Rule 9(b) for failing to identify where misrepresentations were made. See, e.g., Riker, 2016 WL 5334980 at *6; Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A., 244 F.R.D. 204, 216 (S.D.N.Y. 2007).

Accordingly, Pilkington's misrepresentation claims fail for the additional reason that they do not meet Rule 9(b)'s particularity requirement.

## IV.  MSI's Motion to Dismiss

MSI moves to dismiss all four of Pilkington's claims against it. Each is discussed in turn below.

### A.  Reformation of Contract

Pilkington argues it is entitled to reform the Windstorm Sublimit in the 2016-2017 Policy to the Original Windstorm Sublimit because the inclusion of the Revised Windstorm Sublimit in the Policy was the product of mutual mistake or fraud. MSI argues the reformation claim must be dismissed because the

mistake was not mutual and the Complaint fails to adequately allege fraud.

Under New York law, reformation of a contract "may be appropriate where a writing does not set forth the actual agreement of the parties." Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc., 322 F. Supp. 2d 482, 495 (S.D.N.Y. 2004). There is, however, "a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties, and a correspondingly high order of evidence is required to overcome that presumption." Id. at 496 (quoting Chimart Assocs. v. Paul, 489 N.E.2d 231, 234 (N.Y. 1986)). A claim for reformation may be "grounded upon either mutual mistake or fraudulently induced unilateral mistake." Greater N.Y. Mut. Ins. Co. v. U.S. Underwriters Ins. Co., 827 N.Y.S.2d 147 (1st Dep't 2007); see also Travelers, 322 F. Supp. 2d at 498 (collecting cases).

### 1. Mutual Mistake

MSI argues that Pilkington's claim of mutual mistake fails because it is directly contradicted by the Complaint and it defies logic to suggest that MSI did not intend to revise the scope of the Windstorm Sublimit where MSI drafted the June 2015 Excel file that specifically delineated the proposed change, and subsequently executed the Endorsement and 2016-2017 Policy, both of which included the revised wording. Pilkington argues that

pleading alternative theories does not warrant dismissal and here, the Complaint provides two possible inferences: Either MSI did not disclose the Windstorm Sublimit revision because MSI did not intend for it to change the scope of the sublimit (mistake); or MSI knowingly mislead Aon and Pilkington about the scope of the change (fraud).

"As used in the doctrine of mutual mistake, mistake means being in error in one's belief as to what the contract states." Travelers, 322 F. Supp. 2d at 497 (quoting AMEX Assurance Co. v. Caripides, 316 F.3d 154, 162 (2d Cir. 2003)). In AMEX, the Second Circuit ruled that, although the insured was mistaken in his belief about the terms of the insurance policy, there was no mutual mistake because "AMEX had drafted the policy and knew what it provided." 316 F.3d at 161. The court ruled that reformation was not permitted. Id. at 162.

The Complaint does not plausibly allege mutual mistake. First, Pilkington relies on a vague inference that MSI could have been mistaken; the Complaint does not explain how MSI revised the Windstorm Sublimit by mistake.

Second, although the Complaint asserts that Pilkington and Aon misunderstood the scope of coverage provided by the Endorsement—and hence the coverage that was later included in the 2016-2017 Policy—the Complaint consistently implies that MSI was well-aware of the Endorsement's terms. Indeed, MSI is a

sophisticated insurance company, and the Complaint does not allege facts which give rise to any inference that MSI was not fully aware of every term in the proposed and final insurance policies that it prepared and issued. The Complaint asserts that MSI drafted and circulated the relevant portion of the Policy that Pilkington now alleges was a mistake: the June 2015 Excel file and the November and December 2015 proposed policy changes, both of which included the new wording. (Compl. ¶¶ 52-54, 57-58, 62.) Accepting these allegations as true and drawing all reasonable inferences in Pilkington's favor, the overwhelming inference is that MSI intended to change the terms of the Windstorm Sublimit to allow it to apply to a broader set of windstorms.

Third, "rescission is appropriate only 'when the parties have made a mutual mistake as to a fact or assumption which goes to the heart of the agreement.'" Travelers, 322 F. Supp. 2d at 497 (quoting Beecher v. Able, 441 F. Supp. 426, 430 (S.D.N.Y. 1977)). In Travelers, the plaintiff did not dispute that it had agreed to an insurance policy involving a certain amount of coverage, but it did dispute terms regarding the length of the covered period. The court dismissed the plaintiff's reformation claim based upon mutual mistake under AMEX and for the additional reason that the disputed error was "merely a matter of degree—the length of time to be covered—and does not go to

the heart of the agreement." Id. Pilkington's dispute is similarly a matter of degree—the type of windstorm subject to the sublimit—and its assertion of mutual mistake fails for the same reason.

### 2. Fraudulently Induced Unilateral Mistake

"To state a claim for fraud in the inducement, [plaintiff] must allege: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [plaintiff]; and (iv) resulting damages." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 143 (2d Cir. 2011). Such claims are subject to Rule 9(b) which "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." Minnie Rose, 169 F. Supp. 3d at 511. MSI argues that the Complaint fails to properly allege that (1) MSI made a material misstatement; (2) MSI had the requisite intent to deceive; (3) Pilkington reasonably relied on a misstatement by MSI; and (4) MSI caused Pilkington's damages.

### a. "Upon information and belief"

Pilkington did not directly communicate with MSI regarding the Endorsement or the 2016-2017 Policy. (Compl. ¶¶ 24, 44, 47-48.) Therefore, any misrepresentation that MSI provided to Pilkington had to come through Aon. Pilkington is thus permitted to allege the substance of certain conversations

between MSI and Aon "upon information and belief" because the
facts underlying the fraud—i.e., the alleged misstatements or
omissions that MSI provided to Aon, and which Aon then provided
to Pilkington—are particularly within Aon's and MSI's knowledge.
See Minnie Rose, 169 F. Supp. 3d at 517. "However, even in
those circumstances, the plaintiff still bears the burden of
alleging the facts upon which her or his belief is founded." Id.
(alterations and internal quotation marks omitted)

As discussed above, Pilkington has not provided a factual
basis regarding the Complaint's crucial allegations of fraud.
Accordingly, the Complaint's reformation of contract claim
grounded upon fraudulently induced unilateral mistake fails for
the same reason as its misrepresentation claims against Aon.

### b. Material misrepresentations

The Complaint alleges MSI misrepresented the scope of the
Endorsement (1) by affirmative misstatements in its June and
November 2015 emails to Aon (Compl. ¶¶ 53, 58-59); and (2) by
omissions in its January 2016 call with Aon and its failure to
correct Aon's January and March 2016 emails that said
Pilkington's consent was based on certain conditions which MSI
knew to be incorrect. (Id. ¶¶ 65, 70, 88, 90-91.) MSI argues
the Complaint does not sufficiently allege any actual
misrepresentations by MSI.

**June 2015 email**: The Complaint asserts that MSI's June

42

2015 email affirmatively misrepresented the scope of MSI's proposed changes because it failed to describe or otherwise flag MSI's proposed revisions in the body of the email and it assured Aon that the changes "will not affect too much on client." (Id. ¶¶ 53, 91.) Pilkington concedes, however, that the email also included the Excel file attachment that clearly reflected MSI's proposed change to the Windstorm Sublimit's wording. (Id. ¶ 54.) When the email and attachment are read together, the alleged facts—standing alone—do not plausibly support a material misrepresentation by MSI.

**November 2015 email**: MSI's November 2015 email allegedly included an affirmative misrepresentation because the attached proposed revised policy declarations changed the wording of the Windstorm Sublimit, but the changes were not marked in any way to indicate that it had been revised. (Id. ¶ 58.) Further, the email included an Excel file attachment "described as 'the comparison of major items,'" which, "upon information and belief," did not indicate that any change was proposed with respect to the Windstorm Sublimit. (Id. ¶ 59.) As discussed above, Pilkington does not allege facts upon which its belief is founded. Accordingly, Pilkington has not plausibly alleged that the November 2015 email included a material misrepresentation.

**January 2016 call**: MSI allegedly misrepresented by omission the scope of the revisions to the Windstorm Sublimit by

failing to correct Aon's expressed, and mistaken, understanding. (Id. ¶ 69.)  This allegation fails, however, because all of Pilkington's assertions rely on facts insufficiently alleged "upon information and belief."

**January and March 2016 emails**:  Finally, MSI allegedly misrepresented by omission the terms of the Endorsement by failing to respond to Aon's email that Pilkington agreed to it "based on the property limit presentation" MSI provided "and the assurance no other terms and conditions other than valuation were included in the [E]ndorsement." (Id. ¶ 65.)  Setting aside the above allegation insufficiently pleaded "upon information and belief," MSI's silence, combined with allegations elsewhere in the Complaint that Aon discussed the Windstorm Sublimit with MSI after Aon realized that the Endorsement changed the Windstorm Sublimit, could support an allegation that MSI's silence was a material misrepresentation.  But, as discussed above, these additional facts are not sufficiently pleaded. Therefore, Pilkington is left with the allegation that MSI agreed (by omission) that the Endorsement only changed valuation, and the other allegations that MSI authored and proposed the Endorsement, MSI knew about the $15 million Windstorm Sublimit, and MSI failed to adequately inform Aon or Pilkington regarding the Endorsement's changes to the Windstorm Sublimit.  (Id. ¶¶ 52, 57, 89-90.)  These facts may be

sufficient to allege a material misrepresentation by MSI. But, as discussed below, Pilkington's fraud claim nevertheless fails because these facts do not also plausibly allege scienter.

### c. Intent to deceive

The scienter element of fraud requires a plaintiff to "allege facts that give rise to a strong inference of fraudulent intent." Nakahata v. New York-Presbyterian Healthcare Sys. Inc., 723 F.3d 192, 198 (2d Cir. 2013). "A strong inference of fraudulent intent may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., 478 F. App'x 679, 681-82 (2d Cir. 2012) (internal quotation marks omitted).

The Complaint fails to satisfy either method of alleging scienter. With respect to the "motive and opportunity" theory, setting aside the Complaint's insufficiently pleaded allegations, Pilkington fails to plead facts showing MSI had the opportunity to commit fraud where MSI first provided a redline that clearly showed the proposed change and later provided two documents with the Revised Windstorm Sublimit wording to Pilkington's sophisticated insurance broker, Aon. Even though MSI failed to correct Aon's "assurance" regarding the terms and

conditions of the Endorsement, this was in a setting where MSI
had already circulated earlier versions with the Revised
Windstorm Sublimit, and the Endorsement was made available for
review by Pilkington and Aon.  These facts do not show
opportunity to commit fraud. <u>See</u> <u>Travelers</u>, 322 F. Supp. 2d at
503 (citing <u>John Hancock Mutual Life Ins. v. Carolina Power &</u>
<u>Light Co.</u>, 717 F.2d 664, 671 (2d Cir. 1983) (finding "no
evidence of deception, fraud, or inequitable conduct" where the
agreement was available for review by the plaintiff, holding
that it "should have been aware of the provisions . . . after a
thorough reading of the contract")).  The Complaint does not
establish circumstantial evidence of conscious misbehavior or
recklessness for the same reason.  Accordingly, without the
facts alleged "upon information and belief," the Complaint fails
to plead scienter.

### d.  Reasonable reliance

MSI argues that Pilkington cannot claim reasonable reliance
because (1) it could have discovered the Windstorm Sublimit's
revised wording with due diligence; (2) MSI's misrepresentations
were made to Aon, and thus, Pilkington relied on Aon, not MSI;
and (3) any reliance on statements by MSI was not reasonable
because Aon is a sophisticated party to which MSI provided
sufficient information.  At this procedural stage, under the
plain statement rule of Rule 8(a), the Complaint sufficiently

alleges reasonable reliance.  Drawing all reasonable inferences in favor of Pilkington, the Complaint plausibly asserts that MSI made a deceptive statement to Aon, Aon conveyed the deceptive statement to Pilkington, and Pilkington relied detrimentally on the deceptive statement that was conveyed to it via Aon acting as a conduit.  This plausibly alleges reasonable reliance by Pilkington that is sufficient to survive MSI's motion to dismiss. See Pasternack v. Lab. Corp. of Am. Holdings, 59 N.E.3d 485, 228 (N.Y. 2016) ("[I]ndirect communication can establish a fraud claim, so long as the statement was made with the intent that it be communicated to the plaintiff and that the plaintiff rely on it."); Amusement Indus., Inc. v. Stern, No. 07-cv-11586 (LAK), 2016 WL 6820744, at *3 (S.D.N.Y. Nov. 10, 2016), aff'd, 721 F. App'x 9 (2d Cir. 2018) (same).

### e.  Causation

MSI argues that its alleged misrepresentations are not the direct and proximate cause of Pilkington's damages because (1) the misrepresentations relate to the Endorsement, not the 2016-2017 Policy upon which MSI denied Pilkington's claim; and (2) Aon is the proximate cause of Pilkington's loss because (a) MSI provided information to Aon which Aon did not share with Pilkington and (b) Aon was responsible for incorporating the terms of the Revised Windstorm Sublimit into the 2016-2017 Policy proposal.  Pilkington argues that New York courts have

long recognized that endorsements inserted into predecessor insurance policies provide grounds for reforming renewal policies, and New York's Insurance Law requires insurers to give clear notice to a policyholder when proposing a renewal policy on terms different than the preceding policy.[3] See N.Y. Ins. Law § 3426(e)(1)(C).

A fraudulent inducement claim requires "a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." Bank of Am. Corp. v. Lemgruber, 385 F. Supp. 2d 200, 218 (S.D.N.Y. 2005) (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 105 (2d Cir. 2001)) (internal quotation marks omitted).

The parties dispute whether a presumption of continuity exists between insurance policies such that MSI's conduct with respect to the Endorsement directly and proximately caused Pilkington's damages under the following year's policy; or whether such insurance contracts are highly negotiated agreements tailored to the coverage needs of sophisticated

---

[3] Pilkington acknowledges, however, that the statute is not applicable in this case because it only requires an insurer to alert the policyholder to a material change at the time of renewal. (Opp. at 14-15 (ECF No. 36).)

buyers and sellers such that causation fails. Pilkington alleges the former, and when the allegations in the Complaint are accepted as true and all reasonable inferences are drawn in its favor, the Complaint plausibly alleges causation: But for a hidden revision to the Windstorm Sublimit, inserted into the Policy by means of the Endorsement, the terms of the Original Windstorm Sublimit would have been incorporated into the 2016-2017 Policy, and Pilkington would have been fully indemnified for the loss caused by the Tornado. (Compl. ¶¶ 39-49, 51, 88, 93.) This is sufficient, at this stage, to plausibly allege that MSI's misrepresentations regarding the Revised Windstorm Sublimit were the direct and proximate cause of Pilkington's damages because the Complaint also specifically alleges continuity between successive insurance policies with respect to the terms of the Windstorm Sublimit. (Id. ¶ 39 (alleging the same Windstorm Sublimit was used in each of Pilkington's 2010-2011 through 2015-2016 Policies).)

B. **Implied Covenant of Good Faith and Fair Dealing**

The Complaint alleges MSI breached the implied covenant of good faith and fair dealing by misrepresenting the Endorsement's proposed changes, which induced Pilkington to assent to the Revised Windstorm Sublimit and wrongly deprived it of the full benefit of the 2015-2016 and 2016-2017 Policies. MSI argues the implied covenant does not apply to negotiations between parties

and the elements of causation are not met.

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." <u>511 West 232nd Owners Corp. v. Jennifer Realty Co.</u>, 773 N.E.2d 496, 500 (N.Y. 2002); <u>19 Recordings Ltd. v. Sony Music Entm't</u>, 97 F. Supp. 3d 433, 438 (S.D.N.Y. 2015). This implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Dalton v. Educ. Testing Serv.</u>, 663 N.E.2d 289, 291 (N.Y. 1995) (internal quotation marks omitted). It "encompass[es] any promises which a reasonable person in the position of the promisee would be justified in understanding were included." <u>511 West</u>, 773 N.E.2d at 500-01 (internal quotation marks omitted).

"The implied covenant 'does no more' than this, however; 'it works only to ensure that a party with whom discretion is vested does not act arbitrarily or irrationally.'" <u>19 Recordings</u>, 97 F. Supp. 3d at 438 (quoting <u>Dalton</u>, 663 N.E.2d at 296). "For this to occur, a party's action must directly violate an obligation that may be presumed to have been intended by the parties." <u>Thyroff v. Nationwide Mut. Ins. Co.</u>, 460 F.3d 400, 407-08 (2d Cir. 2006) (internal quotation marks omitted). "[S]o long as the promisee is allowed to reap the benefits of the contract, the implied covenant of good faith does not

require the promisor to take actions contrary to his own economic interest." Travelers, 322 F. Supp. 2d at 494 (internal quotation marks omitted).  The implied covenant "is limited to performance under a contract and does not encompass future dealings or negotiations between the parties." Id. (internal quotation marks omitted).

## 1. Breach

MSI argues that all of the conduct underlying Pilkington's implied covenant claim took place during negotiations related to the Endorsement, and thus, the Complaint does not sufficiently allege a breach relating to MSI's performance under the Policy. The Court disagrees.  First, the relevant allegations relate to performance, not simply negotiations, because if MSI had unilaterally applied the scope of coverage afforded by the Revised Windstorm Sublimit to the 2015-2016 Policy, Pilkington would have had a valid claim for breach of contract.

Second, the Complaint plausibly alleges that reducing the scope of coverage MSI was obligated to provide to Pilkington under 2015-2016 Policy injured Pilkington's right to receive one of the contract's fundamental promises.  The insurance policy between Pilkington and MSI required certain performance from each.  Distilled to its core, the Policy required Pilkington to pay a contractually agreed premium to MSI every year and required MSI to promise to indemnify Pilkington for certain

losses which Pilkington may or may not incur during the life of the Policy. Here, the Complaint alleges that Pilkington and MSI operated under such an agreement, and while the agreement was active, MSI implemented a change to the active agreement that significantly reduced the types of losses MSI was obligated to indemnify. The Complaint further alleges that MSI misrepresented the terms of the changes to induce Pilkington's assent. When Pilkington incurred a loss, which would have been covered under the original, unchanged agreement, MSI refused to fulfill its original promise to Pilkington.

Finally, similar cases in this district do not hold that an implied covenant claim is improper in circumstances such as this case. For example, in <u>Travelers</u>, the court dismissed the plaintiff's implied covenant claim because—unlike here—it was duplicative of the plaintiff's breach of contract claim. 322 F. Supp. 2d at 494. The court further ruled that the implied covenant claim would have failed on the merits, however, because the defendant's actions "could not 'have the effect of destroying or injuring' [the plaintiff's] rights under the . . . agreement." <u>Id.</u> Similar to the facts in this case, the plaintiff in <u>Travelers</u> alleged that an attempt by the defendant to enlarge the scope of insurance coverage constituted a breach of the implied covenant, which the court rejected because the plaintiff could not be bound by the policy without an

opportunity to review and accept it. See id. Unlike this case, however, Travelers did not involve claims that the defendant misrepresented the terms of the changes it proposed to an active insurance policy and used this false premise to implement it. And, also unlike the facts here, in Travelers, the allegedly wrongful proposed changes were not provided by the insurer to its policyholder; it was a proposal by the policyholder to an entirely different insurer.[4]

By contrast, in Chase Manhattan Bank, N.A. v. Keystone Distributors Inc., Plaintiff Chase Bank alleged that Defendant KDI breached the implied covenant by making repeated misrepresentations to Chase's officers and systematically manipulating the sale of certain funds to keep income that KDI would have been obligated to pay to Chase. 873 F. Supp. 808, 815 (S.D.N.Y. 1994). The court denied KDI's motion for summary judgment on Chase's implied covenant claim holding, "if Chase can prove that KDI manipulated cash flows and fund sales and misrepresented the machinations to Chase, a trier of fact could

---

[4] Travelers involved an implied covenant claim brought by Plaintiff Travelers Indemnity Company against one of its policyholders. 322 F. Supp. 2d at 486. Travelers alleged that the policyholder had attempted to revise the terms of an insurance contract the policyholder had with a different insurance company, which would have impacted the insurance coverage Travelers was obligated to provide. See id. at 487-88. The court explained that Travelers would have been able to review any revised terms to the related policy and could have canceled or modified its own policy with the policyholder in response. See id. at 495-96.

conclude that KDI breached it[s] duty to act in good faith even though there was no technical breach of the Contract." Id. at 816.

## 2. Causation

"It is well settled that in breach of contract actions the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York, 886 N.E.2d 127, 130 (N.Y. 2008) (internal quotation marks omitted). "The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made. The breaching party need not have foreseen the breach itself, however, or the particular way the loss came about. It is only necessary that loss from a breach is foreseeable and probable." Ashland Mgmt. Inc. v. Janien, 624 N.E.2d 1007, 1010 (N.Y. 1993).

As discussed above, the Complaint plausibly alleges that MSI's conduct with respect to the Endorsement directly and proximately caused Pilkington's damages under the 2016-2017 Policy. Accordingly, Pilkington's damages were a natural, probable, and foreseeable result of MSI's revisions to the Windstorm Sublimit. Pilkington's breach of the implied covenant of good faith and fair dealing claim survives.

### C. Breach of Contract

"An action may be brought for a reformation of a contract, and for a recovery at the same time upon the contract when reformed." <u>Maher v. Hibernia Ins. Co.</u>, 67 N.Y. 283, 292 (1876). Pilkington argues that if the Policy is deemed reformed, MSI will have breached its contractual obligations by failing to fully indemnify the loss caused by the Tornado. MSI argues that this claim must be dismissed where Pilkington's reformation claim is dismissed because MSI has fully honored the 2016-2017 Policy as it is currently drafted. As discussed above, Pilkington's reformation of contract claim fails to meet the requirements of Rule 9(b). Accordingly, Pilkington's breach of contract claim is also dismissed because the Complaint does not plausibly allege that MSI breached the 2016-2017 Policy as it is currently drafted.

### D. Declaratory Relief

Pilkington requests a declaration pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57 that the Tornado is covered under the Policy and MSI is obligated to indemnify the full amount of Pilkington's loss. MSI argues that this claim must be dismissed because it has fully complied with its obligations under the 2016-2017 Policy.

> The declaratory judgment is a remedy the availability of which is committed to the discretion of the district court. It need not be granted unless (1) the judgment

> will serve a useful purpose in clarifying and settling
> the legal relations in issue, or (2) it will terminate
> and afford relief from the uncertainty, insecurity, and
> controversy giving rise to the proceeding.

Bristol-Myers Squibb Co. v. SR Int'l Bus. Ins. Co., 354 F. Supp.

2d 499, 506 (S.D.N.Y. 2005) (citation and internal quotation

marks omitted). As discussed above, Pilkington's breach of the

implied covenant of good faith and fair dealing claim survives.

Accordingly, Pilkington's declaratory judgment claim also

survives because an actual case or controversy exists between

Pilkington and Aon such that declaratory judgment may serve a

useful purpose. See id.; Morris v. Progressive Cas. Ins. Co.,

Inc., 662 F. Supp. 1489, 1491 (S.D.N.Y. 1987) ("Disputes over

coverage afforded by an insurance policy present an actual case

or controversy, so that declaratory judgment is appropriate.").

## V. Leave to Amend

Pilkington requests leave to amend the Complaint to satisfy

Rule 9(b). (Opp. at 19 n.10 (ECF No. 39).) "[P]laintiffs must

be allowed an opportunity to amend to remedy deficiencies under

Rule 9(b)." Luce v. Edeistein, 802 F.2d 49, 56-57 (2d Cir.

1986). Accordingly, Pilkington's request is GRANTED.

## VI. Conclusion

For the above-stated reasons, Aon's motion to dismiss the

Complaint's breach of contract, negligence, and breach of

fiduciary duty claims is DENIED. Aon's motion to dismiss the

Complaint's intentional misrepresentation and negligent misrepresentation claims is GRANTED.  MSI's motion to dismiss the Complaint's declaratory relief and breach of the implied duty of good faith and fair dealing claims is DENIED.  MSI's motion to dismiss the Complaint's reformation of contract and breach of contract claims is GRANTED.

It is FURTHER ORDERED that this Court's January 29, 2019 order (ECF No. 53) imposing a stay on discovery is amended to permit discovery of documents and answers to interrogatories. The stay on discovery is still in effect until any motions relating to a proposed First Amended Complaint are resolved.

It is FURTHER ORDERED that Pilkington is to replead its fraud-based claims with the particularity required under Federal Rule of Civil Procedure 9(b), and to do so by December 2, 2019.

The Clerk of Court is directed to terminate the motions docketed at ECF Nos. 23 and 34.


**SO ORDERED.**

Dated:    New York, New York
          October 30, 2019

_____
          John F. Keenan
          United States District Judge