UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------ X

PILKINGTON NORTH AMERICA, INC.,    :

                        Plaintiff,    :

    -against-    :

MITSUI SUMITOMO INSURANCE CO.    :
OF AMERICA and AON RISK    :
SERVICES CENTRAL, INC.,    :

                        Defendants.    :

------------------------------ X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____          │
│ DATE FILED:  05/18/2020          │
└─────────────────────────────────┘
```

No. 18 Civ. 8152 (JFK)
**OPINION & ORDER**

APPEARANCES

FOR PLAINTIFF PILKINGTON NORTH AMERICA, INC.:
    Seth A. Tucker, Bethany Theriot, Bruno Campos, Rachel
    Snidow, P. Benjamin Duke, COVINGTON & BURLING LLP

FOR DEFENDANT MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA:
    Brian E. O'Donnell, Maura C. Smith, Brooks H. Leonard,
    RIKER DANZIG SCHERER HYLAND & PERRETTI LLP

FOR DEFENDANT AON RISK SERVICES CENTRAL, INC.:
    Robert B. Ellis, Lauren Casazza, Rana B. Dawson, Michael S.
    Biehl, KIRKLAND & ELLIS LLP

**JOHN F. KEENAN, United States District Judge:**

    Before the Court are motions by Defendants Mitsui Sumitomo

Insurance Company of America ("MSI"), a New York insurance

company, and Aon Risk Services Central, Inc. ("Aon"), an

Illinois insurance broker, to dismiss the Amended Complaint

("the AC") filed by Plaintiff Pilkington North America, Inc.

("Pilkington"), a Delaware manufacturer.  On October 30, 2019,

the Court granted in part and denied in part similar motions by

MSI and Aon to dismiss Pilkington's claims against them pursuant

to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil
Procedure. <u>See</u> <u>Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins.</u>
<u>Co. of Am.</u>, 420 F. Supp. 3d 123, 130 (S.D.N.Y. 2019). The
October 30, 2019 Opinion & Order ("the MTD Order") allowed
Pilkington the opportunity to replead its fraud claims with the
particularity required under Rule 9(b). Jurisdiction is based
on diversity of citizenship pursuant to 28 U.S.C. § 1332(a).

For the reasons set forth below, MSI's motion is DENIED.
Aon's motion is GRANTED.

## I.  Background

This action arises out of an approximately $60 to $100
million loss that Pilkington incurred when a tornado ("the
Tornado") struck its glass manufacturing factory in Ottawa,
Illinois on or around February 28, 2017. Pilkington seeks
compensation for the loss pursuant to a commercial property and
business interruption insurance policy that was issued by MSI to
Pilkington's parent company, and which was brokered by Aon.
Pilkington alleges that MSI is liable for fraudulently revising
the insurance policy such that the loss caused by the Tornado is
not fully compensable; and Aon is liable for providing faulty
advice while brokering the policy, which allowed MSI's fraud to
succeed.

The AC asserts ten total causes of action, nine of which
were asserted in the Complaint ("the original complaint" or "the

OC"), (ECF No. 1), and one new claim against MSI for equitable estoppel.  The AC adds additional detail to Pilkington's original allegations of fraud, but it is, in essence, substantially the same as the OC.

### A.  Factual Allegations

To briefly summarize, Pilkington alleges that MSI misrepresented certain changes MSI wanted to make to the active insurance policy it had issued to Pilkington's parent company for the 2015–2016 policy period ("the Policy").  MSI proposed the changes by means of an endorsement ("the Endorsement") to Pilkington's insurance broker, Aon, who failed to notify Pilkington that, in addition to certain non-controversial changes to currency valuations in the Policy, the Endorsement also revised the wording of a policy sublimit applicable to certain types of windstorms ("the Windstorm Sublimit").  Aon failed to advise Pilkington that the Endorsement substantially reduced coverage for windstorms such as the Tornado.

Distilled to its core, the AC alleges that MSI represented to both Aon and Pilkington that the Endorsement only changed currency valuations, when in fact the Endorsement also stealthily reduced MSI's exposure to certain types of losses. The AC further alleges that Aon either was a willing participant in MSI's fraud or a negligent conduit who helped trick Pilkington into consenting to the Endorsement, and

surreptitiously or negligently incorporated the same fraudulently revised terms into the following year's insurance policy, which was in effect when the Tornado struck.

Pilkington's claims center on the following communications and allegations, which the Court must deem to be true at this procedural stage:

**June 2015 email.**  On June 2, 2015, MSI's agent, Shinji Tanaka ("Tanaka"), emailed Aon's agent, Joseph Perry ("Perry"), to request "changes in limit/sublimit on Pilkington's [p]roperty [insurance policy]" ("the June Email").  (Am. Compl. ¶¶ 8, 11, 56–57, ECF No. 73; Ex. 8 to Am. Compl., ECF No. 73-8.)  Tanaka's message disclosed only that MSI proposed to increase the value of some of the Policy's limit/sublimits and decrease others— revisions that Tanaka stated were needed to address "figures [that] were incorrect."  (Am. Compl. ¶ 57.)  Tanaka explained that MSI proposed to "consolidate[]" certain sublimits to address "redundancy," and further explained that the revisions would address "the exchange rate," which was "incorrectly used before."  (Id.)  Tanaka's email said nothing about changing the scope of any sublimits.  (Id. ¶ 58.)  To the contrary, Tanaka indicated that MSI's proposed changes consisted solely of non- controversial corrections, (id.), which the AC describes as "corrections pertaining to valuation only," (id. ¶ 99).  Tanaka assured Perry that the proposed changes "will have mixed impact

on the coverage, but overall, I believe those changes will not affect too much on client [<u>i.e.</u>, Pilkington], except the overall limit has increased by $62.2 million." (<u>Id.</u> ¶ 59.) Tanaka asked Perry to "[p]lease discuss with client [<u>i.e.</u>, Pilkington] if we can re-issue the policy with those changes." (<u>Id.</u>)

The June Email attached an Excel file that listed all of the sublimits in the Policy and showed changes to certain of the sublimits, some of which were marked for deletion to address the "redundancy" issue noted in Tanaka's email. (<u>Id.</u> ¶ 60.) Although the body of Tanaka's message did not disclose any proposed changes to the scope of any of the sublimits, in the Excel file, the Windstorm Sublimit was annotated "Partially Delete" and was modified with a strikethrough as follows: "Windstorm ~~caused by Named Storm combined per occurrence and in the annual aggregate.~~" (<u>Id.</u>) Pilkington was not copied on, and did not otherwise receive, the June Email or its attachment.[1] (<u>Id.</u> ¶¶ 61, 72.)

---

[1] Regarding the Excel file attachment, contrary to MSI's assertion, Tanaka did not "specifically ask[] Mr. Perry to review and discuss [the spreadsheet] with Pilkington." (MSI's Mem. of L. in Supp. Mot. to Dismiss at 10, ECF No. 77; <u>see also id.</u> at 1.) Rather, Tanaka's June 2015 email began by asking Perry to "[p]lease refer [to] the attached file," but at the end of his message, after he allegedly misleadingly summarized MSI's proposed changes, Tanaka only asked Perry to "[p]lease discuss with client if we can re-issue the policy with those changes." (June 2, 2015 email from MSI to Aon, Ex. 8 to Am. Compl., ECF No. 73-8.) This is notably different than Tanaka's November 2015 email to Perry in which he asked Perry to "please use the attached materials to propose the policy changes." (November 24, 2015 email from MSI to Aon, Ex. 9 to Am. Compl., ECF No. 73-9.)

**November 2015 email.** Almost six months later, on November 24, 2015, Tanaka again emailed Perry regarding proposed changes to the Policy ("the November Email"). (Id. ¶ 62; Ex. 9 to Am. Compl., ECF No. 73-9.)  Tanaka's message did not reference the June Email or its Excel file attachment. (Am. Compl. ¶ 62.) The November Email attached an Excel file that Tanaka described as "the comparison of major items," and a Word document labeled "Pilkington Revised Policy 2015-16 (3)." (Id.; Ex. 9 to Am. Compl.)  "[T]he comparison of major items" attachment indicated that MSI only proposed to change certain of the monetary values in the Policy—it did not indicate that any change was proposed with respect to the Windstorm Sublimit. (Am. Compl. ¶ 63.) Likewise, the monetary values in the Word document were highlighted, indicating that MSI's proposed revisions only concerned valuation and did not change the wording of any sublimits. (Id. ¶ 64.)  The Word document included new wording for the Windstorm Sublimit ("the Revised Windstorm Sublimit")— specifically, "U.S. Windstorm combined per occurrence and in the annual aggregate"—but the revised wording, unlike the monetary values, was not highlighted or otherwise marked in any way to indicate that it had been revised. (Id.)  Tanaka asked Perry to

---

Unlike the June Email, however, the materials attached to Tanaka's November 2015 email did not clearly mark MSI's proposed revisions to the Windstorm Sublimit's wording in any way.

"use the attached materials to propose the policy changes" and to "start negotiating with client [i.e., Pilkington] at the earliest." (Id. ¶ 65.) Pilkington was not copied on, and did not otherwise receive, the November Email or its attachment. (Id. ¶¶ 66, 73.)

**December 2015 email.** On December 14, 2015, Tanaka again emailed Perry requesting that the proposed revised version of the Policy declarations be incorporated into the Policy through the Endorsement ("the December Email"). (Id. ¶ 67; Ex. 10 to Am. Compl., ECF No. 73-10.) Pilkington was copied on the December Email, however, the text of Tanaka's message did not address any of the revisions that were proposed, and, as with the November Email, the attachment did not flag any proposed changes to the wording of the Windstorm Sublimit. (Am. Compl. ¶ 68.)

**January 2016 call between MSI and Aon.** On or around January 17, 18, or 19, 2016, Perry conferred with Tanaka over the telephone about the Endorsement ("the January Call"). (Id. ¶ 74.) Sometime prior to the call, despite the fact that the Policy does not define "U.S. Windstorm," Perry independently formed the understanding that the term was defined by reference to certain "hazard wind zones" defined elsewhere in the Policy, and the Revised Windstorm Sublimit would apply only to windstorms occurring within those zones. (Id. ¶ 75.) During

7

the January Call, Perry conveyed this mistaken understanding to Tanaka.  Tanaka, however, did not correct or contradict Perry's statement, and Perry did not ask any questions about or further discuss the proposed revisions to the Windstorm Sublimit.  (Id. ¶ 76.)

The factory the Tornado struck is not located within the hazard wind zones.  (Id. ¶ 77.)  Accordingly, if the Revised Windstorm Sublimit applied as Perry believed, Pilkington's loss would not have been subject to the $15 million sublimit, and it would have been fully covered up to the Policy's approximately $320 million limit.  (Id.)  Aon, however, failed to ensure that the language of the Policy reflected and effectuated its understanding of how the revised sublimit would apply.  (Id. ¶¶ 79-80.)

**January 2016 call between Pilkington and Aon.**  Following the January Call, Perry spoke with Pilkington's Elizabeth Feltman ("Feltman") to advise her on the changes proposed by the Endorsement.  (Id. ¶¶ 6, 81.)  Perry knew that Feltman lacked insurance expertise and that she and Pilkington relied on Aon's advice and guidance.  (Id. ¶ 82.)  Despite his awareness that the wording of the Windstorm Sublimit was changing, Perry incorrectly advised Feltman that the Endorsement would only change the monetary values of the Policy limit and sublimits to correct currency valuations.  (Id. ¶¶ 83, 104.)  Perry further

advised Feltman that the Endorsement's changes were acceptable, and he recommended that Pilkington accept them.  (Id. ¶ 84.) Relying on Aon's advice and guidance, Pilkington consented to the Endorsement under the mistaken belief that it only changed the values of the Policy limit and sublimits, and that it did not change the wording of any sublimits, including the Windstorm Sublimit.  (Id. ¶ 87.)

**January 2016 email.**  On January 19, 2016, Perry emailed Pilkington's authorization to execute the Endorsement to Tanaka and MSI's underwriter, Ewan Noel ("Noel") ("the January Email"). (Id. ¶¶ 9, 69; Ex. 11 to Am. Compl., ECF No. 73-11.)  The Endorsement became part of Pilkington's Policy.  (Am. Compl. ¶ 69.)  The Policy premium, however, was not reduced as a result. (Id.)  In his email, Perry expressly notified MSI that Pilkington's consent was "based on the property limit presentation provided by [MSI] . . . and the assurance no other terms and conditions other than valuation were included in the [E]ndorsement."  (Id. ¶ 70.)  The "property limit presentation" was the same document as the "comparison of major items" that Tanaka had sent in the November Email.  (Id.)  Neither Tanaka, Noel, nor any other representative of MSI ever contacted Aon or Pilkington to clarify that, beyond simply changing valuation, the Endorsement also revised the scope of the Windstorm Sublimit.  (Id. ¶ 71.)

9

**March 2016 email.**  On March 24, 2016—eight days before the 2015–2016 Policy was to expire—Tanaka emailed Perry to request Pilkington's routine property submission for the 2016–2017 policy period.  (Id. ¶ 88.)  Aon prepared the property submission and, without conferring with Pilkington on the matter, copied the Revised Windstorm Sublimit from the Endorsement into Pilkington's property submission for the 2016–2017 policy period.  (Id. ¶¶ 90-91.)  On March 28, 2016—four days before the 2015–2016 Policy expired—Perry emailed Tanaka and Noel the 2016–2017 property submission that Aon had prepared.  (Id. ¶ 93.)  As a result, Pilkington's 2016–2017 insurance policy contained the revised Windstorm Sublimit, which capped Pilkington's recovery for the Tornado at $15 million.  (Id. ¶¶ 2, 95.)

### B.  Procedural History

On September 6, 2018, Pilkington initiated this action by filing the OC.  (ECF No. 1.)  On January 24, 2019, MSI and Aon filed individual motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  (ECF Nos. 23, 34.)

On October 30, 2019, the Court granted in part and denied in part Aon's and MSI's motions.  (ECF No. 64.)  As to Aon, the MTD Order dismissed Pilkington's intentional misrepresentation and negligent misrepresentation claims for failure to meet the heightened pleading requirements of Rule 9(b), but allowed

Pilkington's claims for breach of contract, negligence, and breach of fiduciary duty to move forward.  As to MSI, the Court dismissed Pilkington's reformation of contract and breach of contract claims also pursuant to Rule 9(b), but denied MSI's motion with respect to Pilkington's claims for declaratory relief and breach of the implied duty of good faith and fair dealing.  The Court granted Pilkington the opportunity to remedy its Rule 9(b) deficiencies by filing an amended complaint.

On November 13, 2019, MSI moved for reconsideration of the MTD Order or, in the alternative, certification for interlocutory appeal.  (ECF No. 69.)  The Court denied the motion as premature because MSI would have the opportunity to raise its objections to the MTD Order after Pilkington's amended pleading was filed.  (ECF No. 72.)

Pilkington filed the AC on December 2, 2019.  (ECF No. 73.)  On January 29, 2020, MSI and Aon once again individually moved to dismiss certain of Pilkington's claims for failure to state a claim upon which relief may be granted.  (ECF Nos. 76, 81.)  The motions to dismiss were heard during a telephonic argument on March 16, 2020.  At the Court's request, the parties provided supplemental briefing regarding certain issues that were raised during the argument.  (ECF Nos. 100, 101, 103, 104.)

**II.  Legal Standards Governing Motions Under Rules 12(b)(6) and 9(b)**

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. Consequently, to survive a motion under Rule 12(b)(6), a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 70 (2d Cir. 2014) (citations omitted).

"[I]n deciding a Rule 12(b)(6) motion to dismiss a complaint, [the Court] is required to accept all 'well-pleaded factual allegations' in the complaint as true." Lynch v. City of New York, 952 F.3d 67, 74–75 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).  "Although allegations that are conclusory are not entitled to be assumed true, [w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 75 (citations, emphasis, and internal quotation marks omitted).  "The court must also 'construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the

plaintiff.'" Id. (quoting Arar v. Ashcroft, 585 F.3d 559, 567
(2d Cir. 2009) (en banc), cert. denied, 560 U.S. 978 (2010)).
"The assessment of whether a complaint's factual allegations
plausibly give rise to an entitlement to relief 'does not impose
a probability requirement at the pleading stage; it simply calls
for enough fact to raise a reasonable expectation that discovery
will reveal evidence of illegal' conduct." Id. (quoting Bell
Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)).

    In addition to the requirements of Rule 12(b)(6), a
complaint alleging fraud must satisfy the heightened pleading
requirements of Rule 9(b) by stating the circumstances
constituting fraud "with particularity." Loreley Fin. (Jersey)
No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 174 (2d Cir.
2015). "Rule 9(b)'s heightened particularity requirement does
not apply to allegations regarding fraudulent intent, also known
as scienter, which may be alleged generally." Minnie Rose LLC v.
Yu, 169 F. Supp. 3d 504, 511 (S.D.N.Y. 2016). Plaintiffs,
however, "are still required to plead the factual basis which
gives rise to a 'strong inference' of fraudulent intent."
Stephenson v. PricewaterhouseCoopers, LLP, 482 F. App'x 618, 622
(2d Cir. 2012) (summary order) (emphasis omitted) (quoting
Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir.
1990)). "An inference is 'strong' if it is 'cogent and at least
as compelling as any opposing inference one could draw from the

facts alleged.'" Loreley Fin., 797 F.3d at 176–77 (quoting

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324

(2007)).

### III.  MSI's Motion to Dismiss

The AC asserts five claims against MSI for reformation of
contract, breach of contract, declaratory relief, breach of the
implied duty of good faith and fair dealing, and equitable
estoppel.  MSI moves to dismiss the AC in its entirety.

As a preliminary matter, it is worth noting that most of
the arguments MSI makes in support of dismissal go too far for
the procedural posture of this case.  As discussed below, the
Court finds that the AC gives rise to the plausible inference
that MSI knowingly deceived Pilkington (and Aon) into believing
that the Endorsement only changed numerical valuations; that it
did not also change other material terms which could—and did—
materially impact Pilkington's insurance coverage.  Accordingly,
this action must be allowed to proceed to discovery. See
Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, 185 (2d
Cir. 2012), cert. denied, 568 U.S. 1087 (2013) ("The choice
between two plausible inferences that may be drawn from factual
allegations is not a choice to be made by the court on a Rule
12(b)(6) motion.").

### A.   Reformation of Contract

Under New York law, reformation of a contract "may be appropriate where a writing does not set forth the actual agreement of the parties." Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc., 322 F. Supp. 2d 482, 495 (S.D.N.Y. 2004). There is, however, "a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties, and a correspondingly high order of evidence is required to overcome that presumption." Id. at 496 (quoting Chimart Assocs. v. Paul, 489 N.E.2d 231, 234 (N.Y. 1986)).  A claim for reformation "must be grounded upon either mutual mistake or fraudulently induced unilateral mistake." Greater N.Y. Mut. Ins. Co. v. U.S. Underwriters Ins. Co., 36 A.D.3d 441, 443 (1st Dep't 2007); see also Travelers, 322 F. Supp. 2d at 497–98 (collecting cases).

#### 1.   Mutual Mistake

The MTD Order ruled that the OC failed to plausibly allege mutual mistake.  The parties do not challenge this ruling, and the AC no longer includes mutual mistake as a ground for Pilkington's reformation of contract claim.

#### 2.   Fraudulently Induced Unilateral Mistake

"To state a claim for fraud in the inducement, [a plaintiff] must allege: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive;

(iii) reasonable reliance on the misrepresentation by [the plaintiff]; and (iv) resulting damages." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 143 (2d Cir. 2011). Such claims are subject to Rule 9(b) which "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." Minnie Rose, 169 F. Supp. 3d at 511 (quotation marks omitted).

The MTD Order ruled that Pilkington failed to plead certain of MSI's alleged misrepresentations with the particularity required under Rule 9(b). Without these crucial allegations, all of which were made "upon information and belief," the Court further ruled that Pilkington had failed to plausibly allege scienter. Accordingly, the Court dismissed Pilkington's reformation of contract claim based on fraudulent inducement.

The AC once again alleges that MSI fraudulently induced Pilkington's assent to the terms of the Endorsement—and by extension, the 2016–2017 Policy—by (1) failing to describe or otherwise flag the Windstorm Sublimit's revisions in the body of the June, November, or December Emails; (2) repeatedly and misleadingly presenting the proposed revisions as corrections pertaining to valuation only; (3) failing to refer back to the June Email's Excel file attachment in later communications; (4) failing to flag the proposed revision to the Windstorm Sublimit in the November or December Emails' attachments; (5) failing to correct Aon's expressly mistaken understanding regarding the

scope of the proposed revision; and (6) failing to correct or otherwise respond to Aon's statement that Pilkington accepted the revisions in reliance on MSI's "property limit presentation"—which indicated changes to certain monetary values only—and MSI's "assurance no other terms and conditions other than valuation were included in the [E]ndorsement."  (Am. Compl. ¶¶ 63, 70, 99.)

MSI argues that Pilkington's fraudulent inducement claim must be dismissed because, once again, Pilkington fails to properly allege a material misrepresentation or scienter.  MSI also re-raises its argument that Pilkington has not properly alleged reasonable or justifiable reliance—and that the Court incorrectly ruled that an indirect communication can establish a fraud claim in these circumstances—because Aon was Pilkington's agent, and thus, any information that MSI provided to Aon may be imputed to Pilkington.  Each of MSI's objections is discussed in turn below.

### a.  Material Misrepresentations

After setting aside the OC's allegations which were insufficiently pleaded "upon information and belief," the MTD Order ruled that Pilkington only plausibly alleged one material misrepresentation by MSI: that MSI may have misrepresented by omission the terms of the Endorsement by failing to respond to Aon's qualification statement in the January Email.

Here, the Court need not decide the question of whether the AC now plausibly alleges affirmative misrepresentations by MSI in the June, November, and December Emails because the following two misrepresentations by omission are sufficiently pleaded to allow Pilkington's fraud claim to move forward: (1) MSI failed to correct or contradict Aon's mistaken understanding during the January Call between Aon and MSI, (supra at 7-8); and (2) MSI failed to correct or respond to Aon's qualification statement in the January Email with Pilkington's consent to the Endorsement, (supra at 9).  These two allegations independently and plausibly give rise to the inference that MSI misrepresented (by omission) that the Endorsement only changed valuation, when in fact MSI knew that it also materially changed the scope of the Windstorm Sublimit.

MSI argues that neither omission is actionable because it did not have a duty to speak.  The Court disagrees.

> New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (citation and internal quotation marks omitted).  "[H]alf-

truths—representations that state the truth only so far as it
goes, while omitting critical qualifying information—can be
actionable misrepresentations." <u>Universal Health Servs. v.
United States</u>, 136 S. Ct. 1989, 2000 (2016).

Taking the AC as a whole, Pilkington's allegations
plausibly give rise to the inference that MSI had a duty to
correct both of Aon's clearly expressed misunderstandings
regarding the scope of the Endorsement's changes.  Here, the AC
plausibly asserts a series of affirmative half-truths by MSI
with respect to the changes to be implemented by the
Endorsement.  MSI strenuously argues that it is objectively
unreasonable for any of its purported mischaracterizations
regarding the Endorsement to be affirmative misstatements
because MSI's June, November, and December Emails included
attachments with the Revised Windstorm Sublimit language.  While
the Court need not decide whether MSI's apparent downplaying of
the Endorsement's true revisions constitute material
misrepresentations, the allegation that MSI repeatedly referred
to the changes as non-controversial valuation corrections gives
rise to the inference, that must be drawn in Pilkington's favor,
that MSI affirmatively and repeatedly attempted to make Aon and
Pilkington believe that the Endorsement did not materially
impact anything other than dollar amounts.  Drawing all
reasonable inferences in Pilkington's favor, as the Court must

do, the AC plausibly alleges literally true half-statements by MSI that created a materially misleading impression.  Indeed, Aon's express qualification of Pilkington's consent in the January Email reflects how MSI's strategy succeeded and how the inaccurate impression MSI advanced was adopted by Aon and Pilkington.  MSI had a duty to speak and clarify. See Universal Health, 136 S. Ct. at 2000 n.3 (quoting Prosser and Keeton on Law of Torts § 106 (5th ed. 1984) ("[I]f the defendant does speak, he must disclose enough to prevent his words from being misleading.")); see also Loreley Fin., 797 F.3d at 174–75 ("It is not for us to say at this stage whether Plaintiffs' account . . . is true, nor is it for us to say whether, at a later stage, a judge or jury might find that such misrepresentations were immaterial to sophisticated investors like Plaintiffs. . . . Rule 9(b) requires only that Plaintiffs plead, with particularity, facts from which it is plausible to infer fraud; it does not require Plaintiffs to plead facts that make fraud more probable than other explanations.").

### b.  Scienter

The scienter element of fraud requires a plaintiff "to allege facts that give rise to a strong inference of fraudulent intent." In re Carter-Wallace, Inc., Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (quotation marks omitted).  "A strong inference of fraudulent intent may be established either (a) by

alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. (internal quotation marks omitted).

MSI argues that the scienter element cannot be satisfied where the June Email attached an Excel file that showed MSI's proposed change to the Windstorm Sublimit, and the November and December Emails included attachments with the revised wording, all of which were sent to Pilkington's sophisticated insurance broker, Aon.  The Court disagrees.

At the procedural posture of this case, Pilkington's allegations establish a strong inference of fraudulent intent with respect to the two misstatements by omission discussed above because the AC plausibly alleges that (1) MSI, a sophisticated insurance company, drafted the Endorsement and was fully aware of the changes it proposed; (2) MSI nevertheless repeatedly characterized the Endorsement as merely making minor corrections to currency valuations; (3) on at least two occasions, MSI knew that Aon did not realize that the Endorsement materially changed the Windstorm Sublimit; and (4) MSI never corrected Aon's mistaken understanding when it had two clear opportunities to do so.  Further, the AC plausibly alleges facts that demonstrate MSI had a motive to substantially reduce

Pilkington's insurance coverage without a corresponding reduction in Pilkington's premium, and MSI seized on that opportunity when it became clear that silence in the face of Aon's incorrect understanding would not prevent Pilkington from consenting to the Endorsement.  These same facts also establish conscious misbehavior or recklessness. See In re Amaranth Nat. Gas Commodities Litig., 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009) ("[A]n express allegation of deliberate misconduct can be sufficient to plead scienter.").

MSI cites Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc., 322 F. Supp. 2d 482, 503 (S.D.N.Y. 2004), to argue that the AC cannot plausibly plead scienter where Pilkington had an opportunity to review the relevant insurance policy.  MSI's argument, and its reliance on Travelers, is not persuasive. First, Travelers only focused on the motive and opportunity theory of pleading fraudulent intent—it did not involve allegations of conscious misbehavior or recklessness.  Second, Travelers did not involve the sort of half-truths present here, nor did it involve efforts by the defrauded party to clarify the agreement, such as Aon's statements to MSI during the January Call and in the January Email—efforts which were defeated by MSI's failure to correct Aon's mistaken understanding.  Finally, Travelers involved a situation where the parties were engaged in unsettled arms-length negotiations regarding the relevant terms

of the disputed insurance policy.  This is not the nature of the discussions in this case which were more in keeping with two parties amicably working together to fix certain clerical errors.  Here, the danger that MSI had induced Pilkington to unknowingly consent to a material policy change was known or should have been known to MSI.  This is sufficient to plead scienter. See, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litig., 27 F. Supp. 3d 447, 469–70 (S.D.N.Y. 2014) (holding allegations of conscious misbehavior adequately pleaded scienter); Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 456 (S.D.N.Y. 2007) (same).

### c. Reasonable Reliance

Fraud claims require a plaintiff "to establish reasonable reliance on the alleged misrepresentations or omissions." Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003).

The MTD Order ruled that Pilkington plausibly alleged that "MSI made a deceptive statement to Aon, Aon conveyed the deceptive statement to Pilkington, and Pilkington relied detrimentally on the deceptive statement that was conveyed to it via Aon acting as a conduit." Pilkington, 420 F. Supp. 3d at 148 (citing Pasternack v. Lab. Corp. of Am. Holdings, 59 N.E.3d 485, 492 (N.Y. 2016) ("[I]ndirect communication can establish a fraud claim, so long as the statement was made with the intent that it

be communicated to the plaintiff and that the plaintiff rely on it.")).

MSI argues that the Court's decision was in error, and Pilkington cannot establish reasonable reliance as a matter of law because (1) it could have discovered the Windstorm Sublimit's revised wording with its own due diligence; (2) MSI's misrepresentations were made to Aon, Pilkington's agent, and thus, Pilkington is bound by any information that Aon received from MSI, including the June Email and its attachment; and (3) indirect reliance does not apply because Aon omitted substantial portions of MSI's communications in its discussions with Pilkington.  The Court disagrees.

Drawing all reasonable inferences in favor of Pilkington, the AC plausibly alleges that MSI undertook a course of action to induce Pilkington's consent to the Endorsement which, unbeknownst to Pilkington or Aon even after the relevant changes had been reviewed, materially altered the types of loss that MSI was obligated to indemnify.  Whether or not Pilkington's reliance on MSI's misrepresentations was "reasonable" in light of MSI's allegedly deliberate and repeated attempts to mislead Aon, and Aon's flawed assessment of the new wording, is a quintessential question of fact that is not for the Court to resolve at this time.  The cases cited by MSI in support of its argument were decided on motions for summary judgment or after a

trial, or involved circumstances where the plaintiff did not even bother to read the relevant document during arms-length or contentious negotiations.  At the early procedural posture of this action, Pilkington need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.  Pilkington has done so.

This is especially true in light of the January Email in which Aon conditioned Pilkington's consent "based on the property limit presentation provided by [MSI] . . . and the assurance no other terms and conditions other than valuation were included in the [E]ndorsement." (Jan. 19, 2016 email from Aon to MSI, Ex. 11 to Am. Compl., ECF No. 73-11.)  This evidence—not an allegation the Court must deem true, not an inference the Court has drawn—demonstrates that Pilkington's consent to the Endorsement was conditioned on—i.e., relied on—(1) a document provided by MSI and (2) MSI's assurance that the Policy's valuation terms were the only terms that changed. MSI's subsequent misrepresentation by omission—i.e., MSI's subsequent assurance, by its silence, that the Endorsement did not include changes to terms and conditions other than valuation—was directly conveyed from MSI to Pilkington when MSI subsequently executed the Endorsement and incorporated the Revised Windstorm Sublimit into the Policy.

Finally, the Court is not persuaded by MSI's argument that reliance was unreasonable because Aon was provided the text of the Revised Windstorm Sublimit or had formed the mistaken impression that the new windstorm sublimit wording applied to certain hazard wind zones.  Accepting the AC's allegations as true, MSI misrepresented by omission the terms of the Endorsement—including the Revised Windstorm Sublimit—after the relevant documents were exchanged and after Aon performed reasonable due diligence by expressly raising its mistaken understanding with MSI.  None of the authority MSI cites supports dismissal of such claims at this time or stands for the extraordinary proposition that an insurer can allegedly perpetrate a fraud against an insured, but that insurer will be insulated, as a matter of law, from any liability to the insured who was the target of the fraud simply because there was a broker to whom the insurer misleadingly provided the information that was subsequently transmitted to the defrauded party.  Cf. Glidepath Holding, 590 F. Supp. 2d at 459 (finding reasonable reliance where the defendant allegedly "thwarted" the plaintiff's due diligence "by misrepresenting information related to the[] requests").

Accordingly, Pilkington has plausibly alleged at least one material misstatement by omission where MSI had a duty to speak,

reasonable reliance on that omission, and scienter.  Its reformation of contract claim survives.

### B.  Equitable Estoppel

The MTD Order granted Pilkington leave to amend its pleading to satisfy Rule 9(b).  The AC added a claim against MSI for equitable estoppel.  MSI argues that the new claim was improperly added, and it may be dismissed on that basis.  In the alternative, MSI argues that the new claim fails to satisfy Rule 12(b)(6).

### 1.  Leave to Amend

Leave to amend should be freely granted when justice so requires. Fed. R. Civ. P. 15(a)(2); Dluhos v. Floating & Abandoned Vessel, 162 F.3d 63, 69 (2d Cir. 1998).  "Nonetheless, the Court may deny leave if the amendment (1) has been delayed unduly, (2) is sought for dilatory purposes or is made in bad faith, (3) the opposing party would be prejudiced, or (4) would be futile." Lee v. Regal Cruises, Ltd., 916 F. Supp. 300, 303 (S.D.N.Y. 1996) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002).  "Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." IBEW Local Union No. 58 Pension

Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783
F.3d 383, 389 (2d Cir. 2015).

Pilkington argues that because the motion-to-amend futility
inquiry is equivalent to the motion-to-dismiss standard for
failure to state a claim, it is more efficient for the Court to
consider Pilkington's equitable estoppel claim at this time
rather than requiring Pilkington to separately move for leave to
add the claim.  The Court agrees.  Accordingly, the AC's
equitable estoppel claim will be permitted if it is able to
withstand MSI's Rule 12(b)(6) objections.

### 2.  Sufficiency of the Claim

"Equitable estoppel is grounded on notions of fair dealing
and good conscience and is designed to aid the law in the
administration of justice where injustice would otherwise
result." In re Ionosphere Clubs, Inc., 85 F.3d 992, 999 (2d Cir.
1996).  The doctrine "is properly invoked where the enforcement
of the rights of one party would work an injustice upon the
other party due to the latter's justifiable reliance upon the
former's words or conduct." Kosakow v. New Rochelle Radiology
Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001).

"Under New York law, the elements of equitable estoppel are
with respect to the party estopped: (1) conduct which amounts to
a false representation or concealment of material facts; (2)
intention that such conduct will be acted upon by the other

party; and (3) knowledge of the real facts." <u>In re Vebeliunas</u>, 332 F.3d 85, 93–94 (2d Cir. 2003). "The parties asserting estoppel must show with respect to themselves: (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions." <u>Id.</u> at 94.

> Where an insurance carrier knowingly conceals or misstates facts with the intention or the expectation that such conduct will be relied upon, and the insured substantially changes its position to its detriment in reasonable reliance upon the false impression thus created, the carrier is estopped from taking a position inconsistent with that which was misstated or concealed.

<u>One Beacon Ins. Co. v. Old Williamsburg Candle Corp.</u>, 386 F. Supp. 2d 394, 401 (S.D.N.Y. 2005) (collecting cases); <u>see also</u> <u>Katz v. Colonial Life Ins. Co. of Am.</u>, 951 F. Supp. 36, 41 (S.D.N.Y. 1997) ("[S]ilence may act as a 'representation' for purposes of estoppel . . . when one has a duty to speak or one knows that the other party was acting under a mistaken belief.").

MSI argues that Pilkington's equitable estoppel claim fails for the same reasons as its fraud claim: namely, that the AC does not plausibly allege a misrepresentation or reasonable reliance. At this procedural stage the AC plausibly alleges both. Pilkington's equitable estoppel claim is permitted.

### C.  Breach of the Implied Covenant of Good Faith and Fair Dealing

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y. 2002); 19 Recordings Ltd. v. Sony Music Entm't, 97 F. Supp. 3d 433, 438 (S.D.N.Y. 2015).  This implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995) (internal quotation marks omitted), and it "encompass[es] any promises which a reasonable person in the position of the promisee would be justified in understanding were included," 511 W., 773 N.E.2d at 500-01 (internal quotation marks omitted).  "[S]o long as the promisee is allowed to reap the benefits of the contract, the implied covenant of good faith does not require the promisor to take actions contrary to his own economic interest." Travelers, 322 F. Supp. 2d at 494 (quotation marks omitted).  The implied covenant "is limited to performance under a contract and does not encompass future dealings or negotiations between the parties." Id. (quotation marks omitted).

The MTD Order ruled that the OC plausibly alleged breach of the implied covenant because Pilkington's claims against MSI

relate to MSI's performance under the Policy—_i.e._, MSI's obligation to indemnify Pilkington in the event of loss caused by certain types of windstorms.  The Court found that, under the unique promises inherent in an insurance contract, Pilkington plausibly alleged that MSI injured its right to receive one of the contract's fundamental promises by covertly reducing the scope of coverage that MSI was obligated to provide.

MSI argues that the Court's decision was in error, and it re-raises its prior objection to Pilkington's implied covenant claim by once again arguing that the conduct on which the claim is based relates to negotiations over the Endorsement, not performance under the Policy.  Additionally, although it cites to no authority in support, MSI adds an argument that allowing Pilkington's implied covenant claim "would create an end-run around the exacting requirements for reforming a written agreement."  (MSI's Mem. of L. in Supp. Mot. to Dismiss at 2, ECF No. 77.)  The Court disagrees.

First, Pilkington's implied covenant claim is a stand-alone claim: it seeks damages of its own accord, not reformation of the Policy.  (Am. Compl. ¶ 135; _id._ at 39.)

Second, none of MSI's arguments or the case law it cites establish that an implied covenant claim is improper under the facts asserted here.  Drawing all reasonable inferences in Pilkington's favor, the AC alleges that MSI was obligated to

31

indemnify Pilkington for losses caused by certain windstorms, but instead of fulfilling that promise in good faith, MSI tricked Aon and Pilkington into substantially eliminating that benefit, thereby reducing MSI's obligation to indemnify.  This plausibly alleges a breach of the implied covenant. See Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 514 (2d Dep't 1999) ("For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff."); see also Chase Manhattan Bank, N.A. v. Keystone Distribs. Inc., 873 F. Supp. 808, 815–16 (S.D.N.Y. 1994).

The November Email further demonstrates that MSI's conduct with respect to the Endorsement was undertaken "in the course of performance," 511 W., 773 N.E.2d at 500, and not, as MSI argues, simply during negotiations over a modification to the Policy. In the November Email, Tanaka tells Perry that the Endorsement's policy changes would be retroactively applied to April 1, 2015, thereby reducing not simply MSI's indemnification obligations going forward, but its earlier obligations as well.  (Nov. 24, 2015 email from MSI to Aon, Ex. 9 to Am. Compl., ECF No. 73-9.) This cuts to the very heart of MSI's performance.  Indeed, Tanaka even ends his email by informing Perry that "this change

will not affect the recent claim." (Id.)  And, as discussed above, the context of MSI's request and the communications between Aon and MSI related to it, gives rise to the inference that the Endorsement was less of a negotiation than of two parties working together to fix certain clerical errors.

Finally, as discussed above, the AC plausibly alleges that MSI's actions exhibited an intent to harm the party on the other side of its contract or, at the very least, a reckless disregard of the harm Pilkington would incur.  This alone implies bad faith by MSI which would allow the implied covenant claim to withstand a motion to dismiss brought under Rule 12(b)(6). See In re LIBOR, 27 F. Supp. 3d at 482-83; In re LIBOR-Based Fin. Instruments Antitrust Litig., 962 F. Supp. 2d 606, 632-34 (S.D.N.Y. 2013).  Pilkington's breach of the implied covenant claim survives.

### D.  Breach of Contract

"An action may be brought for a reformation of a contract, and for a recovery at the same time upon the contract when reformed." Maher v. Hibernia Ins. Co., 67 N.Y. 283, 292 (1876). The AC's breach of contract claim survives because, as discussed above, Pilkington's reformation of contract claim survives. Cf. Pilkington, 420 F. Supp. 3d at 151-52.

### E.   Declaratory Relief

A declaratory judgment claim may be brought where "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue" or "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Bristol-Myers Squibb Co. v. SR Int'l Bus. Ins. Co., 354 F. Supp. 2d 499, 506 (S.D.N.Y. 2005) (quotation marks omitted).  The AC's declaratory judgment claim survives because an actual case or controversy exists such that declaratory judgment may serve a useful purpose. See Pilkington, 420 F. Supp. 3d at 152.

### IV.  Aon's Motion to Dismiss

The AC asserts five claims against Aon for breach of contract, intentional misrepresentation, negligence, negligent misrepresentation, and breach of fiduciary duty.  Aon moves to dismiss only the intentional misrepresentation claim.

### A.  Conflicts of Law

As before, Aon and Pilkington agree that a conflicts of law analysis is not necessary at this time.  (Aon's Mem. of L. in Supp. Mot. to Dismiss at 7 n.3, ECF No. 82; Pilkington's Mem. of L. in Opp'n Mot. to Dismiss at 10 n.6, ECF No. 87.)  "If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law." Licci

ex rel. Licci v. Leb. Can. Bank, SAL, 672 F.3d 155, 157 (2d Cir.
2012).  The Court applies New York law to Aon's motion.

### B.  Intentional Misrepresentation

### 1.  Sufficiency of the Claim

Under New York law, "a claim for intentional
misrepresentation . . . is identical to a claim for fraud."
Assoun v. Assoun, No. 14 Civ. 1368 (PAC), 2015 WL 110106, at *5
(S.D.N.Y. Jan. 7, 2015) (collecting cases).  "[F]raud requires
proof of (1) a material misrepresentation or omission of a fact,
(2) knowledge of that fact's falsity, (3) an intent to induce
reliance, (4) justifiable reliance by the plaintiff, and (5)
damages." Loreley Fin., 797 F.3d at 170.  Where a plaintiff
alleges fraudulent concealment, it must specify "(1) what the
omissions were; (2) the person responsible for the failure to
disclose; (3) the context of the omissions and the manner in
which they misled the plaintiff, and (4) what defendant obtained
through the fraud." Malmsteen v. Berdon, LLP, 477 F. Supp. 2d
655, 664 (S.D.N.Y. 2007).

As discussed above, the scienter element requires
particularized allegations which give rise to a strong inference
of fraudulent intent. In re Carter-Wallace, 220 F.3d at 39.  In
addition to allegations of motive and opportunity, such a
showing may be made by alleging strong circumstantial evidence
of conscious misbehavior or recklessness, "which is[,] at the

least, conduct which is highly unreasonable and which represents
an extreme departure from the standards of ordinary care to the
extent that the danger was either known to the defendant or so
obvious that the defendant must have been aware of it." Id. at
39-40 (internal quotation marks omitted).  Recklessness is
typically established where a plaintiff "specifically allege[s]
defendants' knowledge of facts or access to information
contradicting their public statements." Novak v. Kasaks, 216
F.3d 300, 308 (2d Cir. 2000).

Pilkington argues that Perry's statement to Feltman in
January 2016, that the Endorsement revised only limit and
sublimit valuations, constitutes an actionable intentional
misrepresentation because Perry had formed the understanding
that the Endorsement also revised the Windstorm Sublimit to
apply to certain hazard wind zones.  (Am. Compl. ¶¶ 75, 83-86.)
Aon argues that these allegations do not give rise to a strong
inference of fraudulent intent.  The Court agrees with Aon.

First, Pilkington's opening argument that Aon improperly
seeks reconsideration of an issue the Court already decided is
without merit.  The MTD Order dismissed both of Pilkington's
misrepresentation-based claims because the allegations
supporting the claims failed to meet the requirements of Rule
9(b)—the Court did not examine whether the OC's allegations of
intent to defraud, standing alone, satisfied Rules 12(b)(6) and

9(b).  Aon's instant motion is not a motion for reconsideration at all, and the Court will not apply that standard here.

Second, reading the AC in its entirety, as the Court must, see Loreley Fin., 797 F.3d at 177 ("In determining whether th[e] strength-of-inference requirement is met, we consider the complaint in its entirety and take into account plausible opposing inferences.") (alteration and internal quotation marks omitted), Aon's statement in the January Email, which qualified Pilkington's consent based on the same mistaken understanding that Aon conveyed to Pilkington, gives rise to the strong opposing inference that Aon had no intention of defrauding Pilkington out of any benefit afforded by the Policy's original windstorm sublimit. See, e.g., Deutsch v. JPMorgan Chase & Co., No. 18 Civ. 11655 (VSB), 2019 WL 4805689, at *11 (S.D.N.Y. Sept. 30, 2019) (holding allegation that a defendant subsequently honored a promise that he had earlier made precluded the inference that the defendant had fraudulent intent when he made the promise); B & M Linen, Corp. v. Kannegiesser, USA, Corp., 679 F. Supp. 2d 474, 483 (S.D.N.Y. 2010) (stating conflicting allegation "creates an inference that fraudulent intent is lacking") (emphasis in original).  Indeed, the gravamen of the AC is that Aon did not understand that the Windstorm Sublimit changed in a detrimental way.  Pilkington's conclusory assertion to the contrary, (Am. Compl. ¶¶ 105, 152), does not suffice to

plausibly plead otherwise. See Lynch, 952 F.3d at 75
("[A]llegations that are 'conclusory' are 'not entitled to be
assumed true[.]'"); see also Spinnato v. Unity of Omaha Life
Ins. Co., 322 F. Supp. 3d 377, 402 (E.D.N.Y. 2018) (holding
insured's fraud allegations were legally insufficient to
establish scienter).

Finally, the Court is not persuaded that Aon's actions
demonstrate motive and opportunity, or constitute recklessness
in the form of highly unreasonable conduct or an extreme
departure from the standards of ordinary care, on the theory
that the danger of substantial harm to Pilkington was either
known to Aon or so obvious that Aon must have been aware of it.
Here, the AC specifically alleges that Pilkington relied on Aon
for advice and guidance, and Aon "exercise[d] its judgment about
what information to relay to Pilkington." (Am. Compl. ¶¶ 26,
28.) Accordingly, Aon's decision to summarize the Endorsement's
changes and omit the fact that the wording of the Windstorm
Sublimit was altered when—as Pilkington's own pleading makes
clear—Aon did not believe the changes materially impacted
anything other than valuation, does not constitute highly
unreasonable conduct. Nor does it constitute an extreme
departure from the standards of ordinary care where—as the AC
makes clear—the true effect of the revised wording was not known
to Aon and it was not so obvious that Aon should have been aware

of it.  Indeed, before discussing the Endorsement with
Pilkington, Aon first took the prudent step of confirming its
mistaken understanding with MSI.  The fact that Aon did not do
more does not imply fraudulent intent where MSI did not correct
or contradict Aon's mistaken understanding.

At bottom, Pilkington's allegations against Aon are
grounded in negligence: that Pilkington trusted Aon to handle
its insurance needs but Aon carelessly allowed it to be the
victim of a fraud perpetrated by MSI.  The fact that Aon
understood that changes to a sublimit's wording could have
profound consequences, (Am. Compl. ¶ 103), is not enough to
establish that Aon's false statement to Pilkington was
intentional where Aon was empowered by Pilkington to exercise
its judgment about what information to relay, (id. ¶ 28), and
Aon believed the Endorsement only changed valuations—which is
what it told Pilkington—because of misrepresented information
that Aon received from MSI, (id. ¶¶ 98-100).  Accordingly, the
AC fails to plead a factual basis which gives rise to a strong
inference of fraudulent intent by Aon, and Pilkington's
intentional misrepresentation claim must be dismissed.

### 2.  Leave to Amend

As discussed above, although leave to amend generally
should be freely given, "a district court has discretion to deny
it for good reason, including futility, bad faith, undue delay,

or undue prejudice to the opposing party." <u>Eastman Kodak Co. v.</u>
<u>Henry Bath LLC</u>, 936 F.3d 86, 98 (2d Cir. 2019) (internal
quotation marks omitted).

Pilkington has requested leave to amend.  The Court will
not grant it at this time.

First, Pilkington has already had an opportunity to amend
its pleading to satisfy Rule 9(b).  Indeed, the Court granted
Pilkington's prior request well after Aon and MSI had thoroughly
deconstructed the OC and pinpointed its flaws.  Further, the MTD
Order provided a comprehensive analysis of the merits of the
parties' arguments, including the elements that Pilkington is
required to satisfy to adequately allege scienter.  Pilkington
has already had a full opportunity to cure its Rule 9(b)
pleading deficiencies.

Second, even if the Court were inclined to grant
Pilkington's request, leave to amend would be futile because the
additional allegations that Pilkington proposes are nothing more
than additional detail to its prior insufficient claim.  (<u>See</u>
Decl. of Seth A. Tucker (Jan. 15, 2020), ECF No. 88; <u>see also</u>
Oral Arg. Tr. at 21:7-25 (Mar. 16, 2020), ECF No. 105 (counsel
stating Pilkington does not "have the basis for new
allegations").)

## V. Conclusion

For the reasons set forth above, MSI's motion to dismiss the Amended Complaint in its entirety is DENIED.  Aon's motion to dismiss Count VII (intentional misrepresentation) is GRANTED.

It is FURTHER ORDERED that the stay on discovery imposed by the Court's January 29, 2019 Order (ECF No. 53) is LIFTED.  The parties are directed to (1) proceed to discovery under the supervision of Magistrate Judge Fox; (2) join any additional parties by no later than June 15, 2020; and (3) confer and file a joint-proposed case management order by no later than June 22, 2020, which is to contain an agreed upon cutoff date for discovery.  If no agreed upon cutoff date is fixed, the Court will impose one.

The Clerk of Court is directed to terminate the motions docketed at ECF Nos. 76 and 81.

**SO ORDERED.**

Dated:    New York, New York
          May 18, 2020

_John F. Keenan_
John F. Keenan
United States District Judge