## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PILKINGTON NORTH AMERICA, INC., | CASE NO.: 1:18-CV-08152-JFK |
| Plaintiff, | **ELECTRONICALLY FILED** |
| vs. | |
| MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA and AON RISK SERVICES CENTRAL, INC., | **AMENDED THIRD-PARTY COMPLAINT** |
| Defendants. | |
| -and- | |
| MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA, | |
| Third-Party Plaintiff, | |
| vs. | |
| NIPPON SHEET GLASS CO., LTD., AON UK LIMITED, | |
| Third-Party Defendants. | |

Third-Party Plaintiff, Mitsui Sumitomo Insurance Company of America ("**MSI-US**"), by and through its undersigned attorneys, alleges as follows:

### INTRODUCTION

1.      Pilkington North America, Inc. ("**Pilkington-US**") filed its action against MSI-US to recover between $60 million and $100 million in losses allegedly sustained as a result of a tornado striking its Ottawa, Illinois facility on February 28, 2017 (the "**Windstorm Loss**").

2.      Both MSI-US and Pilkington-US agree that the property claim is subject to a local property insurance policy issued by MSI-US to NSG Holding USA II, Inc. ("**NSG-US**") that

affords coverage to its wholly-owned subsidiary, Pilkington-US, effective from April 1, 2016 to April 1, 2017 (the "**2016-2017 U.S. Local Policy**"). The 2016-2017 U.S. Local Policy specifies that property damage claims arising from a "U.S. Windstorm" are subject to a $15 million sublimit (the "**2016-2017 Windstorm Sublimit**"). There is no dispute that MSI-US has paid the $15 million 2016-2017 Windstorm Sublimit to Pilkington-US in full.

3.  Pilkington-US is a wholly-owned subsidiary of NSG-US, "a holding company that did not have any operations or active business". (Am. Compl. ¶ 17.) Both Pilkington-US and NSG-US are indirect subsidiaries of Nippon Sheet Glass Co., Ltd. ("**NSG-Japan**"). NSG-US is the named insured on the 2016-2017 U.S. Local Policy. Upon information and belief, NSG-Japan indirectly pays for and receives all benefits from the 2016-2017 U.S. Local Policy.

4.  MSI-US is a subsidiary of Mitsui Sumitomo Insurance Co. Ltd. ("**MSI-Japan**").

5.  MSI-Japan reinsures 100% of the exposure assumed by MSI-US in connection with the issuance of the 2016-2017 U.S. Local Policy.

6.  The 2016-2017 U.S. Local Policy that Pilkington-US procured from MSI-US—like all local property insurance policies that Pilkington-US procured from MSI-US since at least 2009—was part of a comprehensive global risk transfer program (the "**Global Program**") that NSG-Japan and its insurance agent, Aon UK Limited ("**Aon-UK**"), negotiated with MSI-Japan on behalf of all of NSG-Japan's global affiliates and subsidiaries, including Pilkington-US (the "**NSG Group Companies**").

7.  Under the Global Program, NSG-Japan represented itself as the designated insurance purchasing agent for the NSG Group Companies and negotiates and agrees to the terms and conditions of property coverage for each of its members with a designated "lead" insurer that has subsidiaries in all or most of the countries in which the NSG Group Companies

2

operate.   Once an agreement for all coverages to be afforded is reached, NSG-Japan memorializes the agreement in a document (referred to as the "**Master Policy**") with the lead insurer.

8.      Upon information and belief, NSG-Japan then advises its subsidiaries of the terms and conditions that have been agreed to on their behalf.  Consistent with NSG-Japan's, Aon-UK's and MSI-Japan's agreement, to formalize this agreement in a way that does not violate any local insurance law in a jurisdiction in which a particular subsidiary operates, a second insurance policy (known as a "**Local Policy**"), is issued by a member of the multinational insurance group that is authorized to issue insurance in that particular jurisdiction.  Consistent with NSG-Japan, Aon-UK's and MSI-Japan's agreement, the Local Policy is supposed to mirror (or replicate) the terms and conditions in the Master Policy for the particular jurisdiction in which it is issued.

9.      Since 2009, MSI-Japan has been the lead insurer of the NSG Global Program and has issued on an annual basis a Master Policy that sets out, *inter alia*, worldwide sublimits for the NSG Group Companies.  The Master Policy is implemented in local jurisdictions under the Local Policies, including the 2016-2017 U.S. Local Policy issued by MSI-US.

10.      As part of the negotiations of the Global Program dating back to 2008-2009, NSG-Japan and Aon-UK have consistently represented themselves to MSI-Japan as having the authority to bind all of the NSG Group Companies, including Pilkington-US, to the insurance sublimits of the Master Policy, including the sublimit for U.S. Windstorms. NSG-Japan and Aon-UK have, therefore, consistently represented themselves to MSI-Japan as the agent and subagent, respectively, of Pilkington-US with respect to obtaining insurance coverage from MSI-Japan and its own global affiliates, including MSI-US.

11.     As with each of the Master Policies dating back to 2009, the 2016-2017 Master Policy negotiated with MSI-Japan by NSG-Japan and Aon-UK with represented authority to negotiate on behalf of Pilkington-US established the total amount of insurance coverage NSG-Japan will obtain for itself and its worldwide subsidiaries and affiliates.  Consistent with prior years, once the Master Policy terms were executed, Aon-UK delegated to its local affiliates, including Aon-US, its represented authority to bind the local NSG Group Companies, including Pilkington-US, to the sublimits of the Master Policy in a series of Local Policies.

12.     In the United States, Aon-US, as an agent of Aon-UK and a subagent of NSG-Japan and Pilkington-US, represented to MSI-US that it had the authority and instructions from Aon-UK to apply the applicable Master Policy sublimits to a local policy for the United States for Pilkington-US (the "**U.S. Local Policy**").

13.     Unless prohibited by local regulation, the Local Policies—including the U.S. Local Policy—are written to provide the same aggregate limits and sublimits of liability that were already negotiated and agreed to as part of the annual Master Policy.  To the extent local regulations require lower aggregate limits or sublimits in the Local Policy, the Local Policy is written to reflect those lower limits and the Master Policy then serves as a second layer of insurance providing coverage up to the higher aggregate limit or sublimit reflected in that agreement.  The Master Policy thus caps the total coverage, including sublimits, that will be available under both that policy and the Local Policies issued pursuant to its terms.  These limitations of liability—negotiated by NSG-Japan and Aon-UK with represented authority to negotiate on behalf of all of its affiliates and subsidiaries—are explicitly incorporated into the various Local Policies, including the 2016-2017 U.S. Local Policy.

14. Under the 2016-2017 Master Policy, the parties agreed to a sublimit of $15 million for "US Windstorm". The 2016-2017 U.S. Local Policy, including the 2016-2017 Windstorm Sublimit, is consistent with and applied the sublimits agreed to under the 2016-2017 Master Policy. Nonetheless, Pilkington-US alleges that it is entitled to more than the $15 million payment it already received from MSI-US for the Windstorm Loss. Despite the plain text of the 2016-2017 U.S. Local Policy, Pilkington-US claims, *inter alia*, that it is entitled to reformation of the agreement because, it claims, it never knowingly agreed to a sublimit that covers all "Windstorms".

15. MSI-US agreed to participate in the Global Program through the 2016-2017 U.S. Local Policy in reliance on the representations of authority to bind all of the NSG Group Companies made by NSG-Japan and Aon-UK to MSI-Japan, that those companies knew or reasonably should have known would be conveyed to and relied upon by local affiliates of MSI-Japan. MSI-US also relied directly on the representations of authority from Aon-US that it had the authority to bind Pilkington-US, both based on the represented delegated authority from Aon-UK and Aon-US's direct interactions with Pilkington-US.

16. MSI-US thus believed that Pilkington-US agreed to the $15 million limit for U.S. Windstorms in the Master Policy through the represented delegated authority of NSG-Japan and Aon-UK. MSI-US also was led to understand that the subsequent execution of the 2016-2017 U.S. Local Policy simply incorporated that sublimit that had already been agreed upon by Pilkington-U.S.'s duly authorized agents and subagents, and that Pilkington-U.S. had no retained authority to renegotiate that sublimit after the Master Policy was executed.

17. Documents recently produced by Pilkington-US are consistent with the representations of authority made to both MSI-Japan and MSI-US. In particular, these

documents confirm MSI-US's position throughout this litigation that the 2016-2017 US Local Policy simply incorporated the applicable sublimits that were negotiated as part of the Master Policy and directly undermine Pilkington-US's entire theory of the case.  Specifically, in an April 19, 2017, internal email directly addressing the available coverage for the losses sustained by Pilkington-US when the tornado hit is Ottawa facility, a Pilkington-US employee observed:



(**Exhibit 10**, PNA00017433-434 at -434 (emphases in original).)

18.     As this email confirms, MSI-US should prevail on Pilkington-U.S.'s claims in this action based on a finding that Pilkington-US had in fact delegated to its various agents and subagents, including NSG-Japan, Aon-UK and Aon-US, the authority to reach the $15 million 2016-2017 Windstorm Sublimit, as evidenced by the agreements signed on its behalf at the global level and its own ratification of that agreement through execution of the 2016-2017 U.S. Local Policy.

19.     This third-party claim is brought by MSI-US as an alternative ground for relief in the event that a fact-finder (i) finds that Pilkington-US had the authority to negotiate its own insurance sublimits and to reject the $15 million sublimit for U.S. Windstorms in the Master Policy that NSG-Japan and Aon-UK represented would bind Pilkington-US, and (ii) determines that MSI-US is liable for damages.  When MSI-Japan agreed to participate in the Global

6

Program and MSI-US agreed to insure Pilkington-US, MSI-Japan and MSI-US relied on representations by NSG-Japan, Aon-UK and Aon-US that the sublimits agreed to at the global level each year would apply to the U.S. Local Policy.  If Pilkington-US is successful in claiming that it is not bound by the $15 million U.S. Windstorm sublimit, then NSG-Japan and Aon-UK are liable to MSI-US for damages arising from misrepresenting their authority to bind Pilkington-US to the $15 million U.S. Windstorm Sublimit in the 2016-2017 Master Policy that is incorporated in the 2016-2017 U.S. Local Policy.

## PARTIES

20.    MSI-US is a property and casualty insurance company that is organized under the laws of New York and licensed by the State of New York to transact business (and does transact business)  in New York.  MSI-US's statutory home office is also located in New York.

21.    Upon information and belief, defendant NSG-Japan is a foreign corporation with a principal place of business in Tokyo, Japan, which transacts and/or has transacted business in the State of New York, including by engaging its insurance broker of record, Aon-UK, to direct the negotiation and procurement of the 2016-2017 U.S. Local Policy at issue in this litigation through its affiliate and agent, Aon-US.

22.    Upon information and belief, defendant Aon-UK is a foreign corporation with a principal place of business in London, England.  Aon-UK transacted and/or has transacted business in the State of New York, on behalf of NSG-Japan, including by directing the negotiation and procurement of the 2016-2017 U.S. Local Policy at issue in this litigation through its affiliate and agent, Aon-US.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 1367(a).

7

24.     There is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

25.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c).

## FACTUAL ALLEGATIONS

### I.     The Parties.

26.     **NSG-Japan and Pilkington-US.**  NSG-Japan is a flat glass manufacturer with subsidiaries and affiliates operating worldwide.

27.     Pilkington-US is a wholly-owned indirect subsidiary of NSG-Japan.  At all relevant times, NSG-Japan has identified Pilkington-US as a subsidiary whose undertakings principally affect its consolidated financial statements.

28.     At all relevant times, NSG-Japan has represented that it has the authority to negotiate and obtain insurance coverage under the Global Program for all NSG Group Companies, including Pilkington-US.

29.     NSG-Japan has held itself out as an agent of Pilkington-US for purposes of obtaining insurance coverage under the Global Program.

30.     **Aon-UK and Aon-US.**  Aon-UK is one of the most experienced insurance brokers in the world with affiliates across the globe and designed, developed, and marketed the Global Program for well over a decade.

31.     At all relevant times, Aon-UK was the broker of record for NSG-Japan with regard to the Global Program.

32.     At all relevant times, Aon-UK acted as NSG-Japan's agent (and represented itself as Pilkington-U.S.'s subagent) with respect to the negotiation, placement, management, and administration of the Global Program.

33.     NSG-Japan and Aon-UK entered into the "Service Agreement" to memorialize that Aon-UK would act as NSG-Japan's agent with respect to the Global Program.  (**Exhibit 3**, Service Agreement at 3; *id.* § 4.1.1.)

34.     In the Service Agreement, NSG-Japan expressly ██████████████ ███████████████ to Aon-UK that it was ████████████████████████████ ██████████████ (**Exhibit 3**, Service Agreement at 6; *id.* §§ 3.1.1, 3.1.2.)

35.     As NSG-Japan's agent, Aon-UK's services included:

a.   ██████████████████████████████████████████ ███████;

b.   ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████ (**Exhibit 3**, Service Agreement Schedule 1 – Services at § 3.10);

c.   ██████████████████████████████████████████ ██████████████████████████████████████ (*id.* §§ 3.11, 3.19, 3.20, 3.21); and

d.   ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ █████████ (*id.* §§ 5.4.3, 5.4.5).

36.     Aon-UK likewise was responsible for structuring and marketing the Reinsurance Program to protect the net exposure of the Lead Insurer under the Master Policy and Local Policies issued to the NSG Group Companies.  As discussed below, the Reinsurance Program has consistently involved a captive insurer that is ultimately owned by NSG-Japan, and a "panel" of market reinsurers that Aon-UK solicits to participate in the Program.

37.     Aon-UK received annual commissions for its roles in placing both the insurance and reinsurance components of the Global Program.

38.     Aon-US is an Illinois insurance broker that regularly transacts, or has transacted, its business in the State of New York.

39.     At all relevant times, Aon-US acted as Aon-UK's agent and NSG-Japan's subagent to effectuate the terms of the Global Policy in the United States, including through business conducted from and in New York.

40.     Under the Global Program, Aon-US received instructions from Aon-UK, as NSG-Japan's agent, with respect to implementing the applicable terms, conditions, and sublimits of the Master Policy in a U.S. Local Policy.

41.     Therefore, at all relevant times, NSG-Japan represented that it acted as an agent of Pilkington-US, and Aon-UK and Aon-US represented that they acted as subagents for Pilkington-US for purposes of obtaining insurance coverage.

42.     At all relevant times, Aon-US further acted as Pilkington-US's direct agent with respect to the negotiation and placement of the U.S. Local Policies under the Global Program.

43.     Accordingly, MSI-US, as a general practice, did not communicate directly with Pilkington-US regarding its insurance program.  Rather, MSI-US typically provided all information about the U.S. Local Policies to Pilkington-US's agent, Aon-US.

10

44.     **MSI-Japan and MSI-US.**  MSI-Japan is a property and casualty insurance company that is organized under the laws of Japan with its principal place of business in Tokyo, Japan.

45.     Since 2009, MSI-Japan served as the lead insurer for the Global Program.  MSI-Japan negotiates and provides coverage under the Master Policy as part of the Global Program.

46.     Where MSI-Japan was not directly authorized to transact its insurance business, MSI-Japan enlisted its subsidiaries, like MSI-US, to work with each respective Aon-UK subsidiary to write Local Policies to cover the NSG Group Companies consistent with the Master Policy, and NSG-Japan's and Aon-UK's representations of authority over the NSG Group Companies, including Pilkington-US.

47.     For the United States, MSI-US negotiated with Aon-US to apply the applicable Master Policy sublimits, and write the U.S. Local Policy for the NSG Group Companies in the United States, including Pilkington-US.

## II.    The Global Program Structure.

### A.    Overview.

48.     Since 2009, MSI-Japan and certain of its affiliates and subsidiaries, including MSI-US, have participated in the Global Program—a highly sophisticated, comprehensive global risk transfer program that MSI-Japan understood was designed to, among other things, permit the NSG Group Companies to self-insure many of the risks associated with their business operations.

49.     The Global Program, which pre-dates MSI-Japan's and MSI-US's involvement in it, includes four key features:

- A **Master Policy** issued by a "Lead Insurer" to NSG-Japan to provide direct coverage in those jurisdictions in which the Lead Insurer is authorized to transact insurance business, and to provide supplemental coverage in those jurisdictions in which it is not authorized to transact insurance business directly;

- **Local Policies** issued by affiliates or subsidiaries of the Lead Insurer or other insurance companies in those countries, like the United States, where the Lead Insurer is not authorized to transact insurance business directly;

- A **Reinsurance Program** designed to indemnify the Lead Insurer for liability it may sustain as a result of its participation in the Global Program in excess of a predefined amount; and

- A **Captive Insurance Company**—Pilkington Insurance Limited or NSG Insurance Limited ("**NSG Insurance**")—that is ultimately owned and controlled by NSG-Japan, and participates in reinsuring the Lead Insurer with respect to its participation in the Global Program.

50. A significant component of the Global Program is the creation and utilization of a captive insurance company (NSG Insurance) that is ultimately owned and operated by NSG-Japan.

51. Using a captive insurance company to participate in its risk transfer program permits NSG-Japan to self-insure a significant portion of the expected losses of the NSG Group Companies, including Pilkington-US, and consequently reduces their insurance premium costs.

52. NSG Insurance, however, is not licensed to conduct the business of insurance in all countries where the NSG Group Companies are located, including the United States.

53. NSG-Japan and Aon-UK, therefore, solicit bids from large multinational insurance companies (like MSI-Japan) to directly insure the operations of the NSG Group Companies, and then reinsure a significant portion of those risks back to NSG Insurance.  As alleged in more detail below, the negotiated terms of the insurance coverage are memorialized in annual Master Policies, the limits and sublimits of which are in turn incorporated into annual Local Policies.

**B.** **The Master Policy and Its Negotiation.**

54. Each year, NSG-Japan and Aon-UK negotiated with MSI-Japan the material terms, conditions, sublimits, and premiums of all policies in the Global Program.

55.     As part of this process, Aon-UK prepared and distributed a "Market Submission" for the Global Program to the insurance market (a "**Global Market Submission**"), which provided detailed information concerning the NSG Group Companies, including the nature of their business, exposure and claims information, program structure and administration, and the minimum insurance coverages required.

56.     Based on the information contained in the Global Market Submission, MSI-Japan submitted a quotation of coverage for the Global Program to Aon-UK.  MSI-Japan's quotation of coverage was based on the terms of the Master Policy agreed to by NSG-Japan, Aon-UK, and MSI-Japan.  Those terms included the maximum aggregate limits and sublimits that would be available to the NSG Group Companies pursuant to any Local Policies issued as part of the Global Program.  The premiums were calculated based on the terms of the Master Policy to be charged by each of MSI-Japan's local affiliates to each of NSG-Japan's local subsidiaries.

57.     The Market Submission formed the basis for the Master Policy negotiations each year.

58.     Following negotiations with NSG-Japan and Aon-UK, and based on their representations of authority over the NSG Group Companies, MSI-Japan issued the resulting Master Policy that provided specific sublimits for the NSG Group Companies worldwide.  A party to the Master Policy, NSG-Japan is a necessary and indispensable party to any determination of the rights and obligations arising from the Master Policy.

59.     Once the Master Policy terms were finalized, those sublimits were applied, as applicable, to the Local Policies in each jurisdiction in which the NSG Group Companies operate, except where prohibited by law.

60.     If the laws or regulations of a particular jurisdiction prohibited a local insurer from issuing coverage on the terms and with the sublimits specified in the Master Policy, then the Master Policy provided coverage on a difference in conditions ("DIC") and/or difference in limits ("DIL") basis.

61.     The DIC and DIL features of the Master Policy were, therefore, designed to ensure application of the coverages and limits specified in the Master Policy in all local jurisdictions where a Local Policy could not be issued with those terms.

62.     The Master Policy and the Local Polices were therefore interrelated contracts that were designed to work together to provide the NSG Group Companies with consistent worldwide insurance coverage and, as discussed further below, the sublimits of the Master Policy were explicitly incorporated into the Local Policies.

63.     At all relevant times, NSG-Japan and Aon-UK represented, and MSI-Japan and MSI-US understood, that the Master Policy set the outer boundary of coverage and sublimits available to the NSG Group Companies, including Pilkington-US.

64.     For example, the Global Market Submission sent by Aon-UK on NSG-Japan's behalf for the 2016-2017 Global Program (the "**2016-2017 Global Market Submission**") sets forth a "Service Requirement" that the "[c]overage to be globally admitted with a Difference in Conditions / Difference in Limits extension under the Master policy".  (**Exhibit 4**, 2016-2017 Global Market Submission at 4.)

65.     The 2016-2017 Global Market Submission also specified that "[a]ll local policies to be issued to a good local standard incorporating the following coverage," including "[n]atural catastrophe perils – up to sub limit agreed – i.e. Local US policy should show US $15m CA EQ

limit".  (**Exhibit 4**, 2016-2017 Global Market Submission at 4.)  The 2016-2017 Global Market Submission specified a $15 million sublimit for "US Windstorm".  (*Id.* at 38.)

66.     The 2016-2017 Master Policy provided that it is "a condition precedent to [MSI-Japan's] liability under this Policy that this Policy shall apply where specific local property damage and business interruption policies (hereinafter referred to as a Local Policy) have been issued to [NSG-Japan and the NSG Group Companies] and are maintained in full force and effect".  (**Exhibit 5**, 2016-2017 Master Policy at 5.)  This provision is identical to provisions in preceding and subsequent Master Policies.

67.     The 2016-2017 Master Policy further provided that "the indemnity provided by the Insurer shall not exceed the Sums Insured or Limits as stated in this Policy in the aggregate under this Policy and all Local Policies."  (**Exhibit 5**, 2016-2017 Master Policy at 5.)  This provision is identical to provisions in preceding and subsequent Master Policies.

68.     As part of the negotiation of the Master Policy, NSG-Japan and Aon-UK consistently represented themselves as having the authority to bind the NSG Group Companies, including Pilkington-US, and that the sublimits that NSG-Japan and Aon-UK negotiated with MSI-Japan would apply to all of the NSG Group Companies, including Pilkington-US.

69.     NSG-Japan and Aon-UK documented their representation of authority to procure insurance coverage for Pilkington-US in the Master Policy itself, which expressly stated that the "Insured" under the Master Policy consisted of "Nippon Sheet Glass Co., Ltd. and Subsidiary and Associated Companies and Joint Ventures as declared to the Insurer".  (**Exhibit 5**, 2016-2017 Master Policy at 6.)  Pilkington-US is a wholly-owned subsidiary of NSG-Japan and is clearly encompassed in the Master Policy's definition of a "Subsidiary Company", which is "any company standing in relation of subsidiary to the Insured within the meaning of the Companies

Act 1985 (as amended) or the Companies (Northern Ireland) Order 1986". (**Exhibit 5**, 2016-2017 Master Policy at 14.)

70.     Furthermore, NSG-Japan and Aon-UK documented their representation of authority to bind Pilkington-US by, *inter alia*, identifying in the 2016-2017 Global Market Submission that the "Ottawa, Illinois" location—the Pilkington-US property at issue in this dispute—was "In Programme" for the Global Program. (**Exhibit 4**, 2016-2017 Global Market Submission at 30.)

71.     NSG-Japan and Aon-UK also documented their representation of authority to bind Pilkington-US by identifying in a list of properties in the 2016-2017 Master Policy the same Pilkington-US property at issue in this dispute:  Plant 5, 300 20th Avenue, Ottawa, Illinois 61350. (**Exhibit 5**, 2016-2017 Master Policy at 11.)

72.     MSI-Japan and MSI-US understood that NSG-Japan's and Aon-UK's negotiated sublimits in the Master Policy would be binding on Pilkington-US as a result, at least in part, of NSG-Japan's and its agent Aon-UK's representations of authority over Pilkington-US to MSI-Japan, which each of NSG-Japan and Aon-UK reasonably expected would be communicated to, and relied upon by, MSI-US.

73.     For example, since it began participating in the Global Program in 2009, MSI-Japan explained to its affiliates, including MSI-US, that the "Local Policy is providing the same coverage as the Master Policy", and that the "Local Policy should be consistent with the Master Policy as far as local regulations . . . will allow". (**Exhibit 1**, 2009 Reference Manual at 4.)

74.     MSI-Japan also explained consistently to MSI-US that MSI-Japan and its subsidiaries must "[i]ssue NSG local policies with terms and conditions equivalent to the master policy". (**Exhibit 2**, 2013 Reference Manual at 2.)

75.     As noted above, this structure is also reflected in internal Pilkington-US/NSG emails produced in this litigation.  It is also reflected in NSG's agreement with Aon-UK cited above.

**III.    The U.S. Local Policy and Its Implementation.**

76.     Once NSG-Japan, Aon-UK and MSI-Japan agreed to the terms, limits, sublimits, and premiums for the Global Program in the Master Policy, MSI-Japan communicated the sublimits of the Master Policy to its local affiliates in each jurisdiction in which coverage was provided under a Local Policy, including MSI-US in the United States.

77.     Similarly, Aon-UK, acting as an agent for NSG-Japan and a subagent for Pilkington-US, transmitted the Master Policy information to its local affiliates in each jurisdiction in which coverage is provided under a Local Policy, including Aon-US in the United States.  Those Aon affiliates, including Aon-US, therefore, served as agents of Aon-UK and subagents of NSG-Japan, each of which was acting as an agent of Pilkington-US.

78.     Based on the instructions provided by Aon-UK under the Master Policy, Aon-US generally then prepared and sent MSI-US a "Market Submission" with the requested terms of coverage for Pilkington-US under the U.S. Local Policy (a "**Local Market Submission**").

79.     Thereafter, MSI-US provided Aon-US with a quotation of coverage for the U.S. Local Policy—based on the premium negotiated under the Master Policy—which Aon-US reviewed and reconciled with its instructions from Aon-UK, before asking MSI-US to bind coverage.

80.     As noted above, the parties understood that the U.S. Local Policy was intended to mirror and implement the sublimits of the Master Policy, and their course of conduct reflected that understanding.

81.    Indeed, the U.S. Local Policy incorporated the relevant Master Policy by reference and specified that the insurance coverage in the U.S. Local Policy shall not exceed the sums insured and limits as stated in the Master Policy:

**The draft wording which is to be added to each local policy for making our intention explicit.**

**Memorandum**

(a)  The indemnity provided by the Insurer shall not exceed the Sums Insured or Limits as stated in this Policy.

(b)  Notwithstanding the above (a), the indemnity provided by the Insurer might be adjusted irrespective of the Sums Insured or Limits as stated in this Policy in case the "Provision 3 of OPERATION PROVISIONS" in the Master Policy Wording would be applicable, as this Policy would be deemed to be (a) Local Policy(ies) as stated in that Provision.

> **OPERATION PROVISIONS in the Master Policy Wording (Abstract)**
> 3.    the indemnity provided by the Insurer shall not exceed the Sums Insured or Limits as stated in this Policy in the aggregate under this Policy and all Local Policies

Note: Full Contractual Wording of the Master Policy would be provided upon request.

(c)  The outline of the Master Policy as stated in the above (c) would be as follows:

| Policy Number | Policy Holder (The Insured) | Policy Issuer (Insurer) |
|---|---|---|
| C450368113 | Nippon Sheet Glass Co., Ltd. and Subsidiary and Associated Companies and Joint Ventures as declared to the Insurer | Mitsui Sumitomo Insurance Co., Ltd., Tokyo JAPAN |

(**Exhibit 8**, 2016-2017 U.S. Local Policy.)

## IV.    Coverage For Windstorm Losses In The United States Under The 2016-2017 Global Program

82.    The 2016-2017 Master Policy set a combined limit of € 300 million policy limit as a "combined maximum [or] any one occurrence in respect to all Sections of this Policy", subject to the sublimits provided under the agreement.  (**Exhibit 5**, 2016-2017 Master Policy at 7.)

83.    One such sublimit was for "US Windstorm", which was limited "in respect of one Occurrence", as well as limited "in the Aggregate during any one Period of Insurance", to $ 15 million.  (**Exhibit 5**, 2016-2017 Master Policy at 8.)

84.    In or around January 2016, Aon-UK, as agent of NSG-Japan, prepared and transmitted to MSI-Japan the 2016-2017 Global Market Submission for the 2016-2017 Global Program.

85.     The 2016-2017 Global Market Submission requested a $15 million sublimit for all windstorm losses in the United States. The 2016-2017 Global Market Submission also specified that the local policies should be issued with coverage for natural catastrophe perils (like windstorms) up to the sublimit agreed to at the global level – here, $15 million for windstorms in the United States.  (**Exhibit 4**, 2016-2017 Global Market Submission at 4, 38.)

86.     The global insurance coverage premium agreed to by NSG-Japan, Aon-UK, and MSI-Japan was based, in part, on the $15 million "US Windstorm" sublimit contained in the Master Policy.  As alleged above, the premium was apportioned to the respective Local Policies, including the U.S. Local Policy.

87.     In or around March 2016, Aon-US, as an agent for Aon-UK and a subagent for NSG-Japan and Pilkington-US, prepared and transmitted a Local Market Submission for the 2016-2017 U.S. Local Policy (the "2016-2017 **U.S. Submission**") to MSI-US in New York.  In accordance with the sublimits negotiated and agreed to at the global level by NSG-Japan, Aon-UK and MSI-Japan for the Master Policy, the 2016-2017 U.S. Submission requested a $15 million sublimit for "U.S. Windstorm" losses for the Local Policy.  A copy of the 2016-2017 U.S. Submission is attached as **Exhibit 6**.

88.     Based on the information contained in the 2016-2017 U.S. Submission, MSI-US underwriter, Ewan Noel, sent Aon-US, from his office in New York, a quotation of coverage for the 2016-2017 U.S. Local Policy, which included a $15 million sublimit for "U.S. Windstorm." A copy of this communication is attached as **Exhibit 7**.

89.     Aon-US then "reconciled" the quotation that it received from MSI-US with its "instructions" from Aon-UK, and directed the MSI-US underwriter, Ewan Noel, in New York, to "proceed with policy issuance."  In doing so, Aon-US was confirming in a direct representation

to MSI-US that it was acting on alleged authority delegated to it by Aon-UK, consistent with the representation of authority previously made by NSG-Japan and Aon-UK to MSI-Japan.  A copy of this communication is attached as **Exhibit 9**.

90.    In accordance with the Master Policy coverage requested by Aon-UK and NSG-Japan under the Global Program, and the information contained in the 2016-2017 U.S. Submission provided by Aon-US as an agent for Aon-UK and subagent for NSG-Japan and Pilkington-US, MSI-US issued, from its New York office, the 2016-2017 U.S. Local Policy.  A copy of this Policy is attached as **Exhibit 8**.

91.    The 2016-2017 U.S. Local Policy contained a $15 million sublimit for "U.S. Windstorm combined per occurrence and in the annual aggregate."  (**Exhibit 8**, 2016-2017 U.S. Local Policy at p. 4 of 52).  "Windstorm" is defined, in pertinent part, as "the direct action of wind."  (*Id.* at p. 47 of 52.)

92.    The 2016-2017 U.S. Local Policy Windstorm sublimit aligned with the 2016-2017 Master Policy issued by MSI-Japan, which contained a $15 million sublimit for "US Windstorm" per occurrence and in the aggregate.  This was consistent with the coverage specified in the Master Policy for windstorms in the United States every year since 2009, when MSI-Japan and its affiliates first participated in the Global Program.

93.    The reinsurance coverage procured by Aon-UK for the MSI-Japan and its affiliates for windstorm losses in the United States under the 2016-2017 Global Program is likewise subject to a $15 million limit.  This was consistent with the reinsurance coverage obtained by Aon-UK for windstorms in the United States every year since 2009, when MSI-Japan and its affiliates first participated in the Global Program.

A.      **The Windstorm Loss.**

94.      Upon information and belief, on February 28, 2017, at approximately 4:45 p.m., a category EF-3 tornado (the "**Tornado**") struck two buildings at Pilkington-US's Ottawa, Illinois facility, causing property damage, business interruption, and other losses to Pilkington-US.

95.      On February 28, 2017, Elizabeth Feltman, Pilkington-US's regional manager, provided MSI-US with notice of damages resulting from the Tornado.

96.      Pilkington-US has claimed that the total amount of claimed property damage and other losses arising out of the Tornado is between $60 million and $100 million.

97.      Because a tornado is "the direct action of wind", the 2016-2017 U.S. Local Policy's $15 million sublimit for "U.S. Windstorm" applies to the Windstorm Loss.

98.      As such, MSI-US paid Pilkington-US $15 million in satisfaction of its coverage obligations under the 2016-2017 U.S. Local Policy.

99.      For the fiscal year ended March 31, 2017, NSG-Japan's consolidated financial statements reported a loss on "disposal of current assets" attributable to the "inventories damaged at Ottawa, USA" by the Tornado.

100.      For the fiscal year ended March 31, 2018, NSG-Japan's consolidated financial statements disclosed a gain on settlement of insurance proceeds related to "insurance monies received following the Tornado that struck the Group's plant at Ottawa, Illinois".

101.      On September 6, 2018, Pilkington-US initiated this lawsuit against MSI-US, alleging that the $15 million "U.S. Windstorm" sublimit in the 2016-2017 U.S. Local Policy does not apply to the Windstorm Loss because Pilkington-US did not request or agree to the sublimit.

**V.    In the Alternative, if Pilkington-US's Claim Succeeds, Then NSG-Japan and Aon-UK Are Liable to MSI-US for Any Damages It Sustains.**

102.    As alleged above, NSG-Japan, Aon-UK, and MSI-Japan negotiated and set the sublimits of the Master Policy each year, which were intended to be applied and incorporated into the corresponding Local Policies.

103.    Based on Pilkington-US's past conduct and NSG-Japan's, Aon-UK's and Aon-US's representations, MSI-US understood that Pilkington-US was aware that it was bound by the sublimits of the Master Policy, and that the U.S. Local Policy applied the sublimits set out in the Master Policy.

104.    But if a fact-finder finds that Pilkington-US was not bound by the sublimits in the Master Policy as MSI-US, Pilkington-US, Aon-US and Aon-UK incorporated them in the U.S. Local Policy, then NSG-Japan and Aon-UK misrepresented their authority to bind Pilkington-US under the Global Program.

105.    As alleged above, NSG-Japan and Aon-UK represented to MSI-Japan that NSG-Japan and Aon-UK had the authority to negotiate and set insurance coverage sublimits for the NSG Group Companies, including Pilkington-US.

106.    As such, NSG-Japan and Aon-UK warranted that they had the authority to enter contractual sublimits that would be binding on Pilkington-US.

107.    MSI-Japan relied on NSG-Japan's and Aon-UK's representation of authority to bind the NSG Group Companies when participating in, and negotiating a Master Policy under, the Global Program.  As reasonably expected, MSI-Japan also communicated NSG-Japan's and Aon-UK's representations to its affiliate, MSI-US, which relied on those representations to implement the Global Program in the United States through the U.S. Local Policy.  Neither MSI-US nor MSI-Japan would have participated in the Global Program if NSG-Japan and Aon-UK

had not represented that they had the authority to negotiate and bind the sublimits for the NSG Group Companies, including Pilkington-US.

108.    NSG-Japan and Aon-UK, through Aon-UK's agent Aon-US, further represented to MSI-US that Aon-US had the authority to bind Pilkington-US in the 2016-2017 U.S. Local Policy to the sublimits set out in the 2016-2017 Master Policy.  NSG-Japan and Aon-UK, acting through Aon-US, knew or should have known that MSI-US would rely on that representation to enter into the 2016-2017 U.S. Local Policy and participate in the Global Program.  NSG-Japan and Aon-UK also knew or should have known that MSI-Japan would communicate to MSI-US that NSG-Japan and Aon-UK represented that they had the authority to bind Pilkington-US and that they did so bind Pilkington-US to the sublimits of the Master Policy.

109.    MSI-US relied on Aon-UK's representation of authority through Aon-US to bind Pilkington-US to the U.S. Local Policy, which applied the Master Policy's sublimits.

110.    MSI-US, as MSI-Japan's affiliate in the United States, relied on NSG-Japan's representation of authority to bind the NSG Group Companies under each Master Policy when MSI-US was directed to apply the Master Policy sublimits to the U.S. Local Policy.  MSI-US would not have participated in the Global Program and/or would have negotiated different insurance agreement terms with Pilkington-US if it had understood that Pilkington-US was not bound by the  sublimits of the Master Policy, as incorporated in the U.S. Local Policy.

111.    Therefore, to the extent that Pilkington-US succeeds on a claim that it was not bound by the sublimits of the 2016-2017 U.S. Local Policy, which incorporates the applicable sublimits of the 2016-2017 Master Policy, and obtains monetary relief from MSI-US, then NSG-Japan and Aon-UK are liable to MSI-US for damages that MSI-US sustains as a result of what,

in that case, were NSG-Japan's and Aon-UK's false representation of authority to bind Pilkington-US to the sublimits of the Master Policy.

## COUNT ONE
### (Breach of the Implied Warranty of Authority Against NSG-Japan)

112.    MSI-US realleges and restates paragraphs 1-111 as though fully set forth herein.

113.    NSG-Japan expressly or impliedly represented to MSI-Japan that it had the authority to bind Pilkington-US to the sublimits of the 2016-2017 Master Policy, to be subsequently incorporated into the 2016-2017 U.S. Local Policy.

114.    NSG-Japan knew or should have known that this representation would be conveyed to MSI-US by Aon-US, serving as a subagent for NSG-Japan's agent, Aon-UK, and also MSI-Japan, to effectuate the sublimits of the Global Program.

115.    NSG-Japan knew or should have known that MSI-US would rely on NSG-Japan's representation of authority in order to negotiate and enter the 2016-2017 U.S. Local Policy with Pilkington-US and participate in the Global Program.

116.    NSG-Japan breached its implied warranty of authority if it did not have authority to bind Pilkington-US to the applicable sublimits of the Master Policy.

117.    To the extent that a fact-finder awards damages to Pilkington-US, then NSG-Japan is liable for damages at least in the same amount to compensate MSI-US for the harm suffered as a result of NSG-Japan's breach of the implied warranty of authority to bind Pilkington-US to the sublimits of the 2016-2017 Master Policy, as incorporated in the 2016-2017 U.S. Local Policy.

## COUNT TWO
### (Breach of the Implied Warranty of Authority Against Aon-UK)

118.    MSI-US realleges and restates paragraphs 1-111 as though fully set forth herein.

119.    Aon-UK expressly or impliedly represented to MSI-Japan that it had the authority to bind Pilkington-US to the sublimits of the 2016-2017 Master Policy, to be subsequently incorporated into the 2016-2017 U.S. Local Policy.

120.    Aon-UK, through its agent, Aon-US, further expressly or impliedly represented to MSI-US that it had the authority to bind Pilkington-US to the sublimits of the 2016-2017 Master Policy, to be subsequently incorporated into the 2016-2017 U.S. Local Policy.

121.    Aon-UK, including by acting through Aon-US, knew or should have known that MSI-US would rely on that representation of authority in order to negotiate and enter into the 2016-2017 U.S. Local Policy with Pilkington-US and participate in the Global Program.

122.    Aon-UK breached its implied warranty of authority if it did not have authority to bind Pilkington-US to the applicable sublimits of the Master Policy.

123.    To the extent that a fact-finder awards damages to Pilkington-US, then Aon-UK is liable for damages at least in the same amount to compensate MSI-US for the harm suffered as a result of Aon-UK's breach of the implied warranty of authority to bind Pilkington-US to the sublimits of the 2016-2017 Master Policy, as incorporated in the 2016-2017 U.S. Local Policy.

**WHEREFORE,** MSI-US demands judgment, and, if Pilkington-US is successful in its claims, then respectfully requests that the Court enter judgment in MSI-US's favor as follows:

a.    On Count One, a money judgment against NSG-Japan in an amount exceeding $75,000 to be determined at trial;

b.    On Count Two, a money judgment against Aon-UK in an amount exceeding $75,000 to be determined at trial;

c.    An award of reasonable counsel fees and costs of suit incurred in defending this matter; and

d.   Any further relief that the Court deems equitable and just.

**RIKER DANZIG SCHERER HYLAND &**
**PERRETTI LLP**

Dated:  June 2, 2021                    By:  _____
                                            Brian E. O'Donnell, Esq. (BO-7488)

                                            500 Fifth Avenue
                                            49th Floor
                                            New York, N.Y. 10110
                                            (212) 302-6574

                                            - and -

                                            Headquarters Plaza
                                            One Speedwell Avenue
                                            Morristown, N.J. 07962-1981
                                            (973) 538-0800

                                            **CRAVATH, SWAINE & MOORE LLP**

                                            Kevin J. Orsini, Esq.
                                            Michael P. Addis, Esq.
                                            Worldwide Plaza
                                            825 Eighth Avenue
                                            New York, NY  10019-7475
                                            Tel.:  (212) 474-1000
                                            Fax:  (212) 474-3700
                                            korsini@cravath.com
                                            maddis@cravath.com

                                            *Attorneys for Third-Party Plaintiff*
                                            *Mitsui Sumitomo Insurance Company of America*

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, MSI-US hereby demands

trial by jury of all issues that may be so tried.

**RIKER DANZIG SCHERER HYLAND &
PERRETTI LLP**

Dated: June 2, 2021                    By: _____

Brian E. O'Donnell, Esq. (BO-7488)

500 Fifth Avenue
49th Floor
New York, N.Y. 10110
(212) 302-6574

- and -

Headquarters Plaza
One Speedwell Avenue
Morristown, N.J. 07962-1981
(973) 538-0800

**CRAVATH, SWAINE & MOORE LLP**

Kevin J. Orsini, Esq.
Michael P. Addis, Esq.
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019-7475
Tel.:  (212) 474-1000
Fax:  (212) 474-3700
korsini@cravath.com
maddis@cravath.com

*Attorneys for Third-Party Plaintiff
Mitsui Sumitomo Insurance Company of America*

27