UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
PILKINGTON NORTH AMERICA, INC.,           :

                                                     :       OPINION AND ORDER

         Plaintiff,

                                                   :       18 Civ. 8152 (JFK) (GWG)

   -v.-
                                                   :

MITSUI SUMITOMO INSURANCE              :
COMPANY OF AMERICA, et al.,

                                                   :

         Defendants.           :
-----------------------------------------------------------------X
GABRIEL W. GORENSTEIN, United States Magistrate Judge

      Plaintiff Pilkington North America, Inc. ("Pilkington") brings this action against Mitsui Sumitomo Insurance Company of America ("MSI") and Aon Risk Services Central, Inc. ("Aon"), asserting claims arising from a $60 to $100 million loss that Pilkington suffered when a tornado struck its glass manufacturing factory in Ottawa, Illinois on February 28, 2017. See Amended Complaint, filed Dec. 2, 2019 (Docket # 73) ("Am. Comp."), at 1-2. Before the Court is MSI's motion to compel Pilkington to produce certain withheld or redacted documents over which Pilkington has claimed work product protection.[1] For the following reasons, MSI's motion is granted.

I. BACKGROUND

---

[1] See Motion to Compel, filed Feb. 16, 2022 (Docket # 296); Memorandum of Law in Support of Motion to Compel, filed Feb. 16, 2022 (Docket # 297) ("Def. Mem."); Declaration of Brian E. O'Donnell in Support of Motion to Compel, annexed as Ex. 1 to Def. Mem.; Pilkington's Memorandum of Law in Opposition to Motion to Compel, filed Feb. 22, 2022 (Docket # 298) ("Pl. Opp."); Declaration of Seth A. Tucker in Opposition to Motion to Compel, filed Feb. 22, 2022 (Docket # 299) ("Tucker Decl."); Reply Memorandum of Law in Support of Motion to Compel, filed Feb. 25, 2022 (Docket # 307) ("Def. Reply"); Supplemental Declaration of Brian E. O'Donnell, filed Feb. 25, 2022 (Docket # 308).

A. <u>Factual Background</u>

From 2009 to 2017, Pilkington procured commercial property insurance from MSI through Pilkington's insurance broker, Aon. <u>See</u> Am. Comp. ¶¶ 17-23; MSI's Answer, filed June 1, 2020 (Docket # 110), ¶¶ 17, 23. Before 2015, Pilkington's insurance policy with MSI offered coverage of up to $313 million for damages caused by certain windstorms. <u>See</u> Am. Comp. ¶¶ 97, 110. In June 2015, MSI proposed to Aon certain changes to Pilkington's policy, including a change in the wording of a policy sublimit applicable to windstorms. <u>See</u> <u>id.</u> ¶¶ 56-59. Pilkington alleges that it assented to the policy changes based on Aon's representations that the changes would impact "the values of the Policy limit and sublimits only, and that it did not change the wording of . . . the Windstorm Sublimit." <u>Id.</u> ¶ 87.

On February 28, 2017, a tornado struck a factory owned and operated by Pilkington in Ottawa, Illinois, causing property damage and other losses that Pilkington estimates to be $60 to $100 million. <u>See</u> <u>id.</u> ¶ 1. The next day, Pilkington sought coverage under its insurance policy with MSI. <u>See</u> Def. Mem. at 8; Pl. Opp. at 5. On March 2, 2017, Aon alerted Pilkington to the provision of the MSI policy that limited certain windstorm losses to $15 million. <u>See</u> March 2017 E-mail Exchanges Between Aon and Pilkington, annexed as Ex. A to Tucker Decl. Shortly thereafter, Pilkington retained Aon as a consultant to assist Pilkington with the preparation of its insurance claim under the MSI policy. <u>See</u> Pl. Opp. at 5; Aon Consulting Agreement, annexed as Ex. G to Def. Mem.

Pilkington's then-general counsel contacted outside counsel Seth A. Tucker on March 3, 2017, to discuss the damage to the Ottawa plant as well as Pilkington's retention of Aon as a "claims consultant to help develop Pilkington's insurance claim." Tucker Decl. ¶ 4. Tucker avers that one of the purposes of the engagement was to "respond to MSI's coverage defenses

(and in particular, MSI's contention that the windstorm sublimit capped Pilkington's recovery at $15 million)." Id. ¶ 6.

The agreement contemplated that Aon would assist with "the settlement of any claims, including subrogation or other litigation support" and would offer expert testimony, see Aon Consulting Agreement at 1, though the agreement provides that Pilkington "acknowledges that none of the Services provided by [Aon] are of a legal nature, unless separately negotiated," id. at 2. Tasks set out in the consulting agreement include visiting the Ottawa factory and quantifying the losses resulting from the tornado. See id. at 1. Many of the documents withheld as privileged involve instances where Pilkington's outside counsel was directly involved in communication with Aon. See, e.g., Privilege Log, annexed as Ex. D to Def. Mem., at line 32.

In response to Pilkington's claim under the insurance policy, MSI indemnified Pilkington for $15 million of its claimed losses but, citing the revised windstorm sublimit, denied coverage for any damages exceeding that amount. See Am. Comp. ¶ 41.

B. Procedural History

Pilkington's original complaint named both MSI and Aon and included claims of "intentional misrepresentation" against Aon. See Complaint, filed Sept. 6, 2018 (Docket # 1) ("Comp."), ¶¶ 130-37. The claims against MSI were based on MSI's revising the insurance policy to reduce the availability of coverage for certain windstorms, see id. ¶¶ 100-23, and the claims against Aon are based on its allegedly improper advice to Pilkington to accept these revisions without informing Pilkington of their full impact, see id. ¶¶ 124-59. Following motions to dismiss filed by Aon and MSI, the district court permitted Pilkington to maintain claims against Aon consisting of breach of contract, negligence, and breach of fiduciary duty, and against MSI for declaratory relief and for breach of the implied duty of good faith and fair

dealing.  See Opinion & Order of October 30, 2019 (Docket # 64); Opinion & Order of May 18, 2020 (Docket # 108).

On February 16, 2022, MSI filed the instant motion seeking to compel Pilkington to produce documents created by Pilkington and Aon pursuant to Aon's performance of claim preparation services from March 2017 to August 2017.  See Def. Mem. at 1.

## II.  LEGAL STANDARD

"Federal law governs the applicability of the work-product doctrine in all actions in federal court."  Wultz v. Bank of China Ltd., 304 F.R.D. 384, 393 (S.D.N.Y. 2015); accord Egiazaryan v. Zalmayev, 290 F.R.D. 421, 435 (S.D.N.Y. 2013).  The work product doctrine is codified in Rule 26 of the Federal Rules of Civil Procedure, which provides that a party is not entitled to obtain discovery of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" unless the party makes a showing of substantial need "and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3).  The purpose of the doctrine is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."  United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)).  As the Supreme Court has noted, "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial.  It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself."  United States v. Nobles, 422 U.S. 225, 238-39 (1975); accord Universal Standard Inc. v. Target Corp., 331 F.R.D. 80, 93

(S.D.N.Y. 2019) ("The work product doctrine protects materials prepared not only by attorneys but also by their agents.").

The party claiming work product protection has the burden of establishing that it applies. See In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d 379, 384 (2d Cir. 2003). To qualify for protection, it must be shown that the material at issue "(1) [is] a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative." Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 173 (S.D.N.Y. 2008) (internal quotation marks and citation omitted). "Documents prepared in the ordinary course of business, or that would have been created whether or not litigation was anticipated, are not protected by work-product immunity." In re Copper Mkt. Antitrust Litig., 200 F.R.D. 213, 221 (S.D.N.Y. 2001) (citing Adlman, 134 F.3d at 1202). However, "[d]ocuments prepared in anticipation of litigation are work product, even when they are also intended to assist in business dealings." Schaeffler v. United States, 806 F.3d 34, 43 (2d Cir. 2015). "In anticipation of litigation" means that "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Adlman, 134 F.3d at 1202.

"Unlike the rule for the attorney-client privilege, the protection afforded work product is not waived merely because the material is disclosed to a third party." Bank of Am., N.A. v. Terra Nova Ins. Co., 212 F.R.D. 166, 169 (S.D.N.Y. 2002). However, "[a] party waives the work product protection by taking actions inconsistent with . . . its purpose, such as disclosing work product to its adversary, or by placing privileged documents 'at issue' in a litigation." N.Y. Times Co. v. United States Dep't of Just., 939 F.3d 479, 494 (2d Cir. 2019). "Just as the party seeking to assert a claim of privilege bears the burden of establishing the existence of the

privilege, that same party has the burden of establishing nonwaiver." Granite Partners, L.P. v. Bear, Stearns & Co., 184 F.R.D. 49, 54 (S.D.N.Y. 1999).

MSI challenges whether the material at issue qualifies as work product. Because we find that Pilkington waived any work product protection by sharing the documents with Aon, it is not necessary to reach this issue.

III. DISCUSSION

MSI's first argument in support of waiver is a simple one: that Pilkington was adverse to Aon from the very moment the documents at issue were created, thus defeating any claim to work product protection. See Def. Mem. at 8-10. MSI notes that if Pilkington anticipated litigation against MSI at the time the documents were created, it necessarily anticipated litigation against Aon at the same point, since Aon acted as the broker for the policy that Pilkington now claims contained inadequate coverage for windstorms. See id. at 9 ("there is no reasonable scenario in which Pilkington could have concluded there was a substantial probability of litigation against MSI but not against its sophisticated broker, Aon"). This claimed potential adverseness of course came to fruition inasmuch as Pilkington ultimately filed a complaint alleging that Aon intentionally misrepresented the terms of the policy, see Comp. ¶¶ 130-37 — a claim the district court construed as alleging "fraudulent misrepresentation," Opinion & Order of October 30, 2019 at 28.

As already noted, "[t]he work product privilege is not automatically waived by any disclosure to third persons." In re Pfizer Inc. Sec. Litig., 1993 WL 561125, at *6 (S.D.N.Y. Dec. 23, 1993). Instead, "courts find that the work-product privilege is waived only if disclosure to the third party 'substantially increases the opportunity for potential adversaries to obtain the information.'" Cellco P'ship d/b/a Verizon Wireless v. Nextel Commc'n, Inc., 2004 WL

1542259, at *1 (S.D.N.Y. July 9, 2004) (quoting In re Grand Jury Subpoenas Dated Dec. 18, 1981 and Jan. 4, 1982, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982)); accord Rockwell Int'l Corp. v. U.S. Dep't of Justice, 235 F.3d 598, 605 (D.C. Cir. 2001); Merrill Lynch & Co. v. Allegheny Energy, Inc., 229 F.R.D. 441, 445 (S.D.N.Y. 2004). And, obviously, "voluntary disclosure of work product to an adversary waives the privilege as to other parties." In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993).

In keeping with this case law, "courts have found parties to have waived protection of the doctrine by voluntarily submitting documents to potential adversaries." United States v. Stewart, 287 F. Supp. 2d 461, 468 (S.D.N.Y. 2003).

In determining whether a disclosure constitutes waiver, courts look to the nature of the information for which protection is sought and its connection to the relationship between the party and the entity to whom it discloses information. See United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 315 F.R.D. 103, 113 (D.D.C. 2016) (finding waiver where "the IRS could be an adversary in precisely the sort of litigation contemplated in Claimant's work product."). Thus, in United States v. Deloitte LLP, 610 F.3d 129 (D.C. Cir. 2010), the court held that Dow Chemical had not waived work product protection over documents it had provided to Deloitte, its independent auditor. Id. at 140-41. The court focused not on "whether Deloitte could be Dow's adversary in any conceivable future litigation, but whether Deloitte could be Dow's adversary in the sort of litigation the [withheld] Documents address." Id. at 140. Because the withheld documents "would not likely be relevant in any dispute Dow might have with Deloitte," Deloitte was not "a potential adversary for purposes of waiver analysis." Id.

Here, it is uncontested that the withheld documents relate to the very issue contested in this litigation: the coverage provided by MSI's insurance policy. Indeed, the privilege log

indicates that many of the withheld documents relate to discussions between Aon and Pilkington regarding the windstorm sublimit, the primary subject of the instant action. Thus, the potential existed that Pilkington could sue Aon "on the very issues raised in" the withheld documents. Julius Baer, 315 F.R.D. at 113. As reflected in Pilkington's amended complaint, Pilkington's position is that Aon helped facilitate MSI's requests to modify the windstorm sublimit, that Aon advised Pilkington regarding the effects of the proposed modifications, and that Aon acted "as an intermediary between MSI and Pilkington," and "advised Pilkington on the scope and terms of coverage." Am. Comp. ¶ 24. Pilkington contends that "Aon understood that the Pilkington employees with whom the Aon brokers interacted did not have insurance expertise, and that Pilkington relied on Aon for guidance with respect to policy changes and renewals." Id. ¶ 27. Pilkington knew Aon had a contractual obligation to "review with [Pilkington] about the benefits and terms and conditions of insurance contracts." Id. ¶ 33. Because Pilkington knew of Aon's responsibility to advise Pilkington on agreeing to the sublimit, there was obviously a "potential" from the very beginning of Pilkington's consultation with Aon that Aon's conduct could be found lacking and that it could become an adversary.

This conclusion is bolstered by the fact that on April 26, 2017, Pilkington's counsel sent Pilkington a presentation entitled "PNA-MSI-Aon Litigation Strategy," see Supplemental Privilege Log, annexed as Ex. E to Def. Mem., at line 2, indicating that Pilkington anticipated litigation against both Aon and MSI during the period when the withheld documents were being created. Tellingly, Pilkington, which has the burden of proving that it did not waive work product protection, see Granite Partners, L.P., 184 F.R.D. at 54, has not provided sworn testimony from anyone with personal knowledge that describes Pilkington's actual views regarding the possibility that Pilkington would seek to hold Aon responsible for the sublimit

change.  More to the point, Pilkington has not submitted any sworn testimony that it did not view Aon as a potential adversary.  In the absence of such evidence, and in light of the evidence of Aon's critical role in obtaining the coverage at issue, we cannot find that Pilkington saw no potential for Aon to become its adversary with respect to the insurance dispute.  As was true in United States v. Mass. Inst. of Tech., 129 F.3d 681 (1st Cir. 1997), which found a waiver of work product when materials were disclosed to a government agency, even if Pilkington "hoped that there would be no actual controversy between it and [Aon], . . . the potential for dispute and even litigation was certainly there."  Id. at 687."

Accordingly, Pilkington has not met its burden of proving that it should not have regarded Aon as a "potential adversary," id., at the time Aon was acting as its consultant.  This case is thus far afield of cases, such as those involving auditors and public relations consultants, where there was "no conceivable scenario," Regions Fin. Corp. v. United States, 2008 WL 2139008, at *8 (N.D. Ala. May 8, 2008), that the disclosing party would engage in litigation with the party receiving the work product.  To the contrary, litigation against Aon was a likely outcome as soon as Pilkington learned that the policy Aon had brokered contained, as Pilkington puts it, "an abnormal windstorm sublimit."  Pl. Opp. at 10.

Pilkington notes that the consulting agreement contains provisions preserving the confidentiality of information exchanged pursuant to the agreement.  See Pl. Opp. at 15-16; Aon Consulting Agreement at 3-4.  In the typical case, involving documents given by a party to a non-party, the existence of a confidentiality agreement may be strong proof that the party was making appropriate efforts to keep the documents from potential adversaries.  See, e.g., Egiazaryan v. Zalmayev, 290 F.R.D. 421, 437 (S.D.N.Y. 2013) (expectation of confidentiality arose from confidentiality clause in retainer agreement with public relations firm); In re Nat. Gas

Commodity Litig., 2005 WL 1457666, at *8-9 (S.D.N.Y. June 21, 2005) ("defendants had explicit written confidentiality and non-waiver agreements with the governmental agencies"); Maruzen Co. v. HSBC USA, Inc., 2002 WL 1628782, at *1 (S.D.N.Y. July 23, 2002) (same); see also Deloitte, 610 F.3d at 141-42 ("a reasonable expectation of confidentiality may be rooted in a confidentiality agreement or similar arrangement between the disclosing party and the recipient."). Here, however, we have the unusual situation where the confidentiality agreement was between Pilkington and the potential adversary itself. As a result, the confidentiality agreement did absolutely nothing to prevent the work product from falling into the hands of the potential adversary. The fact that Aon was restricted from making further disclosure by the agreement is of no moment since Aon, the potential adversary, already had possession of the work product.

      Pilkington notes that it shares a "common interest" with Aon: namely, ensuring that Pilkington gets its expected payment from MSI. See Pl. Opp. at 13-14. Pilkington thus points to case law holding that "where the disclosing party and the third party share a common interest, there is no waiver of the work product privilege," Merrill Lynch, 229 F.R.D. at 446. See Pl. Opp. at 13-14. But the cases cited by Pilkington stand for the unremarkable proposition that where parties share a common interest, disclosure of work product will not constitute a waiver because the disclosure does not "substantially increase[] the opportunity for potential adversaries to obtain the information." Am. Eagle Outfitters, Inc. v. Payless ShoeSource, Inc., 2009 WL 3786210, at *3 (E.D.N.Y. Nov. 12, 2009) (citation omitted). That scenario does not apply where the party that shares a common interest with the party asserting privilege is itself a potentially adverse party.

In sum, the "common interest" analysis is not a separate doctrine from waiver that nullifies the waiver that normally occurs when a party provides work product to a potential adversary. Rather, the "common interest" analysis in the context of work product waiver is a means to determine whether the party receiving work product "should be conceived of as an adversary or a conduit to a potential adversary." Merrill Lynch, 229 F.R.D. at 447. Certainly, at the time of the disclosure, Pilkington and Aon had a common interest in getting Pilkington out of the sublimit claimed by MSI. But at the same time, Aon was plainly a potential adversary when it was being supplied with Pilkington's work product. If accepted, Pilkington's common interest argument would mean that even today, during this litigation, Pilkington and Aon could freely share work product without waiver given that they share a common interest in eliminating the sublimit — at the same time Pilkington is suing Aon for tens of millions of dollars. See Am. Comp. ¶¶ 1, 2, 147. Any such outcome, however, is inconsistent with the bar on protecting work product shared with an adversary or potential adversary. See Lugosch v. Congel, 219 F.R.D. 220, 240 (N.D.N.Y. 2003) ("common interest" analysis requires that the disclosure "is not inconsistent with maintaining secrecy from their adversary").[2]

Because Pilkington waived work product protection by disclosing work product to Aon, it also waived that protection as to MSI. "The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of

---

[2] In Pascuiti v. New York Yankees, 1999 WL 983882 (S.D.N.Y. Oct. 29, 1999), cited by Pilkington, no waiver was found where two co-defendants shared documents even though one defendant had filed a cross-claim against the other. The court found that the parties were not adversarial notwithstanding the cross-claim because the cross-claim sought damages only if one defendant was found liable. Id. at *2 n.3. Here, of course, there is no contingency attached to Pilkington's effort to extract damages from Aon. As Merrill Lynch notes, common interest cases "turn on their facts," 229 F.R.D. at 446, and we have no trouble concluding that both now and at the time the work product was shared, Pilkington and Aon had powerful and overriding adverse interests in addition to any common interest in eliminating the sublimit.

confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit." Permian Corp. v. United States, 665 F.2d 1214, 1221 (D.C. Cir. 1981); see Steinhardt, 9 F.3d at 235 (noting the extension of the reasoning of Permian to the work product doctrine). We also observe that a finding that Pilkington had not waived the privilege here would place MSI in the unusual position of participating in litigation with two entities who, although opposed, share possession of relevant evidence unavailable to MSI. The work product "doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system." Nobles, 422 U.S. at 238. Permitting a plaintiff and a defendant to access documents that a co-defendant may not see would be contrary to the purpose of the work product doctrine.

IV. CONCLUSION

For the foregoing reasons, MSI's motion to compel (Docket # 296) is granted. Pilkington shall produce the documents at issue within 7 days.

SO ORDERED.

Dated: April 5, 2022

New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge